# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 22, 2014         Decided June 12, 2015

No. 11-1324

ALI HAMZA AHMAD SULIMAN AL BAHLUL,
PETITIONER

v.

UNITED STATES OF AMERICA,
RESPONDENT

On Petition for Review from the
United States Court of Military Commission Review

*Michel Paradis*, Counsel, Office of the Chief Defense Counsel, argued the cause for petitioner. With him on the briefs were *Mary R. McCormick*, Counsel, and Major *Todd E. Pierce*, JA, U.S. Army (Ret.).

*Jeffrey T. Renz* was on the brief for *amici curiae* First Amendment Scholars and Historians and The Montana Pardon Project in support of petitioner.

*Agnieszka M. Fryszman* was on the brief for National Institute of Military Justice as *amicus curiae* in support of petitioner.

*McKenzie A. Livingston* was on the brief for *amici curiae* Robert D. Steele and other former members of the Intelligence

Community in support of petitioner.

*Robert Barton* and *Thomas J. McIntosh* were on the brief for *amicus curiae* Professor David W. Glazier in support of petitioner.

*Jonathan Hafetz* was on the brief for *amici curiae* Asian American Legal Defense and Education Fund, et al., in support of petitioner.

*John F. De Pue*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Steven M. Dunne*, Chief, Appellate Unit, and *Joseph Palmer*, Attorney. *Francis A. Gilligan*, Office of Military Commission, *Lisa O. Moreno* and *Jeffrey M. Smith*, Attorney, U.S. Department of Justice, entered appearances.

*James A. Schoettler Jr.* was on the brief for *amici curiae* Former Government Officials, et al., in support of respondent.

Before: HENDERSON, ROGERS, and TATEL, *Circuit Judges*

Opinion for the Court by *Circuit Judge* ROGERS

Concurring opinion by *Circuit Judge* TATEL

Dissenting opinion by *Circuit Judge* HENDERSON

ROGERS, *Circuit Judge*: Pursuant to the Military Commissions Act of 2006, 10 U.S.C. §§ 948a *et seq.* ("2006 MCA"), a law of war military commission convened at Guantanamo Bay, Cuba, found Ali Hamza Ahmad Suliman al Bahlul guilty of material support for terrorism, solicitation of others to commit war crimes, and inchoate conspiracy to commit war crimes. The court, sitting *en banc*, vacated Bahlul's

convictions for material support and solicitation as violative of the *Ex Post Facto* Clause of the U.S. Constitution, *see Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014), and remanded Bahlul's remaining challenges to his conspiracy conviction to the original panel, *see id.* at 31. Bahlul contends that his inchoate conspiracy conviction must be vacated because: (1) Congress exceeded its authority under Article I, § 8 of the Constitution by defining crimes triable by military commission that are not offenses under the international law of war; (2) Congress violated Article III of the Constitution by vesting military commissions with jurisdiction to try crimes that are not offenses under the international law of war; (3) the government put his thoughts, beliefs, and ideas on trial in violaton of the First Amendment of the Constitution; and (4) the 2006 MCA discriminates against aliens in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

Because Bahlul's challenges include a structural objection under Article III that cannot be forfeited, *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986), we review that challenge *de novo*, and we conclude, for the following reasons, that his conviction for inchoate conspiracy must be vacated.

## I.

Bahlul contends that the jurisdiction of law of war military commissions is, under the Constitution, limited to offenses under the international law of war, and thus that Congress has encroached upon the Article III judicial power by authorizing Executive Branch tribunals to try the purely domestic crime of inchoate conspiracy. As a threshold matter, the government maintains that Bahlul has forfeited the Article III challenge, having failed to raise the argument at his trial before the military commission. Bahlul's challenge, however, presents a structural

violation of Article III and is not waivable or forfeitable.

The Supreme Court held in *Schor* that an Article III structural claim of encroachment on the judicial power was not subject to waiver. *Id.* at 850–51. The Court explained that "Article III, § 1, not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves as an inseparable element of the constitutional system of checks and balances." *Id.* at 850 (internal quotation marks omitted). Further, the Court explained, it "safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby prevent[s] 'the encroachment or aggrandizement of one branch at the expense of the other.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)) (alterations and some internal quotation marks omitted). The Court held:

> To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2. When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.

*Id.* at 850–51 (internal citation omitted). As a result, even though Schor had consented to adjudication of his state-law claim by an Article I tribunal, *see id.* at 849–50, the Supreme Court analyzed his structural challenge *de novo*, *see id.* at 851–57.

The Court reaffirmed *Schor*'s analysis in *Plaut v. Spendthrift Farm, Inc*., 514 U.S. 211 (1995), explaining that it was consistent with a rule that although *res judicata* claims were waivable, courts had discretion to excuse the waiver. *See id.* at 231–32. Accordingly, this court, as well as every other circuit court to address the issue, has held that under *Schor* a party "*could not . . .* waive his 'structural' claim" under Article III. *Kuretski v. Comm'r of Internal Revenue Serv.*, 755 F.3d 929, 937 (D.C. Cir. 2014) (emphasis added); *see In re BP RE, L.P.*, 735 F.3d 279, 287–90 (5th Cir. 2013); *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 769 (7th Cir. 2013) (*rev'd on other grounds*); *Waldman v. Stone*, 698 F.3d 910, 917–18 (6th Cir. 2012). Most recently, in *Wellness International Network, Ltd. v. Sharif*, No. 13-935 (U.S. May 26, 2015), the Supreme Court again confirmed that "*Schor* forbids [] using consent to excuse an actual violation of Article III." *Id.*, slip op. at 14 n.10; *see id.* at 9, 11–12; *accord id.* at 12 (Roberts, C.J., dissenting).

Of course, the issue before us is not waiver but forfeiture. *See generally United States v. Olano*, 507 U.S. 725, 733–34 (1993). The Supreme Court's analysis of waiver in *Schor* applies to forfeiture as well. There, the Court rejected waiver of Article III § 1 claims "for the same reason" that parties cannot waive Article III § 2 jurisdictional limitations, 478 U.S. at 851, which are not subject to forfeiture, *see United States v. Cotton*, 535 U.S. 625, 630 (2002). The Court cited *United States v. Griffin*, 303 U.S. 226, 229 (1938), where it had addressed *de novo* a subject-matter jurisdiction challenge that the defendants had failed to raise in the district court. In *Schor*, the Court explained that the analogy stems from the fact that both "Article III limitations . . . serve institutional interests that the parties cannot be expected to protect." 478 U.S. at 851. As four Justices observed in *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991), "[i]t is clear from our opinion in *Schor* that we had the analogy to Article III subject-matter jurisdiction in

mind." *Id.* at 897 (Scalia, J., joined by O'Connor, Kennedy, and Souter, JJ., concurring in part and concurring in the judgment). Likewise in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the Court analyzed *de novo* a structural Article III challenge to a bankruptcy court's jurisdiction even though that challenge had not been raised in the bankruptcy court. *Id.* at 2601–02, 2608–20. Again in *Sharif*, the Court reviewed the structural Article III issue *de novo*, even though the claim had not been raised in the bankruptcy court *or* the district court. *See Sharif*, No. 13-935, slip op. at 6, 12–15. We therefore hold that under *Schor*'s analysis, Bahlul's structural challenge under Article III is not subject to forfeiture.

Such searching, *de novo* review is appropriate because Bahlul's Article III challenge implicates the power of the political branches to sideline the federal courts. "Trial by military commission raises separation-of-powers concerns of the highest order." *Hamdan v. Rumsfeld*, 548 U.S. 557, 638 (2006) (Kennedy, J., concurring in part). "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts . . . ." *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality op.). The government has conceded, in light of *Schor*, that to the extent Bahlul raises a structural challenge, it is subject to *de novo* review. *See* Appellee's Br. 50; Oral Arg. Tr. 29, 30. It mistakenly suggests, however, that Bahlul's Article III challenge asserts only his personal right to a jury trial, which is subject to forfeiture and thus plain error review. *See* Appellee's Br. 49–50. This ignores Part II of Bahlul's brief where he discusses the "judicial power" and relies on Article III structural precedent of the Supreme Court in maintaining that "[t]his [c]ourt must be sure that the political branches are not seeking to 'chip away at the authority of the Judicial Branch . . . . 'Slight encroachments create new boundaries from which legions of power can seek new territory to capture.'" Appellant's Br. 27 (quoting *Stern*, 131 S. Ct. at 2620 (quoting *Reid*, 354 U.S. at 39 (plurality op.)));

*see id.* at 27–37; Reply Br. 20.

Our dissenting colleague misreads *Schor* in maintaining that its holding, quoted above, does not speak to waivability or forfeitability at all. Dis. Op. 11–18. To the contrary, the Supreme Court, at that point in its opinion, was addressing the distinction between the waivability of the right component and the structural component of Article III § 1, and concluded that only the former was waivable. *See Schor*, 478 U.S. at 848–51. The Court reiterated that distinction in *Sharif*, No. 13-935, slip op. at 9, 11–12, and emphasized that *Schor* "forbids" waiver of the latter, *id.* at 14 n.10. The dissent suggests that *Schor*'s non-waiver holding applies only to substantive rights, not arguments. *See* Dis. Op. 17–19. But the analysis in *Schor* applied to both "consent *and* waiver," 478 U.S. at 851 (emphasis added), and later Supreme Court precedent confirms that *Schor*'s non-waiver holding applies to "defense[s]," "doctrine[s]," "challenge[s]," and "claim[s]," not just rights, *Plaut*, 514 U.S. at 231–32. Indeed, the discussion in *Plaut* about excusing waiver in the *res judicata* context would make little sense if waiver meant there was no violation in the first place. *See id.* at 231. Under *Schor* and *Sharif*, parties can waive neither a separation-of-powers violation nor a separation-of-powers challenge. Our colleague also confuses *Sharif*'s analysis by conflating the individual right and the structural interest protected by Article III § 1. *See* Dis. Op. 14–17. Each acknowledgment of waivability in the Court's opinion refers to the individual right. *See Sharif*, No. 13-935, slip op. at 2, 9, 11, 12–13, 17, 19 & n.13. By contrast, each time the Court discussed the distinction, it made clear that the structural interest, unlike the individual right, is not subject to waiver. *Id.* at 9, 11–12, 14 n.10. The Court explained that it could "not rely on Sharif's consent to 'cure'" an "actual" separation-of-powers violation, but simply treated his consent as relevant to the merits question of whether "such violation has occurred" in the first place. *Id*. at 14 n.10 (alteration omitted).

Our dissenting colleague also misinterprets *Sharif* to suggest that structural Article III claims can be forfeited. *See* Dis. Op. 15–16. Having decided the structural question *de novo*, the Court remanded two questions: Whether Sharif had in fact consented to adjudication by the bankruptcy court, and if so, whether he had forfeited his *right* to adjudication by an Article III judge by failing to raise an Article III objection in the district court. *Sharif*, No. 13-935, slip op. at 6, 20. The reference to forfeiture is unremarkable. If the Seventh Circuit on remand finds that Sharif consented, then all that is left for the Seventh Circuit to decide is Sharif's *personal* right claim, and it has always been clear that individual rights — even individual Article III rights — are subject to forfeiture. The Court resolved the structural issue *de novo* without regard to any possible forfeiture. Even the Justice who was certain that Sharif had forfeited his constitutional claim thought it proper to resolve the structural Article III issue *de novo*. *See id.* at 1–2 (Alito, J., concurring in part and concurring in the judgment). Indeed, the Court tied its remand instruction to the contentions in the petitioners' brief, *see id.* at 20, which acknowledged there are some Article III claims that "raise 'structural' concerns that litigants may not waive or forfeit." Br. for Pet'rs Wellness Int'l, *et al.* 52.

Our analysis would not change even if, as the dissent maintains, the Court in *Schor* had instructed that courts should excuse waivers of Article III structural claims, instead of holding that such claims were unwaivable. *See* Dis. Op. 12–13, 19. The Article III challenge in Bahlul's case goes to the heart of the judiciary's status as a coordinate branch of government. Our colleague's focus on the fact that Bahlul is "concededly — and unapologetically — guilty of the charged offenses," *id.* at 25, is a red herring. To excuse forfeiture would not be for the purpose of protecting an individual defendant, but to "safeguard[] the role of the Judicial Branch in our tripartite system." *Schor*, 478 U.S.

at 850. The court would vindicate "the *federal judiciary*'s strong interest[s]," *Kuretski*, 755 F.3d at 937 (emphasis added), not merely Bahlul's. Any disruption to normal appellate process, *see* Dis. Op. 20–22, 22 n.8, is "plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers" under Article III. *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962). To the extent the dissent insists that this court lacks the power to excuse forfeiture, *see* Dis. Op. 19–20; *contra Nguyen v. United States*, 539 U.S. 69, 80 (2003), it relies on precedent applying Federal Rule of Criminal Procedure 52(b), which "governs on appeal from criminal proceedings . . . in district court," *Olano*, 507 U.S. at 731; *see* Fed. R. Crim. P. 1 Advisory Comm. Note ("[T]hese rules are intended to govern proceedings in criminal cases triable in the United States District Court."), whereas Bahlul is appealing the decision of the Court of Military Commission Review, and the statute governing such appeals, *see* 10 U.S.C. § 950g, contains none of the limitations the dissent labors to establish. The United States Court of Appeals for the Armed Forces has rejected the same argument in the court-martial context, affirming the decision of a lower tribunal to excuse forfeiture and conducting its own review *de novo*. *See United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001); 10 U.S.C. § 950f(d).

We turn to the merits of Bahlul's structural Article III challenge to his conspiracy conviction.

## II.

"Article III, § 1, of the Constitution mandates that '[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.'" *Stern*, 131 S. Ct. at 2608. Section 2, clause 1, provides that "[t]he judicial Power

shall extend" to, among others, "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority" and "to Controversies to which the United States shall be a Party." These cases and controversies include criminal prosecutions. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 15 (1955); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 121 (1866). Article III § 2 requires that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." U.S. CONST. art. III, § 2, cl. 3. The Supreme Court, based on the text of Article III and its own precedent, has continued to reaffirm that

> Article III is an inseparable element of the constitutional system of checks and balances that both defines the power and protects the independence of the Judicial Branch. Under the basic concept of separation of powers that flows from the scheme of a tripartite government adopted in the Constitution, the "judicial Power of the United States" can no more be shared with another branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.

*Stern*, 131 S. Ct. at 2608 (alterations and some internal quotation marks omitted) (quoting U.S. CONST. art. III, § 1).

If a suit falls within the judicial power, then "the responsibility for deciding that suit rests with Article III judges in Article III courts." *Id*. at 2609. There are limited exceptions: Congress may create non-Article III courts to try cases in the District of Columbia and U.S. territories not within a state. *See Palmore v. United States*, 411 U.S. 389, 390–91 (1973); *American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 546 (1828). It may assign certain criminal prosecutions to courts

martial, *see Dynes v. Hoover*, 61 U.S. (20 How.) 65, 79 (1857), and military commissions, *see Ex parte Quirin*, 317 U.S. 1, 46 (1942). And it may assign to administrative agencies the adjudication of disputes involving "public rights" stemming from federal regulatory programs. *See Stern*, 131 S. Ct. at 2610; *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855). There are three types of military commissions. *See, e.g.*, *Hamdan*, 548 U.S. at 595–98 (plurality op.), 683 (Thomas, J., dissenting). Bahlul was tried by a law of war military commission, *Bahlul*, 767 F.3d at 7, so the question is whether conspiracy falls within the Article III exception for that type of commission.

## A.

The Supreme Court addressed the contours of the exception to Article III for law of war military commissions in the seminal case of *Ex parte Quirin*, 317 U.S. 1 (1942). There, Nazi soldiers found out of uniform in the United States during World War II were convicted of sabotage and other offenses by a law of war military commission. They challenged their convictions on the ground that Article III guaranteed them a right to trial by jury in civil court. The Supreme Court held that the law of war military commission had jurisdiction to try "offense[s] against the law of war," of which sabotage was one. *Id.* at 46. The Court explained that Article III § 2 was intended

> to preserve unimpaired trial by jury in all those cases in which it had been recognized by the common law and in all cases of a like nature as they might arise in the future, but not to bring within the sweep of the guaranty those cases in which it was then well understood that a jury trial could not be demanded as of right.

*Id.* at 39 (citation omitted). Given this "long-continued and

consistent interpretation," the Court stated "that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts." *Id.* at 40. "[S]ince the founding of our government" and continued in the Articles of War, Article III has been construed "as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces." *Id.* at 41.

In *Quirin*, the Supreme Court described the law of war as a "branch of international law," 317 U.S. at 29, and defined "the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals." *Id.* at 27–28. The Court stated that Congress had

> exercised its authority to define and punish offenses against the law of nations by sanctioning . . . the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.

*Id.* at 28. In addition to international precedents, *see id.* at 30 n.7, 31 n.8, 35 n.12, the Court also considered domestic precedents (during the American Revolution, the War of 1812, and the Mexican and Civil Wars, *see id.* at 31 nn.9 & 10, 42 n.14), but only as potential limits on the law of war. The Court explained:

> We may assume that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be

> triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.

*Id*. at 29 (citing, as an example of the latter, *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866)). Thus, "our courts" may recognize fewer law of war offenses than other countries' courts, whether because they disagree about the content of international law or because of independent constitutional limitations. In the same vein, the Supreme Court recognized that Congress had "adopt[ed] the system of common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts." *Id.* at 30. The Court in *Hamdan* likewise treated "the American common law of war" as a source of constraint, not expansion. 548 U.S. at 613.

The Supreme Court has adhered to *Quirin*'s understanding of the meaning of the "law of war" for over seventy years. In *Application of Yamashita*, 327 U.S. 1 (1946), the Court reaffirmed *Quirin*'s "governing principles," *id*. at 9, and its statement that Congress had exercised its power to "define and punish Offenses against the Law of Nations, of which the law of war is a part," *id.* at 7 (alterations omitted) (citing U.S. CONST. art. I, § 8, cl. 10). The Court held that the offenses there, stemming from the commanding general's breach of duty to protect civilian populations and prisoners of war against atrocities committed by troops under his command, were "recognized in international law as violations of the law of war." *Id.* at 14. To determine the content of the law of war, the Court looked to international sources, *id.* at 14–16, and it concluded that those sources alone "plainly imposed on petitioner . . . an affirmative duty" that he had violated. *Id.* at 16. Having established that the charged offenses were violations of the international law of war, the Court mentioned two domestic field

orders, but only to confirm domestic recognition of the duty imposed by the Hague and Geneva Conventions. *See id.* at 16 & n.3. Again, in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Supreme Court looked only to international law sources to determine whether the charged offense, "[b]reach of the terms of an act of surrender," was a "war crime." *Id.* at 787–88 & n.13. More recently, in *Hamdan*, the Supreme Court reaffirmed *Quirin*'s principle that the "law of war" means "the body of international law governing armed conflict." 548 U.S. at 641 (Kennedy, J., concurring in part); *id.* at 603 (plurality op.) (quoting *Quirin*, 317 U.S. at 30, 35–36).

The Supreme Court's reason in *Quirin* for recognizing an exception to Article III — that international law of war offenses did not entail a right to trial by jury at common law, 317 U.S. at 40–41 — does not apply to conspiracy as a standalone offense. The Court in *Quirin* held that the international law of war offense of unlawful belligerency was triable by law of war military commissions. 317 U.S. at 36, 46. Although the Court had no occasion to speak more broadly about whether other offenses came within the Article III exception, its reasoning precludes an Article III exception for conspiracy, which did entail a right to trial by jury at common law. In *Callan v. Wilson*, 127 U.S. 540 (1888), cited in *Quirin*, 317 U.S. at 39, the Court pointed to authorities "sufficient to show" that "the nature of the crime of conspiracy at common law . . . [was] an offense of a grave character, affecting the public at large," such that a person so charged could not be tried without a jury, *see Callan*, 127 U.S. at 556. The reasoning in *Quirin* also counsels against expanding the exception beyond international law of war offenses. Stating that "[f]rom the very beginning of its history th[e] Court has recognized and applied the law of war as [being] part of the law of nations," *Quirin*, 317 U.S. at 27, the Court explained that some offenses may not be triable by military commission because "they are not recognized by our courts as

violations of the law of war," *id.* at 29.  No subsequent Supreme Court holding suggests that law of war military commissions may exercise jurisdiction over offenses not recognized by the "law of war" as defined in *Quirin*.

**B.**

The parties agree that Bahlul was tried by a law of war military commission that had jurisdiction to try charges for offenses against the law of war as defined in *Quirin*.  The government concedes that conspiracy is not a violation of the international law of war.  *See* U.S. Appellee's Br. to the *En Banc* Court at 34 (July 10, 2013).  The question, therefore, is whether a law of war military commission may try *domestic* offenses — specifically conspiracy — without intruding on the judicial power in Article III.

The government insists that the Article III exception identified in *Quirin* is not limited to international law of war offenses because "the sabotage offense at issue in *Quirin* — which the Court viewed as akin to spying — is not and has never been an offense under the international law of war."  Appellee's Br. 54.  Yet the Supreme Court in *Quirin* concluded otherwise.  It looked to "authorities on International Law" who "regarded as war criminals" saboteurs who passed behind enemy lines without uniform.  317 U.S. at 35 & n.12.  It relied on international sources to establish that the offense was recognized "[b]y universal agreement and practice."  *Id.* at 30 & n.7, 31 n.8, 35 n.12.  And it quoted language from early statutes and military tribunal proceedings where spying was identified as punishable by military tribunal under the "law and usage of nations."  *Id.* at 31 n.9, 41.  The government points to scholarly criticism of the Court's conclusion, *see* Appellee's Br. 32, but this court is bound by the Supreme Court's analysis in *Quirin*, which was premised on sabotage being an international offense.  *See Quirin*, 317 U.S. at 35–36.

Alternatively, the government maintains that even if *Quirin* did not extend the Article III exception to domestic offenses, historical practice demonstrates that it has been so extended. *See* Appellee's Br. 20, 31–39. The Supreme Court, however, when relying on historical practice to analyze the separation of powers, has required much more evidence of a settled tradition than the government has identified. For instance, in *Myers v. United States*, 272 U.S. 52, 175 (1926), the Court held, upon reviewing more than seven decades in which Presidents had continuously removed Executive Branch officers without congressional involvement, that Congress lacked authority to restrict the President's removal power. In *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), the Court rejected, in view of an "unbroken legislative practice which has prevailed almost from the inception of the national government to the present day," the argument that a joint resolution of Congress authorizing the President to determine whether to embargo the sale of arms and munitions to belligerents in a foreign war was an unlawful delegation of legislative power. *Id.* at 322. Recently, in *National Labor Relations Board v. Noel Canning*, 134 S. Ct. 2550 (2014), the Court defined the scope of the President's authority under the Recess Appointments Clause, U.S. CONST. art. II, § 2, cl. 3, based on a lengthy and dense historical practice. Upon identifying "thousands of intra-session recess appointments" and noting that "Presidents since Madison have made many recess appointments filling vacancies that initially occurred prior to a recess," *id.* at 2562, 2571, the Court concluded that the Clause authorized those types of appointments. By contrast, where the Court found only a handful of instances in which a President had made a recess appointment during an inter-session recess lasting less than ten days, the Court held that those recesses were "presumptively too short to fall within the Clause." *Id.* at 2567.

The history on which the government relies fails to

establish a settled practice of trying non-international offenses in law of war military commissions. The longstanding statutes conferring military jurisdiction over charges of spying and aiding the enemy do not, as the government maintains, demonstrate that domestic offenses come within the Article III exception. The Congresses that enacted those statutes viewed those offenses as punishable under the international law of war. The 1806 statute "imposed the death penalty on alien spies 'according to the law and usage of nations, by sentence of a general court martial.'" *Quirin*, 317 U.S. at 41 (quoting Act of Congress of Apr. 10, 1806, 2 Stat. 371). A 1776 Resolution adopted by the Continental Congress contained a nearly identical provision. *Id.* at 41 & n.13 (citing Edmund M. Morgan, *Court-Martial Jurisdiction over Non-Military Persons Under the Articles of War*, 4 Minn. L. Rev. 79, 107–09 (1920) (quoting Resolution of Aug. 21, 1776, 1 JOURNALS OF CONGRESS 450)). In 1865, the Attorney General of the United States, James Speed, concluded in a formal opinion that "to act as spy is an offence against the laws of war," and that "every lawyer knows that a spy was a well-known offender under the laws of war." *Military Commissions*, 11 Op. Att'y Gen. 297, 312, 313 (1865). The oft-cited William Winthrop, the "Blackstone of Military Law," *Hamdan,* 548 U.S. at 597 (plurality op.) (quoting *Reid,* 354 U.S. at 19 n.38 (plurality op.)), reached the same conclusion. *See* W. Winthrop, MILITARY LAW AND PRECEDENTS 769–70 (2d ed. 1920). Even authority relied upon by the government indicates that during the early Republic spies were considered "war criminals." *See* Appellee's Br. 31–32 (quoting 2 L. Oppenheim, INTERNATIONAL LAW 287 (4th ed. 1926)).

But even if spying and aiding the enemy were not international offenses, their historical pedigrees stand in marked contrast to that of conspiracy. Both of those offenses have been subject to military jurisdiction since the ratification of the Constitution. *See Quirin*, 317 U.S. at 41; Act of Apr. 10, 1806,

2 Stat. 359, 371.  Congress has reenacted the spying and aiding the enemy statutes on multiple occasions, *see, e.g.*, Act of June 4, 1920, Pub. L. No. 66-242, 41 Stat. 759, 804; Act of Aug. 29, 1916, Pub. L. No. 64-242, 39 Stat. 619, 663; Act of Mar. 3, 1863, 12 Stat. 731, 737, and scores of law of war military tribunals have tried the offenses, *see Quirin*, 317 U.S. at 42 n.14.  When analyzing separation-of-powers challenges, the Supreme Court has explained, "the practical construction of the [C]onstitution, as given by so many acts of [C]ongress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible with the supreme law of the land." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 691 (1892); *see Mistretta v. United States*, 488 U.S. 361, 401 (1989); *Stuart v. Laird*, 5 U.S. (1 Cranch) 299, 309 (1803).

The history of inchoate conspiracy being tried by law of war military tribunals is thin by comparison and equivocal at best.  The government has identified only a handful of ambiguous examples, and none in which an inchoate conspiracy conviction was affirmed by the Judicial Branch.  The examples are unpersuasive in themselves and insufficient to establish a longstanding historical practice.

First, although the charges against the Lincoln assassins referred to conspiracy, the specifications listed the elements of the completed offense.  *See* J. Holt & T. Ewing, CHARGE AND SPECIFICATION AGAINST DAVID E. HEROLD, ET AL. 3 (1865) (Petr.'s. Supp. App'x 77–78); *see also Hamdan*, 548 U.S. at 604 n.35 (plurality op.); *id.* at 609.  The Attorney General's formal opinion in 1865 described the charge as "the offence of having assassinated the President."  11 Op. Att'y Gen. at 297; *see id.* at 316–17.  At the time, it was unclear that conspiracy could even be charged separately from the object offense, once completed. *See Iannelli v. United States*, 420 U.S. 770, 781 & n.13 (1975)

(citing Hampton L. Carson, *The Law of Criminal Conspiracies and Agreements as Found in the American Cases*, *in* R. Wright, THE LAW OF CRIMINAL CONSPIRACIES AND AGREEMENTS 191 (1887)).  When Congress first enacted a conspiracy statute in 1867, the offense carried only a two-year penalty.  *See* Act of Mar. 2, 1867, 14 Stat. 471, 484.

Because of conspiracy's uncertain legal status at the time, the dissent's theory that "[t]he circumstances surrounding the Lincoln assassination" indicate that "the criminal defendants could *only* have been charged with conspiracy," Dis. Op. 62–63 (emphasis in original), is mere speculation, especially in view of the contrary contemporary analysis by the Attorney General.  *See* 11 Op. Att'y Gen. at 297, 316–17.  Moreover, Winthrop noted that the Lincoln assassins' tribunal was a mixed martial law and law of war military commission.  *See* W. Winthrop, MILITARY LAW AND PRECEDENTS, at 839 & n.5; *cf. id.* at 842.  The dissent appears to disagree with Winthrop (on whom it otherwise relies, *see* Dis. Op. 54, 59–61, 67) regarding the jurisdictional basis for the assassins' tribunal.  *Compare id.* at 63–64, *with* W. Winthrop, MILITARY LAW AND PRECEDENTS, at 839 & n.5.  The dissent further ignores Winthrop's explanation that conspiracy was a "civil crime" or "crime against society" and not a law of war offense.  W. Winthrop, MILITARY LAW AND PRECEDENTS, at 842.  Where Winthrop listed the law of war violations that had "principally" been charged in U.S. military commissions, conspiracy was not among them.  *See id.* at 839–40.  In response, the dissent cites *Milligan*, 71 U.S. at 127, for the proposition that military tribunals cannot exercise martial law jurisdiction unless the civil courts are closed, *see* Dis. Op. 64, even though *Milligan* was decided *after* the Lincoln assassins' prosecution.  The unreported district court opinion in *Ex parte Mudd*, 17 F. Cas. 954 (1868), hardly strengthens the dissent's position, *see* Dis. Op. 64 n.21; the district court described the offense as "assassination" and only used "conspiracy" in the same terms as

the charging document, while distinguishing *Milligan* based on the state of war in the Capital, not based on the nature of the offense. *Mudd*, 17 F. Cas. at 954.

Second, although the charges against the Nazi saboteurs in *Quirin* included conspiracy to commit the charged offenses, the Court upheld the jurisdiction of the law of war military commission only as to the charge of sabotage and did not mention the conspiracy charge in its analysis. *See Quirin*, 317 U.S. at 46. Similarly, although William Colepaugh was convicted of sabotage and spying, in addition to conspiracy to commit those offenses, the U.S. Court of Appeals for the Tenth Circuit affirmed the jurisdiction of the military tribunal in view of the law of war acts of belligerency without addressing the conspiracy charge. *See Colepaugh v. Looney*, 235 F.2d 429, 431–32 (10th Cir. 1956). Moreover, in both *Quirin* and *Colepaugh*, the charged conspiracies involved completed offenses. By contrast, none of the underlying overt acts for Bahlul's conspiracy conviction was a law of war offense itself, and the government declined to charge him with vicarious liability under *Pinkerton v. United States*, 328 U.S. 640 (1946), or with joint criminal enterprise, *see Bahlul*, 767 F.3d at 38–39 (Rogers, J., concurring in the judgment in part and dissenting) (citing U.S. Appellee's Br. to the *En Banc* Court at 47 (Jul. 10, 2013)).

Third, the government asserts that "during the Civil War, defendants were regularly convicted of conspiracies that were charged as unconsummated offenses," Appellee's Br. 37, but it cites only a single instance. Col. George St. Leger Grenfel was convicted by a military tribunal of conspiracy to free prisoners of war in Chicago and to destroy that city. *See* GENERAL COURT-MARTIAL ORDERS No. 452 (Aug. 22, 1865). As Bahlul points out, however, Grenfel's commission, like that of the Lincoln assassins, was a "hybrid" commission exercising

jurisdiction based in part on the President's declaration of martial law. *See* Reply Br. 18 (citing *Hamdan*, 548 U.S. at 609 n.37 (plurality op.); W. Winthrop, MILITARY LAW AND PRECEDENTS, at 839 n.5); S. Starr, COLONEL GRENFELL'S WARS: THE LIFE OF A SOLDIER OF FORTUNE, 5, 219 (1971) (cited in Appellee's Br. 37). In defending the Grenfel commission's jurisdiction, the prosecution relied on the fact that "martial law obtained throughout the United States and the Territories during the continuance of the [Civil] [W]ar." Judge Advocate's Reply, Courtroom, Cincinnati, Ohio, Jan. 17, 1865, *United States v. Walsh, et al.*, *reprinted in* H. EXEC. DOC. NO. 50, 39th Cong., 2d Sess., at 20. The Grenfel commission, like the Lincoln assassins' commission, "is at best an equivocal" case. *Hamdan*, 548 U.S. at 604 n.35 (plurality op.).

The historical examples identified by the government thus fall far short of what the Supreme Court has required when using historical practice to interpret the constitutional separation of powers. Our dissenting colleague adds only the orders of General MacArthur and General Wedemeyer from the end of World War II and the Korean Conflict. *See* Dis. Op. 66 & nn.22–23. But the *en banc* court dismissed the persuasive force of such military orders for lack of high-level Executive Branch consultation. *See Bahlul*, 767 F.3d at 25 n.16. And during the Korean Conflict there apparently were no trials conducted by United Nations Military Commissions. *See* Jordan J. Paust et al., INTERNATIONAL CRIMINAL LAW: CASES AND MATERIALS 724 (1996).

Finally, the government asserts that any "enemy belligerent" can be tried by a military commission regardless of the offense. Appellee's Br. 56. But the Supreme Court has focused on "the question whether it is within the constitutional power of the national government to place petitioners upon trial before a military commission for the *offenses* with which they

are charged." *Quirin*, 317 U.S. at 29 (emphasis added). Thus, in *Quirin*, the Court "assume[d] that there are *acts*" that could not be tried by military commission "because they are of that class of *offenses* constitutionally triable only by a jury." *Id.* (emphasis added). Likewise, in *Yamashita*, the Court "consider[ed] . . . only the lawful power of the commission to try the petitioner for the *offense* charged." 327 U.S. at 8 (emphasis added). In *Hamdan*, the Court explained that the status of the offender (being a member of a foreign armed force) and the nature of the offense were *both* necessary conditions for the exercise of jurisdiction by a law of war military commission. *See Hamdan*, 548 U.S. at 597–98 (plurality op.) (citing W. Winthrop, MILITARY LAW AND PRECEDENTS, at 836–39); *accord id.* at 2826 (Thomas, J., dissenting).

## C.

This court need not decide the precise relationship between Bahlul's Article I and Article III challenges. In *Quirin*, the Supreme Court's Article III analysis did not look to Article I at all. *See Quirin*, 317 U.S. at 38–46. In some contexts, however, Article III exceptions have turned on the extent of congressional power. *See Palmore v. United States*, 411 U.S. 389, 402–04 (1973); *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 236–38 (1960). Upon examining the government's Article I contentions, we conclude that they do not call into question the conclusion that the Article III exception for law of war military commissions does not extend to the trial of domestic crimes in general, or inchoate conspiracy in particular.

**1.** The government maintains that the war powers in Article I vest Congress with broad authority to subject war-related offenses to the jurisdiction of military commissions. *See* Appellee's Br. 27–30. The war powers include the power to "define and punish . . . Offences against the Law of Nations," U.S. CONST. art. I, § 8, cl. 10, "declare War," *id.* § 8, cl. 11,

"raise and support Armies," *id.* § 8, cl. 12, "provide and maintain a Navy," *id.* § 8, cl. 13, "make Rules for the Government and Regulation of the land and naval Forces," *id.* § 8, cl. 14, "provide for calling forth the Militia," *id.* § 8, cl. 15, and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers," *id.* § 8, cl. 18. Because the war powers contain no textual limitation based on international law, the government concludes there is no such restriction on military commission jurisdiction. *See* Appellee's Br. 29–30. In the government's view, the war powers support military jurisdiction over any offense "committed by an enemy belligerent during and in relation to an armed conflict with the United States [that] . . . has a palpable effect on the nature of that conflict." Oral Arg. Tr. 49.

The Supreme Court has looked to the Define and Punish Clause in determining whether Congress may designate particular offenses within the jurisdiction of a law of war military commission. The Court in *Quirin*, *Yamashita*, and *Hamdan* did look to the war powers in discussing congressional authority to establish military commissions. *See Hamdan*, 548 U.S. at 591 (plurality op.); *Yamashita*, 327 U.S. at 12; *Quirin*, 317 U.S. at 26; *see also* W. Winthrop, MILITARY LAW AND PRECEDENTS, at 831 (stating that Congress's power "to 'declare war' and 'raise armies'" provided the "original sanction" for military commissions). But in addressing Congress's authority to confer jurisdiction over particular offenses, the Court has consistently looked to the Define and Punish Clause alone. *See Hamdan*, 548 U.S. at 601–02 (plurality op.); *Yamashita*, 327 U.S. at 7; *id.* at 26 (Murphy, J., dissenting); *Quirin*, 317 U.S. at 28. In *Yamashita*, the Court emphasized the distinction, explaining that "the [military] commission derives its *existence*" from the war powers, 327 U.S. at 12 (emphasis added), but that its jurisdiction over specific offenses comes from Congress's "exercise of the power conferred upon it by Article I, § 8, Cl. 10

of the Constitution to 'define and punish * * * Offenses against the Law of Nations * * *,' of which the law of war is a part." *Id.* at 7. Winthrop endorsed this distinction in stating that Civil War-era legislation subjecting "spies and guerillas" to military jurisdiction "may be regarded as deriving its authority from" the Define and Punish Clause. W. Winthrop, MILITARY LAW AND PRECEDENTS, at 831.

In applying the Define and Punish Clause, the Supreme Court long ago cautioned that "[w]hether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by [C]ongress." *United States v. Arjona*, 120 U.S. 479, 488 (1887). As noted, the government has conceded that conspiracy is not an international war crime. Notwithstanding the atrocities at issue, the International Military Tribunal at Nuremberg considered and rejected conspiracy to commit war crimes as an international law of war offense. *See* 22 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL: NUREMBERG, 14 NOVEMBER 1945–1 OCTOBER 1946, at 469 (1948). Conspiracy to commit war crimes is included neither in the major treaties on the law of war,[1] nor in the jurisdiction of

---

[1] *See, e.g.*, *Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts*, June 8, 1977, 1125 U.N.T.S. 609; *Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts*, June 8, 1977, 1125 U.N.T.S. 3; *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; *Geneva Convention Relative to the Treatment of Prisoners of War*, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; *Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea*, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; *Geneva Convention for the Amelioration of the Condition of the Wounded and*

modern war crimes tribunals.[2] Congress cannot, pursuant to the Define and Punish Clause, declare an offense to be an international war crime when the international law of war concededly does not. *See United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 198 (1820). The exceptions — conspiracy to commit genocide and common plan to wage aggressive war, *see Hamdan*, 548 U.S. at 610 (plurality op.) — are not at issue here, for Bahlul was charged with neither. In light of the international community's explicit and repeated rejection of conspiracy as a law of war offense, we are puzzled by our dissenting colleague's statement that "[t]he international community does recognize that Bahlul violated the principles of the law of nations," Dis.

_____

*Sick in Armed Forces in the Field*, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; *Convention Respecting the Laws and Customs of War on Land*, Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631; *Convention with Respect to the Laws and Customs of War on Land*, July 29, 1899, 32 Stat. 1803, 1 Bevans 247.

[2] *See Statute of the Special Court for Sierra Leone*, Jan. 16, 2002, 2178 U.N.T.S. 138; *Rome Statute of the International Criminal Court*, July 17, 1998, 2187 U.N.T.S. 90; *Statute of the International Tribunal for Rwanda*, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), *reprinted in* 33 I.L.M. 1598, 1602; *Statute of the International Tribunal for the Former Yugoslavia*, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), *reprinted in* 32 I.L.M. 1159, 1192. Some modern tribunals recognize war crimes liability through participation in a joint criminal enterprise, *see Prosecutor v. Milutinovic*, Case No. IT–99–37–AR72, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction—Joint Criminal Enterprise, ¶ 26 (Int'l Crim. Trib. for the Former Yugoslavia, Appeals Chamber, May 21, 2003); *Rwamakuba v. Prosecutor*, Case No. ICTR–98–44–AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, ¶ 30 (Oct. 22, 2004), but the prosecutor at Bahlul's military commission withdrew that charge against him, *see* Trial Tr. 110, 881 (cited in *Bahlul*, 767 F.3d at 39, 40–41 (Rogers, J., concurring in the judgment in part and dissenting)).

Op. 31 (internal quotation marks and italics omitted), and by its reference to "the international community's agreement that those who conspire to commit war crimes can be punished as war criminals," *id.* at 53. There is no such "agreement." The dissent offers nothing to support this claim.

Our dissenting colleague also maintains that this court must accord Congress "'extraordinary deference when it acts under its Define and Punish Clause powers.'" Dis. Op. 34 (quoting *Bahlul*, 767 F.3d at 59 (Brown, J., concurring in the judgment in part and dissenting in part)). This court has no occasion to decide the extent of that deference because the government has never maintained that Congress defined conspiracy in the 2006 MCA as a violation of the law of nations. The legislative history of the 2006 MCA is not to the contrary. *See id.* at 46 n.17. In maintaining otherwise, the dissent confuses acting pursuant to the Define and Punish Clause with identifying the content of the law of nations, *see id.* at 45–47; Congress purported to do the former, not the latter. In Bahlul's case, the "law of nations" is not "too vague and deficient to be a rule," *id.* at 32 (quotation marks omitted); to the contrary, it quite clearly does not view conspiracy to be an independent war crime, as the government has conceded.

To the extent our colleague would interpret the Define and Punish Clause to confer open-ended congressional authority to create *new* war crimes, *see* Dis. Op. 38–43, the Supreme Court has rejected such an approach. In *Furlong*, 18 U.S. (5 Wheat.) 184, the Court explained with regard to piracy, the other object of the Define and Punish Clause: "If by calling murder *piracy*, [Congress] might assert a jurisdiction over that offence committed by a foreigner in a foreign vessel, what offence might not be brought within their power by the same device?" *Id.* at 198 (emphasis in original). The same reasoning applies to "Offenses against the Law of Nations," the other object of the

Define and Punish Clause. U.S. CONST. art. I, § 8, cl. 10. Congress can neither define as piracy a crime that is clearly not piracy, nor define as a law of nations offense a crime that is avowedly not a law of nations offense. In other contexts as well, the Supreme Court has rejected the limitless form of congressional power the dissent proposes. *Cf. City of Boerne v. Flores*, 521 U.S. 507, 529 (1997). Contrary to our dissenting colleague, international law itself affords no limit because it does not purport to identify which non-international offenses can and cannot be treated as domestic war crimes; the dissent points to no offenses whose trial by military commission are "inconsistent with" or not "permit[ted]" by international law. Dis. Op. 53, 38 (italics omitted). In urging such a limitation, however, the dissent does reveal one shared premise: that the content of international law constrains congressional authority under the Define and Punish Clause. According to the dissent, congressional action under the Clause must be "consistent with international law," *id.* at 47, such that Congress may only "track *somewhat* ahead of the international community," *id.* at 43 (emphasis added). Thus, despite some rhetorical protestations to the contrary, *see id.* at 1, 42, 73, the dissent's disagreement is not about *whether* international law constrains congressional authority, only *to what extent*.

The dissent's reliance on *Yamashita* as support for its understanding of the Define and Punish Clause, *see* Dis. Op. 35–37, is misplaced. In *Yamashita*, the Supreme Court did not address the nature of Define and Punish Clause authority at all, because Congress had not defined any specific offenses. *See Yamashita*, 327 U.S. at 7. The Court therefore had to undertake its own analysis of international law, and it concluded that the Hague and Geneva Conventions "plainly imposed on petitioner" a duty that he had violated. *Id.* at 16. It is therefore difficult to understand how *Yamashita* affects the type of deference owed to Congress one way or the other.

**2.** Nor does the Necessary and Proper Clause allow Congress to do what its express powers do not. *See Toth*, 350 U.S. at 21–22. The government maintains that even if Congress's authority arose only under the Define and Punish Clause, "Congress is not restricted under that Clause only to criminal offenses that are violations of international law." Appellee's Br. 43. "Rather, Congress may, under the Necessary and Proper Clause, proscribe conspiracy to commit war crimes, such as terrorist attacks against civilians, that are themselves violations of the law of nations as a necessary and proper implementation of its power and responsibility to prevent and punish such violations." *Id.* The Supreme Court has adopted a different view.

In *Toth*, 350 U.S. at 22, the Supreme Court explained that it was "not willing to hold that power to circumvent [jury] safeguards should be inferred through the Necessary and Proper Clause." It described the "great difference between trial by jury and trial by selected members of the military forces," *id.* at 17, and explained that "[t]here are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution," *id.* at 22. In *Singleton*, the Court rejected expansion of military jurisdiction through the Necessary and Proper Clause because "[t]his Court cannot diminish and expand that power, either on a case-by-case basis or on a balancing of the power there granted Congress against the safeguards of Article III and the Fifth and Sixth Amendments." 361 U.S. at 246. The Court explained: "If the exercise of the power is valid it is because it is granted in Clause 14 [the Make Rules Clause], not because of the Necessary and Proper Clause." *Id.* at 247. "We are therefore constrained to say that since this Court has said that the Necessary and Proper Clause cannot expand Clause 14 so as to include prosecution of civilian dependents for capital crimes, it cannot expand Clause 14 to include prosecution of them for noncapital offenses." *Id.* at 248.

As the plurality in *Reid* emphasized, "the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law." 354 U.S. at 21; *see Hamdan*, 548 U.S. at 590 (plurality op.). Consequently, "the Necessary and Proper Clause cannot operate to extend military jurisdiction to any group of persons beyond that class described in" an enumerated Article I power. *Reid*, 354 U.S. at 20–21 (plurality op.). "Under the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes against the United States." *Id.* at 21.

The government's response is that Congress may enact legislation "necessary to comply with our nation's international responsibilities." Appellee's Br. 45. In *Arjona*, 120 U.S. at 484, the Supreme Court upheld a counterfeiting prohibition because "[t]he law of nations requires every national government . . . to punish those who, within its own jurisdiction, counterfeit the money of another nation." The Court observed that without the criminal statute, the United States would "be unable to perform a duty which they may owe to another nation, and which the law of nations has imposed on them as part of their international obligations." *Id.* at 487. Here, the government points to the *Geneva Convention Relative to the Protection of Civilian Persons in Time of War*, Aug. 12, 1949, 75 U.N.T.S. 287, 6 U.S.T. 3516 ("*Geneva IV*"), which prohibits "[c]ollective penalties and likewise all measures of intimidation or of terrorism." *Id.* art. 33. The Convention requires signatories to "undertake to enact any legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention," *id.* art. 146, which include the "willful killing . . . of a protected person," *id.* art. 147, defined as "those who . . . find themselves, in case of a conflict or occupation, in the hands

of a Party to the conflict or Occupying Power of which they are not nationals," *id.* art. 4. Each signatory "shall take measures necessary for the suppression of all acts contrary to the provisions of the present Convention." *Id.* art. 146.

Even if Congress has authority to criminalize non-international offenses pursuant to the Define and Punish Clause, as supplemented by the Necessary and Proper Clause, the government fails to explain why such congressional power to prohibit conduct implies the power to establish military jurisdiction over that conduct. Military jurisdiction over the offenses that the Supreme Court has previously upheld under the Define and Punish Clause — such as spying and sabotage — have a textual basis in the Constitution: The "Law of Nations," U.S. CONST. art. I, § 8, cl. 10, *itself* makes those offenses "cognizable by [military] tribunals." *Quirin*, 317 U.S. at 28; *see id.* at 41 & n.13; Act of Apr. 10, 1806, 2 Stat. 359, 371; 11 Op. Att'y Gen. at 316; W. Winthrop, MILITARY LAW AND PRECEDENTS, at 769. Court-martial jurisdiction similarly has a textual basis in the Constitution, which authorizes Congress to "make Rules for the Government and Regulation of the land and naval Forces," U.S. CONST. art. I, § 8, cl. 14, and exempts those offenses from trial by jury, *see id.* amend. V. The sabotage offense in *Quirin* was subject to military jurisdiction based on "a construction of the Constitution which has been followed since the founding of our government." 317 U.S. at 41. Military jurisdiction over conspiracy, by contrast, has neither an express textual basis nor an established historical tradition.

The government maintains that under the Necessary and Proper Clause, "[i]f commission of the substantive crime that is the conspiracy's object would be within the scope of permissible congressional regulation, then so is the conspiracy." Appellee's Br. 45. But again, Bahlul's Article III challenge is not that Congress lacks authority to prohibit his conduct; rather, he

challenges Congress's authority to confer jurisdiction in a military tribunal. Absent a textual or historical basis for prosecuting conspiracy as a standalone offense in a law of war military commission, the government's position is confounded by the Supreme Court's repeated reluctance to extend military jurisdiction based on the Necessary and Proper Clause. *See, e.g., Singleton*, 361 U.S. at 246–48; *Reid*, 354 U.S. at 20–21 (plurality op.); *Toth*, 350 U.S. at 21–22. The cases on which the government relies, such as *Callanan v. United States*, 364 U.S. 587, 593–94 (1961), and *United States v. Feola*, 420 U.S. 671, 694 (1975), involve criminal conspiracy prosecutions in civil courts. *See* Appellee's Br. 45–46 (also citing *United States v. Price*, 265 F.3d 1097, 1107 n.2 (10th Cir. 2001); *United States v. Jannotti*, 673 F.2d 578, 591–94 (3d Cir. 1982)).

**D.**

Before concluding we address some further flaws in our dissenting colleague's opinion.

First, the dissent relies on inapposite authorities regarding the source of congressional authority for law of war military commissions. Its citations refer to military commissions exercising jurisdiction far beyond the law of war. Thus, in *Ex parte Milligan*, 71 U.S. 2 (1866), the four Justices cited by the dissent, *see* Dis. Op. 55, were discussing courts martial and military commissions whose jurisdiction was based on military government and martial law. *See Milligan*, 71 U.S. at 141–42 (Chase, C.J., concurring in the result); *see generally Hamdan*, 548 U.S. at 595–98 (plurality op.), 683 (Thomas, J., dissenting); *Bahlul*, 767 F.3d at 7. The constitutional authority for those commissions, whose jurisdiction may include domestic crimes, *see Hamdan*, 548 U.S. at 595–96 (plurality op.); *Bahlul*, 767 F.3d at 7, does not extend to law of war commissions. The dissent's reliance on *Madsen v. Kinsella*, 343 U.S. 341 (1952); *see* Dis. Op. 55, 58, 61, is likewise misplaced; that case involved

a military-government commission, not a law of war military commission. *Madsen*, 343 U.S. at 343–44, 345–48. And the dissent's reliance on Winthrop's statement that "in general, it is" the war powers "from which the military tribunal derives its original sanction," Dis. Op. 60 (alterations omitted) (quoting W. Winthrop, MILITARY LAW AND PRECEDENTS, at 831), ignores both that Winthrop was discussing *all three kinds* of military commission, stating the commission's "authority is thus the same as the authority for the making and waging of war and for the exercise of military government and martial law," and that Winthrop looked *exclusively* to the Define and Punish Clause as the source of authority for law of war commissions to try spying and aiding the enemy, *see* W. Winthrop, MILITARY LAW AND PRECEDENTS, at 831.

Second, the dissent maintains that if conspiracy does not fall within the Article III exception for law of war military commissions, then Bahlul's conviction must be affirmed under *Schor*'s multi-factor balancing approach. *See* Dis. Op. 73–80. The Supreme Court has never suggested that an entire criminal adjudication outside an established Article III exception could ever satisfy the *Schor* analysis. The dissent cites *Palmore* to suggest otherwise, *see id.* at 72, but the Court conducted no balancing analysis in *Palmore* because the case involved a criminal adjudication *within* the established Article III exception for territorial courts. *Palmore*, 411 U.S. at 403; *see Northern Pipeline*, 458 U.S. at 55 & n.16 (plurality op.). But even accepting the dissent's premise, its analysis fails on its own terms. Bahlul's military commission is on the wrong side of nearly every balancing factor that the Supreme Court has applied.

With respect to what the dissent characterizes as the "most important[]" factor, Dis. Op. 74, the 2006 MCA provides for appellate review "only with respect to matters of law, including

the sufficiency of the evidence to support the verdict," 10 U.S.C. § 950g(d). Sufficiency review is "sharply limited," *Wright v. West*, 505 U.S. 277, 296 (1992), and "very deferential[]," *United States v. Harrison*, 931 F.2d 65, 71 (D.C. Cir. 1991). This is exactly the type of limited judicial review the Supreme Court has repeatedly held offends Article III. *See Stern*, 131 S. Ct. at 2611; *Schor*, 478 U.S. at 853; *Northern Pipeline*, 458 U.S. at 85, 86 n.39 (plurality op.); *id.* at 91 (Rehnquist, J., concurring in the judgment); *Crowell v. Benson*, 285 U.S. 22, 57 (1932). The dissent pretends otherwise, glossing over the details of *Schor* and ignoring *Stern* and *Northern Pipeline*. *See* Dis. Op. 74–76. In *Stern*, the Supreme Court faulted the bankruptcy statute for providing judicial review "only under the usual limited appellate standards," which "require[d] marked deference to, among other things, the [tribunal's] findings of fact." 131 S. Ct. at 2611. The Court reached the same conclusion in *Northern Pipeline*, 458 U.S. at 85, 86 n.39 (plurality op.); *id.* at 91 (Rehnquist, J., concurring in the judgment). In *Schor*, the Court noted that "CFTC orders are [] reviewed under the same 'weight of the evidence' standard sustained in *Crowell*, rather than the more deferential [clearly erroneous] standard found lacking in *Northern Pipeline*." 478 U.S. at 853. The "sufficiency of the evidence" standard in the 2006 MCA is more deferential than the "usual limited appellate standards" rejected in *Stern* and the "clearly erroneous" standard rejected in *Northern Pipeline* and *Schor*. Rather than addressing these holdings directly, the dissent relies on inapposite precedent involving (1) "adjunct" fact-finders within Article III courts, *see* Dis. Op. 75 (citing *Crowell*, 285 U.S. at 51); *see also Stern*, 131 S. Ct. at 2619; *Northern Pipeline*, 458 U.S. at 78 (plurality op.), (2) factual review in appeals from state courts and Article III district courts, *see* Dis. Op. 75–76 (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *The Francis Wright*, 105 U.S. 381, 386 (1881)), and (3) cases within the "public rights" exception to Article III, where there is no reason to apply a balancing analysis, *see* Dis.

Op. 76 (citing *Estep v. United States*, 327 U.S. 114 (1946)). No Article III issue was raised or addressed in *Estep* or *Jackson*. Thus, the dissent's "most important[]" factor — appellate review for legal error only, *id.* at 74 — is one the Supreme Court has expressly foreclosed.

In *Sharif*, where the Court upheld adjudication by bankruptcy courts outside the established Article III exception, the two necessary factors were the parties' consent to the adjudication, *and* the fact that "Article III courts retain[ed] supervisory authority over the process." *Sharif*, No. 13-935, slip op. at 12. Neither is true in Bahlul's case. First, the Court in *Sharif* emphasized that litigant consent has been a crucial factor in its prior decisions on non-Article III adjudication: In *Schor*, the Court "[l]ean[ed] heavily on the importance of Schor's consent." *Sharif*, No. 13-935, slip op. at 9; *see id.* at 14 n.10. Subsequent decisions by the Supreme Court involving the Federal Magistrates Act "reiterated the importance of consent to the constitutional analysis." *Id.* at 10. And in both *Stern* and *Northern Pipeline*, compliance with Article III "turned on" whether the litigant "truly consent[ed]" to the adjudication. *Id.* at 15 (internal quotation marks omitted). Bahlul plainly did not "consent" to his trial by military commission. As the *en banc* court observed, he "objected to the commission's authority to try him" and "flatly refused to participate in the military commission proceedings," even assuming his objections were "too general" to raise specific legal claims. *Bahlul*, 767 F.3d at 10 (internal quotation marks omitted); *see* Trial Tr. 96–97 ("Bahlul has made it very clear that he is boycotting and that he does not recognize this commission."); *contra* Dis. Op. 74. Second, the Court in *Sharif* relied on the fact that bankruptcy judges are appointed, referred cases, allowed to keep cases, supervised, and removable by Article III judges, who thus retain "total control and jurisdiction" over bankruptcy adjudication. *Sharif*, No. 13-935, slip op. at 13 (internal quotation marks omitted); *see id.* at 3–4.

The Court expressly conditioned its holding on this level of "control by the Article III courts." *Id.* at 12, 15. Nothing of the sort is true in Bahlul's case. Military commissions under the 2006 MCA are independent of the Article III courts except for very limited appellate review.

Another factor the Supreme Court has considered is the "concern[] that drove Congress to depart from the requirements of Article III." *Schor*, 478 U.S. at 851. In non-Article III adjudications upheld by the Supreme Court, Congress's "concern" was the fact that an ostensibly "private" claim was so "closely intertwined with a federal regulatory program," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54 (1989), that the program would be "confounded" without the ability to adjudicate that claim. *Schor*, 478 U.S. at 856; *see Sharif*, No. 13-935, slip op. at 13; *Stern*, 131 S. Ct. at 2613–14; *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 593–94 (1985). Neither the government nor the dissent offer any reason to conclude that otherwise-valid military commission prosecutions will be "confounded" by the inability to prosecute non-law of war offenses.

Bahlul's military commission fails a number of other *Schor* factors the dissent neglects to mention. The military commission resolves "all matters of fact and law in whatever domains of the law to which" a charge may lead. *Stern*, 131 S. Ct. at 2610 (internal quotation marks and alterations omitted). It "'issue[s] final judgments, which are binding and enforceable,'" *id.* at 2610–11 (quoting *Northern Pipeline*, 458 U.S. at 85–86 (plurality op.)); *see Schor*, 478 U.S. at 853, and "subject to review only if a party chooses to appeal," *Stern*, 131 S. Ct. at 2619. As for the "origins and importance of the right to be adjudicated," *Schor*, 478 U.S. at 851, the right to "[f]reedom from imprisonment" is one of the oldest and most basic in our legal system. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The

circumstances of Bahlul's prosecution thus could not be further from *Schor*.  There, Congress added to an Article I tribunal otherwise within an established Article III exception the authority to adjudicate a closely intertwined common-law cause of action, only with the consent of the parties, without authority to issue final enforceable judgements, and with meaningful factual review on appeal.  Here, in Bahlul's case, Congress has created a *standalone* Article I tribunal to adjudicate his entire criminal case *without* his consent, *with* the ability to issue final enforceable judgments, and with *almost no* factual review on appeal.

If Bahlul's military commission falls outside the historical Article III exception for law of war military commissions, then there is no question that it usurps "the essential attributes of judicial power." *Schor*, 478 U.S. at 851 (internal quotation marks omitted).  The Supreme Court unanimously agreed in *Stern* that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in [an adjudication of private rights], without consent of the litigants, and subject only to ordinary appellate review." 131 S. Ct. at 2624 (Breyer, J., dissenting); *id.* at 2615 (majority op.); *see Thomas*, 473 U.S. at 584.  The dissent struggles, unpersuasively, to avoid this conclusion.  It suggests that military commissions somehow do not raise the same separation-of-powers concerns as bankruptcy courts, *see* Dis. Op. 79; *contra Hamdan*, 456 U.S. at 638 (Kennedy, J., concurring in part), even though bankruptcy judges are appointed, supervised, and removable by Article III courts, *see Sharif*, No. 13-935, slip op. at 13; *Peretz v. United States*, 501 U.S. 923, 938–39 (1991).  It points to the established Article III exception for military commissions, *see* Dis. Op. 79–80, even though the analysis in *Schor* is *premised* on the adjudication being outside of such an exception, as the dissent elsewhere acknowledges, *see id.* at 71,

73, 80. The government, unsurprisingly, has barely presented any balancing analysis, *see* Appellee's Br. 51.

## III.

For more than seventy years the Supreme Court has adhered to the definition of the law of war articulated in *Quirin*, which the government concedes does not prohibit conspiracy. The government has failed to identify a sufficiently settled historical practice for this court to conclude that the inchoate conspiracy offense of which Bahlul was convicted falls within the Article III exception for law of war military commissions. Absent further guidance from the Supreme Court, this court must apply the settled limitations that Article III places on the other branches with respect to the "judicial Power of the United States." U.S. CONST. art. III, § 1.

Contrary to the government's suggestion, vacating Bahlul's inchoate conspiracy conviction does not "cast doubt on the constitutional validity of the most prominent military commission precedents in our nation's history." Appellee's Br. 52. The Lincoln assassins and Colonel Grenfel were tried by mixed commissions, whose jurisdiction was based on martial law. The lawfulness of military commission jurisdiction over the charges against the Nazi saboteurs and Colepaugh was judicially upheld without having to reach the conspiracy charges. Neither does our holding "inappropriately restrict Congress's ability, in the absence of broad concurrence by the international community, to adapt the range of offenses triable by military commission in light of future changes in the practice of modern warfare and the norms that govern it." *Id.* at 38. Military commissions retain the ability to prosecute joint criminal enterprise, aiding and abetting, or any other offenses against the law of war, however it may evolve. Congress retains the authority it has always had to proscribe domestic offenses

through the criminal law in the civil courts. The international law of war limits Congress's authority because the Constitution expressly ties that authority to "the Law of Nations," U.S. CONST. art. I, § 8, cl. 10.

Accordingly, we hold that Bahlul's conviction for inchoate conspiracy by a law of war military commission violated the separation of powers enshrined in Article III § 1 and must be vacated. We need not and do not address Bahlul's other contentions.

1

TATEL, *Circuit Judge*, concurring: Although I agree that al Bahlul's conviction runs afoul of Article III of the Constitution, I write separately to explain why, having joined the en banc Court in upholding that conviction, I now join an opinion that invalidates it. I also wish to draw out a few points that are especially relevant to the separation-of-powers questions this case presents.

Sitting en banc, this Court decided last year that the Ex Post Facto Clause does not prevent Congress from granting military commissions jurisdiction over the crime of conspiracy. We began by noting that in the months leading up to the September 11th attacks, when al Bahlul committed his crimes, federal law gave military commissions jurisdiction over "offenders or offenses that *by statute or by the law of war* may be tried by military commissions." 10 U.S.C. § 821 (emphasis added). Because no statute on the books in 2001 allowed military commissions to try conspiracy, the en banc Court needed to determine whether that crime qualified as a "law of war" offense at that time and was thus triable by military commission. If so, the Court observed, al Bahlul's ex post facto argument would necessarily fail. Reviewing much of the same history and case law before us now, the en banc Court was unable to conclude that "conspiracy was not already triable by law-of-war military commissions" in 2001. *Al Bahlul v. United States*, 767 F.3d 1, 18 (D.C. Cir. 2014).

So why the different result here? The answer is the standard of review. The en banc Court came down the way it did, and I voted the way I did, because al Bahlul had forfeited his ex post facto challenge by failing to raise it before the Commission, so our review was for plain error. Applying that highly deferential standard, the Court concluded that it was "not 'obvious'" that conspiracy was "not . . . triable by law-

of-war military commissions" at the time al Bahlul committed his crimes. *Id.* at 27.

The government insists that al Bahlul also failed to raise his Article III argument below. But even if that were true, the Article III claim is structural, *see Reid v. Covert*, 354 U.S. 1, 21 (1957) ("Every extension of military jurisdiction is an encroachment on the jurisdiction of civil courts . . . ."), and the Supreme Court held in *Commodities Futures Trading Commission v. Schor* that structural claims cannot be waived or forfeited, *see* 478 U.S. 833, 850–51 (1986) ("To the extent that [a] structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty."). This Court followed suit in *Kuretski v. Commissioner of Internal Revenue Service*, holding that "the Supreme Court has recognized an exception" to the "general rule" that a party may forfeit an argument it fails to raise below: we may nonetheless "hear 'a constitutional challenge' . . . if the 'alleged defect . . . goes to the validity of the . . . proceeding.'" 755 F.3d 929, 936 (D.C. Cir. 2014) (quoting *Freytag v. Commissioner of Internal Revenue Service*, 501 U.S. 868, 879 (1991)). The Supreme Court, moreover, recently reaffirmed *Schor*'s holding in *Wellness International Network, Ltd. v. Sharif*: "a litigant's waiver of his 'personal right' to an Article III court is not always dispositive[;] . . . [t]o the extent that [a] structural principle is implicated in a given case . . . the parties cannot by consent cure the constitutional difficulty." 575 U.S. __ (2015), slip op. at 9 (quoting *Schor*, 478 U.S. at 850–51); *see id.*, dissenting op. at 12 (Roberts, C.J.) ("nobody disputes that Schor forbids a litigant from consenting to a constitutional violation when the structural component of Article III is implicated") (internal quotation marks omitted); Op. at 6–7. If, as the dissent argues, the Court instead intended to hold that structural claims *are* now forfeitable, *see* Dissenting Op. 14–15, thus overruling

decades of precedent and requiring us to depart from our own case law, then I suspect it would have made that point clear.

Under these circumstances, the en banc Court's conclusion that it was neither "clear" nor "obvious"—that is, not "plain"—that the law of war is purely international cannot determine the outcome of this case. However unclear the law and the evidence, we must decide not whether the error below was plain, but whether there was any error at all. In my view, whether Article III prohibits military commissions from trying conspiracy turns on what *Ex Parte Quirin* says and what *Hamdan* does not.

Article III provides that Congress "may vest[] . . . the judicial power of the United States . . . *only* in courts whose judges enjoy the protections set forth in that Article." *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011) (emphasis added). The Supreme Court has ruled time and again that this mandate is essentially ironclad, allowing exceptions only where "delineated in [the Court's] precedents, rooted in history and the Constitution." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 74 (1982). One such exception—the only one relevant here—permits Congress to assign certain criminal cases to military commissions. *See Al Bahlul*, 767 F.3d at 7. The question in this case is whether conspiracy to commit war crimes falls within the military-commission exception to Article III *as articulated by the Supreme Court*.

The search for precedent on that question begins and, for the most part, ends with *Ex Parte Quirin*. Although the en banc Court considered *Quirin* in some depth, our review here must be more searching, and that heightened standard leads me to a different result.

4

In *Quirin*, the Supreme Court described the contours of the military-commission exception: commissions, the Court ruled, may try enemy belligerents for violations of the "law of war." *Ex Parte Quirin*, 317 U.S. 1 (1942). That holding, of course, goes only so far. Because the conviction the Court sustained was for passing behind enemy lines out of uniform in order to attack military assets, and because the Court assumed that that crime violated the international law of war—whatever the contemporary scholarly view—it had no reason to decide whether the law-of-war exception was *limited to* international law. *See Quirin*, 317 U.S. at 36–37; Op. at 10–11.

That question is critical here because in defending the constitutionality of MCA section 950, the government concedes that conspiracy does not violate the international law of war, thus implicitly acknowledging that by enacting that provision, Congress was not exercising its Article I authority to "define" the law of war. Given this, the issue before us is not whether this court must defer to Congress's "definition" of international law, but whether, as the government insists, the law of war includes some domestic crimes.

In my view, the weight of the Court's language in *Quirin* strongly indicates that the law-of-war exception is exclusively international. Making this point repeatedly, the Court observed that in sending Quirin and his fellow saboteurs to a military commission, Congress had permissibly "exercised its authority . . . by sanctioning . . . the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of *the law of nations*, and more particularly the law of war, are cognizable by such tribunals." *Id.* at 28 (emphasis added); *see also id.* at 29 (calling the law of war a "branch of international law"). The Court made the

point even clearer in *Yamashita*: military-commission authority derives from "the Law of Nations . . . *of which the law of war is a part*." 327 U.S. 1, 7 (1946) (alteration in original) (emphasis added); *see also* Op. at 12–14.

Still, the Supreme Court never *held*—because it had no need to—that military commissions are barred from trying crimes recognized only by domestic law. Instead, it left that question for another day. That day looked like it would come in 2006 when the Court took up the case of Salim Hamdan, Osama Bin Laden's personal driver, who was convicted of, among other things, conspiring to commit acts of terrorism. Like al Bahlul, Hamdan argued that the military commission that convicted him lacked jurisdiction because conspiracy was not a violation of the law of war. The Court, however, never reached that issue because it resolved the case on statutory grounds, i.e., it held that the commission's procedures ran afoul of the Uniform Code of Military Justice. In other words, the Court ruled that domestic law could *limit* military commission jurisdiction, but it had no reason to decide whether it could *extend* it.

The government, though agreeing that the *Hamdan* Court never directly held that the law of war includes domestic precedent, nonetheless argues that "seven justices . . . agreed that resolution of the question did not turn solely on whether conspiracy was a violation of international law." Respondent's Br. 41. As the government points out, Justice Thomas, writing on behalf of himself and two other Justices, did embrace this proposition. *See Hamdan*, 548 U.S. at 689 (Thomas, J., dissenting) ("The common law of war as it pertains to offenses triable by military commission is derived from the experience of our wars and our wartime tribunals, and the laws and usages of war as understood and practiced by the civilized nations of the world.") (citation and internal

quotation marks omitted). But Justice Kennedy, writing for himself and three other Justices, relied on *Quirin* for the proposition that the law of war "derives from 'rules and precepts *of the law of nations*'; it is the body of *international law* governing armed conflict," *id.* at 641 (Kennedy, J., concurring) (quoting *Quirin*, 317 U.S. at 28) (emphases added)—a definition that rules out resort to domestic law.

To be sure, Justice Stevens observed that "[t]he crime of 'conspiracy' has rarely if ever been tried as such in this country by any law-of-war military commission." *Id.* at 603 (Stevens, J., plurality opinion). The government, however, reads far too much into this reference to domestic practice, for in the very same sentence Justice Stevens emphasized that "international sources"—the Geneva Conventions and the Hague Conventions, which he described as "the major treaties on the law of war"—"*confirm*" that conspiracy "is not a recognized violation of the law of war." *Id.* at 610 (emphasis added). Justice Stevens described *Quirin* in similar terms: sabotage was triable by military commission in that case because it "was, by universal agreement and practice *both* in this country and internationally, recognized as an offense against the law of war." *Id.* at 603 (quoting *Quirin*, 317 U.S. at 30) (emphasis added) (internal quotation marks omitted). By stating that international law "confirms" that conspiracy is not a violation of the law of war, and by describing the *Quirin* sabotage as a violation of the law of war because it was treated as such "both in this country and internationally," Justice Stevens was saying that, at a minimum, an act must violate the international law of war before Congress can grant military commissions jurisdiction over that crime. In other words, Justice Stevens did not conclude that domestic law *alone* could support military-commission jurisdiction over conspiracy. This interpretation of Justice Stevens's opinion seems especially obvious given that the three Justices who

signed onto his opinion also joined Justice Kennedy's statement that the law of war "is . . . international law," *id.* at 641 (Kennedy, J., concurring), and not Justice Thomas's opinion to the contrary.

Thus, although the Court held in *Hamdan* that domestic law—namely, the UCMJ—can *limit* the scope of military-commission jurisdiction, only three Justices would have extended that jurisdiction beyond the international law of war to the "American common law of war." Given this, and given that Article III courts are the default, that exceptions must be "delineated in [the Court's] precedents," *Northern Pipeline*, 458 U.S. at 74, and that the *Schor* balancing factors favor al Bahlul, *see* Op. at 33–36, this "inferior" court is without authority to go beyond the Supreme Court's clear signal, sent first in *Quirin* and repeated in *Yamashita*, that military-commission jurisdiction is limited to crimes that violate the *international law of war*. *See United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) (the Supreme Court's "carefully considered language . . . must be treated as authoritative"). Instead, we must leave it to the Supreme Court to take that step.

Moreover, and again proceeding on de novo review, I see nothing in Article I of the Constitution that requires a different result. Judge Rogers demonstrates this convincingly. *See* Op. at 19–26. I add only that were the government correct about Article I, Congress would have virtually unlimited authority to bring any crime within the jurisdiction of military commissions—even theft or murder—so long as it related in some way to an ongoing war or the armed forces. Congress could simply declare any crime to be a violation of the law of war and then vest military commissions with jurisdiction to try it, thereby gutting Article III's critical protections. The Supreme Court rejected that view of Article I in *Northern*

*Pipeline*. There, the Court concluded that Congress had no authority to establish bankruptcy courts entirely outside of Article III's reach because any limit on such "broad legislative discretion" would prove "wholly illusory." *Northern Pipeline*, 458 U.S. at 73–74. Like the bankruptcy scheme the Court rejected in *Northern Pipeline*, the government's view of Article I would "effectively eviscerate [Article III's] guarantee of an independent Judicial Branch of the Federal Government." *Id.* at 74.

Although the foregoing is sufficient to resolve this case, the government makes one more argument that deserves attention. Limiting commission jurisdiction to offenses that violate international law, it asserts, "would . . . inappropriately restrict Congress's ability, in the absence of broad concurrence by the international community, to adapt . . . [to] future changes in the practice of modern warfare and the norms that govern it." Respondent's Br. 38; *see also* Dissenting Op. at 30–31. I agree with the government's premise: that as a result of today's decision, Congress will be unable to vest military commissions with jurisdiction over crimes that do not violate the international law of war. But as explained above, that is precisely what the Constitution, as interpreted by the Supreme Court, requires.

Despite the government's protestations, moreover, this court's holding will not "inappropriately restrict" the nation's ability to ensure that those who conspire to commit terrorism are appropriately punished. After all, the government can always fall back on the apparatus it has used to try federal crimes for more than two centuries: the federal courts. *See* 18 U.S.C. § 371 (criminalizing conspiracy). Federal courts hand down thousands of conspiracy convictions each year, on everything from gun-running to financial fraud to, most important here, terrorism. *See* CENTER ON LAW AND

SECURITY, NEW YORK UNIVERSITY SCHOOL OF LAW, TERRORIST TRIAL REPORT CARD: SEPTEMBER 11, 2001-SEPTEMBER 11, 2011 at 2, 7, table 1, *available at* http://goo.gl/Ks3Okc (since September 11, 2001, prosecutors have prevailed in almost 200 "jihadist-related" terrorism and national-security cases in federal courts); *id.* at 13 ("the most commonly charged crimes" have included violations of 18 U.S.C. § 371, for "general criminal conspiracy"). For instance, Zacarias Moussaoui—the potential 20th 9/11 hijacker—pled guilty in federal court to six counts of conspiracy for his role in planning the 2001 attacks, *see United States v. Moussaoui*, 591 F.3d 263, 266 (4th Cir. 2010); a federal jury convicted Wadih el Hage, Mohamed Odeh, and Mohamed al Owhali for conspiring to bomb the American embassies in Kenya and Tanzania, *see In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 107 (2d Cir. 2008); and Ahmed Abu Khattalah, who stands accused of conspiring to attack the American diplomatic mission in Benghazi, Libya, awaits trial in this very courthouse, *see* Superseding Indictment, *United States v. Ahmed Abu Khattala*, No. 14-cr-141 (D.D.C. Oct. 14, 2014), ECF No. 19.

By contrast, although the detention camp at the U.S. naval station at Guantánamo Bay has held at least 780 individuals since opening shortly after September 11th, and although military prosecutors have brought charges against some two hundred, the commissions have convicted only eight: al Bahlul, Hamdan, Noor Uthman Muhammed, David Hicks, Omar Khadr, Majid Khan, Ibrahim al Qosi, and Ahmed al Darbi. *See* MIAMI HERALD, *Guantánamo: By the Numbers*, http://goo.gl/SEPfV6 (last updated May 12, 2015). Furthermore, due to various questions about the military-commission process itself, as of this writing only three of

those convictions—Khan's, al Darbi's, and al Qosi's—remain on the books and unchallenged.

1

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting: In 1952, the Honorable Robert H. Jackson—Associate Justice of the United States Supreme Court and former chief prosecutor at Nuremberg—set out what has become the "accepted framework" for our constitutional jurisprudence in the areas of national security and military affairs. *Medellín v. Texas*, 552 U.S. 491, 524 (2008). Justice Jackson famously identified three categories of governmental action. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) (Jackson, J., concurring). When the President and the Congress disagree (Category 3), their powers are subtractive. *Id.* at 637–38. When the President and the Congress act in concert (Category 1), however, their powers are additive: "the United States is invested with all the attributes of sovereignty" and the courts "should hesitate long before limiting or embarrassing such powers." *Id.* at 635–37 & n.2 (quoting *Mackenzie v. Hare*, 239 U.S. 299, 311 (1915)) (emphasis omitted).

Yet, according to my colleagues, Justice Jackson didn't get the math quite right. He apparently failed to factor in an additional constraint on the political branches' combined war powers: international law. My colleagues contend—as a matter of *constitutional law*, not simple comity—that the Congress cannot authorize military-commission trials unless the international community agrees, jot and tittle, that the offense in question violates the law of war. And the content of international law is to be determined by—who else?—the Judiciary, with little or no deference to the political branches. *Contra Rostker v. Goldberg*, 453 U.S. 57, 65–66 (1981) ("perhaps in no other area has the Court accorded Congress greater deference" than "in the context of Congress' authority over national defense and military affairs"). But the definition and applicability of international law is, in large part, a political determination, *see Finzer v. Barry*, 798 F.2d

1450, 1459–60 (D.C. Cir. 1986), *aff'd in part, rev'd in part sub nom. Boos v. Barry*, 485 U.S. 312 (1988), and the decision to try an alien enemy combatant by military commission is part and parcel of waging war, *see Application of Yamashita*, 327 U.S. 1, 11–12 (1946). The majority opinion thereby draws us into a thicket, one in which our "lack of competence . . . is marked," *Rostker*, 453 U.S. at 65, our democratic unaccountability glaring, *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), and the ramifications of our actions unpredictable, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("most federal judges" do not "begin the day with briefings that may describe new and serious threats to our Nation and its people").

The immediate consequences of today's decision are serious enough: my colleagues bar the Government from employing military commissions to try individuals who conspire to commit war crimes against the United States. But the consequences moving forward may prove more alarming still. My colleagues' opinion means that, in future conflicts, the Government cannot use military commissions to try enemy combatants for *any* law-of-war offense the international community has not element-by-element condoned. Their timing could not be worse. *See* Letter from the President to the Congress of the United States – Authorization for the Use of United States Armed Forces in Connection with the Islamic State of Iraq and the Levant (Feb. 11, 2015). And the beneficiary of today's decision could not be less deserving. Ali Hamza Ahmad Suliman al Bahlul (Bahlul) "is an alien unlawful enemy combatant who—like Hitler's Goebbels—led Osama bin Laden's propaganda operation." *Bahlul v. United States*, 767 F.3d 1, 33–34 (D.C. Cir. 2014) (*en banc*) (Henderson, J., concurring). He "freely admitted"—indeed, bragged about—his role in the attacks of September 11, 2001. *Id.* at 34. During his military-

commission trial, he never raised any of the arguments we today consider. The *en banc* court deemed his Ex Post Facto challenge forfeited and reviewed it for plain error only. *Id.* at 9–11. We should have taken the same approach here, rather than declaring unconstitutional a provision of the Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-366, 120 Stat. 2600.

Accordingly, I must dissent.

I. Standard of Review ................................................................ 3
II. The Constitutional Challenges ........................................... 29
    A. Article I ........................................................................ 30
        1. Define and Punish Clause ...................................... 32
        2. Necessary and Proper Clause ................................ 48
        3. Broader War Powers .............................................. 53
          a. Supreme Court Precedent ................................ 55
          b. Winthrop's Treatise ........................................ 59
          c. Historical Practice .......................................... 62
    B. Article III ..................................................................... 68
        1. Judicial Power Clause ........................................... 68
        2. Criminal Jury Clause ............................................ 80
    C. Equal Protection & First Amendment ........................ 85

## I. STANDARD OF REVIEW

Beyond its troubling ramifications, one of the real tragedies of today's decision is just how *unnecessary* it is. Rather than reaching the merits, this case should begin and end with the "measuring stick" of appellate decisionmaking: the standard of review. John C. Godbold, *Twenty Pages and Twenty Minutes: Effective Advocacy on Appeal*, 30 Sw. L.J. 801, 810 (1976). The measuring stick we should use to review Bahlul's arguments is plain error.

Bahlul is an "alien unlawful enemy combatant" (enemy combatant) subject to trial by military commission under the 2006 MCA. 10 U.S.C. § 948c (2006). He contends that his conviction of conspiracy to commit war crimes, 10 U.S.C. § 950v(28) (2006) (the challenged provision), violates the Define and Punish Clause of Article I, the Judicial Power and Criminal Jury Clauses of Article III, the equal protection component of the Fifth Amendment Due Process Clause and the First Amendment. Had Bahlul properly preserved these questions of law, we would review them *de novo*. *See United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999). But he failed to do so.

During the military-commission proceedings, as the *en banc* court determined, Bahlul "waived all pretrial motions, asked no questions during voir dire, made no objections to prosecution evidence, presented no defense and declined to make opening and closing arguments." *Bahlul*, 767 F.3d at 7. He "flatly refused to participate" and "instructed his trial counsel not to present a substantive defense." *Id.* at 10. When Bahlul did make objections, they were "couched entirely in political and religious terms." *Id.* He began by accusing the United States of being "an enemy [of] the Nation of Muslims" that supports "the great injustice that is carried out by . . . the Jews on the Muslims in Palestine." Appendix (App.) 112. He concluded by disclaiming concern with the proceedings because they were based on earthly law, not Allah's dictates. App. 116. Although he made stray references to "discrimination" and the "illegal" nature of his trial, App. 114–15, his remarks were "unquestionably 'too general to have alerted the trial court to the substance of his point.' " *Bahlul*, 767 F.3d at 10 (quoting, *inter alia*, *United States v. Bolla*, 346 F.3d 1148, 1152 (D.C. Cir. 2003) (alteration omitted)). Bahlul therefore forfeited every

substantive challenge to his conviction. *See Puckett v. United States*, 556 U.S. 129, 134 (2009).

In other words, Bahlul violated the contemporaneous-objection rule. That rule requires a party to, in a phrase, "speak now or forever hold your peace": if he fails to raise an argument in the trial court, he cannot raise it later on appeal. *See id.* at 135; *Miller v. Avirom*, 384 F.2d 319, 321–22 (D.C. Cir. 1967). The contemporaneous-objection rule serves at least two purposes. First, it encourages fairness by penalizing sandbagging—*i.e.*, "the intentional withholding of an objection by a party to be raised on appeal only if he loses at trial." *Bahlul*, 767 F.3d at 9 (citing, *inter alia*, *Wainwright v. Sykes*, 433 U.S. 72, 89 (1977)). Second, the rule promotes judicial efficiency by giving the trial court the first opportunity to correct errors, *Puckett*, 556 U.S. at 134, and by ensuring that "litigation remains, to the extent possible, an orderly . . . winnowing process," *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008) (quotation marks omitted). *See also Wainwright*, 433 U.S. at 90 (contemporaneous-objection rule makes trial "main event" rather than mere "tryout on the road").

The rule operates differently in civil and criminal cases. *See Salazar ex rel. Salazar v. Dist. of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010). In civil cases, forfeiture is usually the end of the matter; the appellate court does not review the tardy argument *at all*, unless it excuses the forfeiture due to "exceptional circumstances." *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1085 (D.C. Cir. 1984). In criminal cases—including these unique enemy combatant cases—forfeiture triggers plain-error review. *Bahlul*, 767 F.3d at 9 (citing, *inter alia*, FED. R. CRIM. P. 52(b); 10 U.S.C. § 950a(a)). The appellate court *automatically* excuses the defendant's forfeiture but reviews his argument under a more

exacting standard.  *See United States v. Olano*, 507 U.S. 725, 732 (1993) ("[t]he appellate court must *consider* the error" but it "may *correct* the error . . . only if" it is plain (first emphasis added)).  In this way, the plain-error standard "tempers the blow" of the contemporaneous-objection rule for a criminal defendant.  *United States v. Young*, 470 U.S. 1, 15 (1985).  But it also "reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed."  *United States v. Frady*, 456 U.S. 152, 163 (1982).

The plain-error standard applies to "all" forfeited arguments in a criminal case.  *Puckett*, 556 U.S. at 136; *accord United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) ("[W]e do not read [the Supreme Court's cases] as allowing for any exceptions to the application of the plain-error test for forfeited claims.").[1]  There is only one type of argument that is nonforfeitable and therefore exempt from plain-error review: subject-matter jurisdiction.  *See United States v. Cotton*, 535 U.S. 625, 631 (2002); *United States v. David*, 96 F.3d 1477, 1482 (D.C. Cir. 1996); *accord United States v. Washington*, 653 F.3d 1251, 1257–58 (10th Cir. 2011) ("if a court ordinarily would consider an argument . . .

---

[1]  Most of Bahlul's arguments involve personal constitutional rights that are indisputably forfeitable.  *See Peretz v. United States*, 501 U.S. 923, 936 (1991) ("[t]he most basic rights of criminal defendants" can be forfeited); *Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited . . . ."); *see also, e.g.*, *Johnson v. United States*, 520 U.S. 461, 466 (1997) (right to petit jury); *United States v. Broxton*, 926 F.2d 1180, 1183 (D.C. Cir. 1991) (equal protection); *United States v. Accardi*, 669 F.3d 340, 343–44 (D.C. Cir. 2012) (First Amendment).

to be forfeited, it should only refrain from doing so . . . when the alleged error is jurisdictional").[2]   Subject-matter jurisdiction "can never be forfeited" because "it involves a court's *power* to hear a case."   *Cotton*, 535 U.S. at 630 (emphasis added); *see also United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996).

Bahlul cannot seriously contest the military commission's jurisdiction.  The 2006 MCA authorizes trial by military commission of "any offense made punishable by this chapter," including "conspiracy."   10 U.S.C. §§ 948d(a), 950v(b)(28) (2006).   It "explicitly confers jurisdiction on military commissions to try [Bahlul on] the charged offenses."   *Bahlul*, 767 F.3d at 10 n.6.   Granted, Bahlul challenges this jurisdictional grant as beyond the Congress's authority under the Define and Punish Clause.  A challenge to the constitutionality of a jurisdictional statute, however, is not itself jurisdictional.  *See United States v. Williams*, 341 U.S. 58, 66 (1951) ("Even the unconstitutionality of the statute

---

[2]   *Nguyen v. United States*, 539 U.S. 69 (2003), and *Glidden Co. v. Zdanok*, 370 U.S. 530 (1962) (plurality), are not to the contrary.  In both cases, the criminal defendants complained that a non–Article III judge sat by designation on the court that reviewed or issued their respective convictions.  *Nguyen*, 539 U.S. at 72 (chief judge of District Court for Northern Mariana Islands); *Glidden*, 370 U.S. at 532 (retired judge of Court of Customs and Patent Appeals).  Although the defendants failed to timely raise their objections, the Supreme Court nevertheless declined to apply the plain-error standard.  *Nguyen*, 539 U.S. at 80–81; *Glidden*, 370 U.S. at 535–36.  Both *Nguyen* and *Glidden*, however, fit comfortably within the "jurisdictional" exception to plain-error review.  In *Glidden*, the plurality declared that it was "treat[ing] the alleged defect as 'jurisdictional.' "  370 U.S. at 536.  And in *Nguyen*, the Court repeatedly described the alleged error as a challenge to the court's "authority."  539 U.S. at 79–80; *see also Rivera v. Illinois*, 556 U.S. 148, 161 (2009) (unanimous) (describing *Nguyen* as case where court of appeals "lacked *statutory authority* to adjudicate the controversy" (emphasis added)).

under which the proceeding is brought does not oust a court of jurisdiction."); *United States v. Drew*, 200 F.3d 871, 876 (D.C. Cir. 2000) (noting "the error in labeling a challenge to the constitutionality of a statute a jurisdictional issue"); *Cotton*, 535 U.S. at 630 (same); *Baucum*, 80 F.3d at 540–41 (because every federal statute enjoys "a presumption of validity," the "assertion of a constitutional defect does not work to divest th[e] court of its original jurisdiction"). Bahlul's Article I Define and Punish Clause argument is no more jurisdictional than his Article I Ex Post Facto Clause argument, which the *en banc* court reviewed for plain error. *See Bahlul*, 767 F.3d at 10 n.6 ("The question whether [the 2006 MCA] is unconstitutional does not involve the court['s] statutory or constitutional *power* to adjudicate the case." (quotation marks omitted)); *see also, e.g.*, *United States v. Nueci-Peña*, 711 F.3d 191, 197 (1st Cir. 2013) (reviewing Define and Punish Clause challenge for plain error); *United States v. Urena*, 140 F. App'x 879, 881 (11th Cir. 2005) (same).

Bahlul's challenge under the Judicial Power Clause of Article III is also forfeitable. Like his Define and Punish Clause argument, his Judicial Power Clause challenge is to the constitutionality of a jurisdictional statute, a challenge that is itself, to repeat, plainly nonjurisdictional. *See Williams*, 341 U.S. at 66; *Bahlul*, 767 F.3d at 10 n.6; *Baucum*, 80 F.3d at 540–41. The "Article III" label changes nothing; by this Clause, Article III restricts *the Congress's* power, not the power of the courts or military commissions. *See CFTC v. Schor*, 478 U.S. 833, 850 (1986) ("Article III, § 1 . . . bar[s] *congressional* attempts to transfer jurisdiction to non-Article III tribunals" (emphasis added) (quotation marks and alterations omitted)). If a Judicial Power Clause challenge were in fact jurisdictional, a court would be required to raise it *sua sponte* each time it reviews a decision of a non–Article III

tribunal (*e.g.*, agency adjudicator, magistrate judge, bankruptcy court). *See Baucum*, 80 F.3d at 541. Courts, of course, do not do this because they "would have to assure themselves of a statute's validity as a threshold matter," "run[ning] afoul of established Supreme Court precedent declining to address constitutional questions not put in issue by the parties." *Id.*; *see also, e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 64 n.19 (1989) (declining to reach Article III issue because "however helpful it might be for us to adjudge every . . . constitutional issue presented by [a statute], we cannot properly reach out and decide matters not before us"); *United States v. Spector*, 343 U.S. 169, 172 (1952) (declining to consider *sua sponte* Article III Judicial Power Clause issue); *Benjamin v. Jacobson*, 172 F.3d 144, 163 n.\*\* (2d Cir. 1999) (*en banc*) (same); *In re Constr. Equip. Co.*, 665 F.3d 1254, 1256 n.3 (Fed. Cir. 2011) (same).

Why, then, do my colleagues review Bahlul's Article III challenge *de novo*? As best I can tell, their answer is "because *Schor* says so." *See* Maj. Op. 3–9; Concur. Op. 2. I respectfully disagree. Here is the relevant passage from *Schor*:

> [O]ur precedents establish that Article III, § 1, not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves as an inseparable element of the constitutional system of checks and balances. Article III, § 1 safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby preventing the encroachment or aggrandizement of one branch at

the expense of the other. To the extent that this structural principle is implicated in a given case, *the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction* beyond the limitations imposed by Article III, § 2. When these Article III limitations are at issue, notions of consent and *waiver* cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.

478 U.S. at 850–51 (emphases added) (quotation marks, citations and alterations omitted). But the High Court did not, by this language, instruct courts to treat Judicial Power Clause challenges as nonforfeitable or to automatically review them *de novo*.[3]

---

[3] My colleagues note that the Government "conceded" their reading of *Schor* is correct. Maj. Op. 6. I do not take them to be saying, however, that the Government *waived* its plain-error argument. On the contrary, the Government "argued for plain-error review before the [United States Court of Military Commission Review (CMCR)], in its original brief to a panel of this Court and in its brief to the *en banc* court." *Bahlul*, 767 F.3d at 10 n.5. The Government again asked us to review Bahlul's Article III challenge for plain error. *See* Resp't's Br. 49–52, 60. And, even at oral argument, the Government objected to the notion that Bahlul was raising a nonforfeitable structural challenge—hardly a concession of the point. *See* Oral Arg. Recording 30:47 ("I do not acknowledge that he [Bahlul] was raising it [the structural Article III argument].").

In any event, to the extent the Government misinterprets *Schor*, I would decline to accept its interpretation. *See Young v. United States*, 315 U.S. 257, 259 (1942) ("The proper administration of the criminal law cannot be left merely to the stipulation of parties."). The Government cannot alter our *standard of review*—by concession, inadvertence, poor oral advocacy or otherwise. *See United States v. Delgado-Garcia*, 374

Put simply, *Schor* is not a case about forfeitability at all. As already discussed, the only nonforfeitable argument is subject-matter jurisdiction. *See Cotton*, 535 U.S. at 631; *David*, 96 F.3d at 1482; *accord Freytag v. Comm'r*, 501 U.S. 868, 893–94 (1991) (Scalia, J., concurring) ("A party forfeits the right to advance on appeal a *nonjurisdictional* claim, structural or otherwise, that he fails to raise at trial." (emphasis added)). *Schor* did not hold that a Judicial Power Clause challenge is "jurisdictional." Granted, the Court said that "parties cannot by consent cure the constitutional difficulty *for the same reason* that the parties by consent cannot confer on federal courts subject-matter jurisdiction." *Schor*, 478 U.S. at 851 (emphasis added). In a later case, four Justices speculated that *Schor* drew an "analogy" between the Judicial Power Clause and subject-matter jurisdiction. *Freytag*, 501 U.S. at 897 (Scalia, J., concurring). But an issue's analogy to subject-matter jurisdiction does not make it jurisdictional; in fact, the very need for analogy suggests that the concepts are different. *See* William Fleming, *Vocabulary of Philosophy*, *in* A VOCABULARY OF THE PHILOSOPHICAL SCIENCES 21 (1878) ("*Analogy* implies a difference in sort, and not merely in degree . . . ."); *see also NFIB v. Sebelius*, 132 S. Ct. 2566, 2656 n.6 (2012) (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) ("That the penalty is to be 'assessed and collected *in the same manner as* taxes' refutes the proposition that it *is* a tax . . . ." (emphases in original)). And the analogy is a poor one at that. Because there is nothing jurisdictional

F.3d 1337, 1341 (D.C. Cir. 2004) (declining to accept Government's concession that issue was jurisdictional and thus subject to *de novo* review); *Nueci-Pena*, 711 F.3d at 196 n.5 (declining to accept Government's concession that constitutional challenge should be reviewed *de novo*, rather than for plain error); *United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir. 1992) ("[N]o party has the power to *control* our standard of review." (emphasis in original)).

about a challenge to the Congress's constitutional authority to enact a statute, *see Williams*, 341 U.S. at 66; *Bahlul*, 767 F.3d at 10 n.6; *Baucum*, 80 F.3d at 540–41, a one-sentence analogy is far too slim a reed to conclude that *Schor* carved out a "judicial power" exception to the Court's earlier—and consistent—precedent on the forfeitability of constitutional arguments. *See, e.g.*, *Williams*, 341 U.S. at 66; *Yakus*, 321 U.S. at 444. *See generally Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

But don't take my word for it. The Supreme Court has since clarified that *Schor* did not declare Judicial Power Clause challenges to be nonforfeitable; instead, the Court in *Schor* at most exercised its *discretion* to excuse the forfeiture. In *Plaut v. Spendthrift Farms, Inc.*, the Government—like Bahlul—attempted to rely on *Schor* for the proposition that "parties cannot waive the structural principle of Article III." Brief for United States at 27, 514 U.S. 211 (1995) (No. 93-1121), 1994 WL 387806. The Supreme Court expressly rejected this view:

> [T]he proposition that legal defenses based upon doctrines central to the courts' structural independence can never be waived simply does not accord with our cases. Certainly one such doctrine consists of the "judicial Power" to disregard an unconstitutional statute; yet none would suggest that a litigant may never waive the defense that a statute is unconstitutional. . . . We held in *Schor* that, although a litigant had consented to bring a state-law counterclaim before an Article I tribunal, we would nonetheless *choose to consider* his Article III challenge, because "when these Article III

limitations are at issue, notions of consent and waiver cannot be *dispositive*," *id*., at 851 (emphasis added). See also *Freytag v. Commissioner*, 501 U.S. 868, 878–879 (1991) (finding a "rare cas[e] in which we should exercise our discretion" to hear a waived claim based on the Appointments Clause, Art. II, § 2, cl. 2).

*Plaut*, 514 U.S. at 231–32 (first emphasis added) (some citations omitted). *Plaut* makes plain that a party can forfeit a Judicial Power Clause argument and there is no "*Schor* exception" to the rule that a "structural" constitutional challenge is forfeitable. Whether an appellate court entertains such a challenge is a matter of *discretion*, not an inexorable command from *Schor*.[4]

Granted, in a series of bankruptcy cases, many of our sister circuits interpreted *Schor* to create a rule of nonforfeitability, despite the Supreme Court's clarification in *Plaut*. *See Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 767–73 (7th Cir. 2013), *rev'd*, No. 13-935, 2015 WL 2456619 (U.S. May 26, 2015); *In re BP RE, L.P.*, 735 F.3d 279, 286–87 (5th Cir. 2013); *Waldman v. Stone*, 698 F.3d

---

[4] My colleagues also cite *Stern v. Marshall*, 131 S. Ct. 2594 (2011), to support their reading of *Schor*. Maj. Op. 6. But *Stern* said nothing about the forfeitability of Judicial Power Clause challenges. In *Stern*, the Supreme Court reviewed *de novo* the respondent's Judicial Power Clause challenge to the bankruptcy court's adjudication of a state-law counterclaim. *See id*. at 2608. There is no indication, however, that the respondent ever *forfeited* this argument. Although he did forfeit his challenge to the bankruptcy court's adjudication of *his* defamation claim, *id*. at 2606, he "did not truly consent to" its adjudication of the *petitioner's* tortious-interference counterclaim, *id*. at 2614. And, in fact, the respondent *had* earlier objected to the bankruptcy court's jurisdiction of the counterclaim. *See id*. at 2601–02.

910, 917–18 (6th Cir. 2012). *But see In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 566 (9th Cir. 2012), *aff'd on other grounds sub nom. Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014). In *Kuretski v. Commissioner*, this Court—relying in part on the bankruptcy cases from our sister circuits—read *Schor* to mean that a party "did not (and *could not*) . . . waive his 'structural' claim" under the Judicial Power Clause of Article III. 755 F.3d 929, 937 (D.C. Cir. 2014) (emphasis added); *see also id.* at 938 (citing *Waldman*). No matter the correctness *vel non* of these cases when they were decided, their continued validity has been fatally undermined by two very recent Supreme Court decisions.

In *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015), the Supreme Court considered whether the decisions of the Trademark Trial and Appeal Board—a non–Article III tribunal—were entitled to issue-preclusive effect. *See id.* at 1299, 1303. If issue preclusion applied, the respondent claimed that the Judicial Power Clause would be violated. *See id.* at 1304. The Court expressly declined to consider the claim because the respondent had not briefed it. *See id.*; *see also id.* at 1305 n.2 ("[W]e do not decide whether such preclusion is unconstitutional because the issue is not before us."); *id.* at 1304 ("To the extent . . . there could be a meritorious constitutional objection, it is not before us."). In other words, the respondent forfeited the Article III argument—a holding that plainly contradicts the notion that Judicial Power Clause challenges are nonforfeitable. Significantly, the Court relied on *Plaut* to support its forfeiture determination. *See id.* at 1304 (citing *Plaut*, 514 U.S. at 231–32).

In *Wellness International Network, Ltd. v. Sharif*, No. 13-935 (U.S. May 26, 2015), the Supreme Court made its view on the forfeitability of a Judicial Power Clause challenge as

plain as day. The main holding of *Sharif* is that a party's consent eliminates the Article III problem presented by bankruptcy court adjudication. *See* No. 13-935, slip op. at 2. But, near the end of the opinion, the Court also indicated that Judicial Power Clause challenges are forfeitable. In the decision under review, the Seventh Circuit had held that the "structural interests" protected by the Judicial Power Clause cannot be forfeited. *See id.* at 7 & n.5 (quoting *Sharif*, 727 F.3d at 771). The Supreme Court reversed that decision *in toto*. *See id.* at 8, 20. In fact, the Court remanded the case to the Seventh Circuit with instructions to conduct the "factbound analysis" necessary to determine "whether . . . Sharif forfeited his *Stern* argument below." *Id.* at 20. [A "*Stern* argument"—it should go without saying, *contra* Maj. Op. 7–8—is a "structural" Judicial Power Clause challenge. *See Arkison*, 134 S. Ct. at 2170 ("*Stern* claims" are "claim[s] designated for final adjudication in the bankruptcy court . . . but prohibited from proceeding in that way as a constitutional matter" because "Article III prohibits *Congress* from vesting a bankruptcy court with th[at] authority" (emphasis added)).] One Justice in *Sharif* went further, concluding that remand was unnecessary because the Judicial Power Clause challenge was indisputably forfeited:

> [R]espondent forfeited any *Stern* objection by failing to present that argument properly in the courts below. *Stern* vindicates Article III, but that does not mean that *Stern* arguments are exempt from ordinary principles of appellate procedure.

*Id.*, concurring op. at 2 (Alito, J.). He, unsurprisingly, relied on *B&B Hardware* for this conclusion. *Id.* (citing *B&B Hardware*, 135 S. Ct. at 1304). The other five Justices in the *Sharif* majority necessarily agreed that "ordinary principles of appellate procedure" govern, *id.*: they would not have

remanded the forfeiture question if the Seventh Circuit were right all along that a "structural" Judicial Power Clause challenge cannot be forfeited.[5] Accordingly, *Sharif* not only overruled our sister circuits' earlier bankruptcy cases, but, in my reading, it also undermined the relevant language from *Kuretski*. *Contra* Maj. Op. 5.

Notwithstanding the charge that I "misinterpret[]" *Sharif*, Maj. Op. 8, it is my colleagues' reading that misses the mark. They believe *Sharif* reinforced *Schor*'s supposed rule of nonforfeitability. To support this point, they rely on passages in *Sharif* that discuss the distinction between the "personal" and "structural" aspects of Article III. *See* Maj. Op. 5, 6, 8

---

[5] My colleagues emphasize that in *Sharif* the Supreme Court reviewed the Article III question *de novo*. Maj. Op. 6, 8. This is true but unhelpful to them. The Supreme Court granted certiorari in *Sharif* to determine whether a party's consent cures the structural Article III problem posed by bankruptcy court adjudication—a question that was decided by the Seventh Circuit and briefed in the Supreme Court. The Court answered the question in the affirmative. It then remanded to the Seventh Circuit to determine whether Sharif in fact consented to bankruptcy court adjudication and—if not—whether Sharif nonetheless forfeited his Judicial Power Clause challenge by not timely raising it. *See* No. 13-935, slip op. at 20; Pet'r's Wellness Int'l, *et al.* Br. 47–48, 2014 WL 4467356 (U.S. 2014) (arguing that "litigants may waive or forfeit constitutional rights that implicate structural concerns"); Pet'r's Wellness Int'l, *et al.* Reply Br. 26, 2014 WL 7272803 (U.S. 2014) (again arguing that "Sharif forfeited his *Stern* argument" (quotation marks and brackets omitted)). In other words, the Supreme Court answered an important question of law *de novo* but still allowed for the prospect that Sharif would ultimately lose his appeal because he forfeited his structural Article III challenge. My colleagues' decision to *vacate* Bahlul's conviction in fact contradicts, rather than hews to, this approach. If they wanted to be faithful to *Sharif*'s disposition in the criminal context, they could have resolved Bahlul's Article III claim *de novo* under the "error" prong of the plain-error standard but then affirmed his conviction because the error was not "plain." *See infra* p. 28.

(citing *Sharif*, No. 13-935, slip op. at 9, 11–12, 14 n.10; *id.*, dissenting op. at 12 (Roberts, C.J.)). These passages, however, have nothing to do with appellate *procedure*; they instead speak to *the merits*.

To put it another way, when *Sharif* speaks of "waiver," it means the waiver of *rights*, not the forfeiture of *arguments*. The question the Court addressed in *Sharif* is whether "consent" (sometimes referred to, interchangeably, as "waiver") can "cure the *constitutional difficulty*" presented by non–Article III adjudication. No. 13-935, slip op. at 9, 14 n.10 (quoting *Schor*, 478 U.S. at 851 (emphasis added)); *id*, dissenting op.. at 12 (Roberts, C.J.) (same). The idea is that, when a party knowingly and voluntarily waives certain constitutional rights, no constitutional violation occurs *in the first place*. *See id*., slip op. at 14 n.10; *see also id.*, dissenting op. at 2 (Thomas, J.) ("Although it may not authorize a constitutional violation, consent may prevent one from occurring in the first place."). This is true for "personal" rights, like the right to a jury, but—as *Schor* and *Sharif* make plain—it is not true for violations of the Article III Judicial Power Clause. *See id.*, slip op. at 9; *Schor*, 478 U.S. at 849–51. A party's consent cannot, *by itself*, "excuse an actual violation of Article III" because the Judicial Power Clause protects "structural" interests *aliunde* the narrow concerns of the parties. *Sharif*, No. 13-935, slip op. at 14 n.10; *see also Schor*, 478 U.S. at 851 ("When these Article III limitations are at issue, notions of consent and waiver cannot be *dispositive* because the limitations serve institutional interests that the parties cannot be expected to protect." (emphasis added)). *Sharif*, however, clarified that consent can be one factor that keeps a violation of Article III from occurring, so long as it is not the only factor. *See* No. 13-935, slip op. at 14 n.10 ("[C]onsent remains highly relevant when determining . . . whether a particular adjudication in fact raises

constitutional concerns . . . . [C]onsent shows, in part, why no [structural] violation has occurred." (citation omitted)). This is an important holding: it clarifies the role of consent in the application of the *Schor* balancing test. Yet it says nothing about forfeiture, appellate procedure, preservation of arguments, standards of review or the like. It pertains only to the merits, *i.e.* the question whether Article III is in fact violated.[6]

The Supreme Court eloquently explained the waiver-of-rights/forfeiture-of-arguments distinction in *Puckett*:

> [The defendant's] argument confuses the concepts of waiver and forfeiture. Nobody contends that [the defendant's] counsel has *waived*—that is, intentionally relinquished or abandoned—[the defendant's] *right* . . . . The objection is rather that [the defendant] *forfeited* the claim of error through his counsel's failure to raise the argument in the District Court. This Court's precedents requiring that certain waivers be personal, knowing, and voluntary are thus simply irrelevant. Those holdings

---

[6] Even if my colleagues were correct that *Sharif*'s discussion of "waiver" refers to forfeiture, they could not reconcile the Court's repeated admonitions that structural Article III challenges can, in fact, be waived. *See, e.g.*, *Sharif*, No. 13-935, slip op. at 16–17 n.11 ("[T]he proposition that legal defenses based upon doctrines central to the courts' *structural* independence can never be waived simply does not accord with our cases." (quoting *Plaut*, 514 U.S. at 231 (emphasis added) (alteration in original))); *id.* at 12–13 ("[A]llowing bankruptcy litigants to waive the right to Article III adjudication of *Stern claims* does not usurp the constitutional prerogatives of Article III courts." (emphasis added)); *id.* at 17 (distinguishing *Stern*—a structural Article III precedent—on basis that "[t]he Court has never . . . h[e]ld that a litigant who has the right to an Article III court may not waive that right through his consent.").

> determine *whether error occurred*, but say nothing about the proper standard of review when the claim of error is not preserved.

556 U.S. at 138 (citation omitted) (second emphasis added). The Court's analysis makes plain an obvious point when applied here. An enemy combatant must knowingly and voluntarily consent to non–Article III adjudication before his consent can ward off a violation of the Judicial Power Clause. *See Sharif*, No. 13-935, slip op. at 18–19. But we should not even review a Judicial Power Clause challenge if he forfeits the argument by failing to timely raise it.

To summarize, the Supreme Court has made triply clear in *Plaut*, *B&B Hardware* and *Sharif* that *Schor* did not label an Article III challenge as nonforfeitable; instead, the *Schor* Court exercised its discretion to excuse a forfeiture of the Judicial Power Clause challenge. This distinction—between nonforfeitability, on the one hand, and discretion to excuse forfeiture, on the other—is crucial for two reasons.

First, in a *criminal* case like this one, an appellate court lacks the kind of discretion the Court exercised in *Schor*. As noted, appellate courts in civil cases can excuse a forfeiture in "exceptional circumstances." *Air Fla.*, 750 F.2d at 1085. The Supreme Court has expressly declined to limit this discretion. *See Exxon Shipping*, 554 U.S. at 487. Accordingly, courts occasionally exercise their discretion in civil cases to review "structural" separation-of-powers challenges *de novo*, notwithstanding they were not raised below. *See, e.g.*, *Freytag*, 501 U.S. at 879; *Schor*, 478 U.S. at 851; *Glidden*, 370 U.S. at 536–37 (plurality); *Kuretski*, 755 F.3d at 936–37. *But see Freytag*, 501 U.S. at 892–901 (Scalia, J., concurring) (explaining why "structural" constitutional challenges should not receive special treatment).

The rules are different, however, in criminal cases. Over the last three decades, the Supreme Court has repeatedly restricted our authority to deviate from the plain-error standard. *See, e.g.*, *United States v. Marcus*, 560 U.S. 258, 262–66 (2010); *Puckett*, 556 U.S. at 134–43; *Cotton*, 535 U.S. at 629–34; *Johnson*, 520 U.S. at 466–70; *Olano*, 507 U.S. at 731–41; *Young*, 470 U.S. at 14–16 & nn.12, 14; *Frady*, 456 U.S. at 163 & nn.13–14. In criminal cases, the plain-error standard operates as a "limitation on appellate-court authority." *Puckett*, 556 U.S. at 134; *see also United States v. Farrell*, 672 F.3d 27, 36 (1st Cir. 2012). It "strictly circumscribe[s]" our ability to remedy forfeited errors, *Puckett*, 556 U.S. at 134; we "must" review them for plain error only. *Marcus*, 560 U.S. at 266; *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007). The plain-error standard strikes a "careful balance" between furthering the purposes of the contemporaneous-objection rule and remedying obvious injustice. *Puckett*, 556 U.S. at 135; *see also Johnson*, 520 U.S. at 466; *Young*, 470 U.S. at 15. "Any unwarranted extension" of the standard "skew[s]" this balance, *Young*, 470 U.S. at 15, and "the creation of an unjustified exception"—like the one Bahlul requests—is "even less appropriate." *Puckett*, 556 U.S. at 136 (alteration omitted); *see also Young*, 470 U.S. at 16 n.14 (criticizing practice of creating "*per se*" exceptions to plain-error review).

Courts apply plain-error review in criminal cases notwithstanding "the seriousness of the error claimed." *Johnson*, 520 U.S. at 466; *accord United States v. Padilla*, 415 F.3d 211, 220 (1st Cir. 2005) (*en banc*) ("forfeited errors, even if structural, are subject to [plain-error review]"). Notably, when the Supreme Court was presented with a "structural" Article III challenge in a *criminal* case, four Justices thought it should be reviewed for plain error—*Schor* notwithstanding. *See Nguyen*, 539 U.S. at 88 (Rehnquist,

C.J., dissenting).[7]  Likewise, our sister circuits frequently review Judicial Power Clause challenges in criminal cases for plain error only.  *See, e.g.*, *United States v. Shultz*, 733 F.3d 616, 621 (6th Cir. 2013); *United States v. Woodard*, 387 F.3d 1329, 1331, 1333 (11th Cir. 2004); *United States v. Bishop*, 603 F.3d 279, 280 (5th Cir. 2010); *United States v. Tejeda*, 476 F.3d 471, 474 (7th Cir. 2007); *United States v. Torres*, 258 F.3d 791, 794 (8th Cir. 2001); *United States v. Mike*, 632 F.3d 686, 691–92, 700 (10th Cir. 2011); *United States v. Nash*, 438 F.3d 1302, 1304 (11th Cir. 2006); *United States v. Daniels*, 182 F.3d 910 (4th Cir. 1999) (table).

The distinction between criminal and civil cases may seem counterintuitive because, ordinarily, the plain-error standard places a criminal defendant in a *better* position than a civil litigant.  *See Bahlul*, 767 F.3d at 9 (plain-error review "mitigate[s] the sometimes harsh results of the forfeiture rule in criminal cases").  But this intuition focuses myopically on one side of the plain-error "balance" to the exclusion of the other.  *Puckett*, 556 U.S. at 135.  Plain-error review gives the contemporaneous-objection rule its "necessary bite."  Daniel J. Meltzer, *State Court Forfeitures of Federal Rights*, 99 HARV. L. REV. 1128, 1135 (1986); *see also id.* ("A requirement that a particular issue be raised in a particular fashion or at a particular time would hardly be effective if failures to comply were never punished.").  As the Supreme Court has cautioned, "a reflexive inclination by appellate courts to reverse because of unpreserved error would be *fatal*" to the rationale of the contemporaneous-objection rule.  *Puckett*, 556 U.S. at 134 (emphasis added).  That rationale is "especially compelling" in criminal cases.  *Cobbledick v.*

---

[7] The majority in *Nguyen* did not reach the Article III question because it decided the case on an alternate statutory ground. *See* 539 U.S. at 81.

*United States*, 309 U.S. 323, 325 (1940); *see also Di Bella v. United States*, 369 U.S. 121, 124 (1962) ("undue litigiousness and leaden-footed administration of justice [are] particularly damaging to the conduct of criminal cases").  Society has an especially strong interest in the finality of criminal proceedings because "[w]ithout [it], the criminal law is deprived of much of its deterrent effect."  *Teague v. Lane*, 489 U.S. 288, 309 (1989); *see also id.* ("No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation."); *Young*, 470 U.S. at 16 ("To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.").  In short, plain-error review reconciles multiple competing concerns in criminal cases and provides a rule to accommodate them *ex ante*.  Absent jurisdictional error, we cannot do otherwise than apply this venerable standard.[8]

---

[8] None of this analysis—contrary to my colleagues' contention, Maj. Op. 9—turns on the applicability of FED. R. CRIM. P. 52(b).  The *en banc* court imported the plain-error standard into enemy combatant cases "whether or not Rule 52(b) directly governs."  *Bahlul*, 767 F.3d at 9 n.4 (citing *Salazar*, 602 F.3d at 437).  The plain-error standard strikes a delicate "balance" that is irrevocably "skew[ed]" whenever courts exempt litigants from its requirements.  *Salazar*, 602 F.3d at 440.  The Supreme Court's decisions to this effect bind us no matter the doctrinal source of the plain-error standard.  *See Olano*, 507 U.S. at 731 (noting that Rule 52(b) is merely "a restatement of existing law" (quoting FED. R. CRIM. P. 52(b), advisory committee's note (1944))).

To the extent it makes a difference, the plain-error standard *does* have a statutory basis in enemy combatant cases.  The 2009 MCA provides that "[a] finding or sentence of a military commission . . . may not be held incorrect on the ground of an error of law unless the error

materially prejudices the substantial rights of the accused." 10 U.S.C. § 950a(a). The Congress took this language from the review provision in the Uniform Code of Military Justice (UCMJ). *See id.* § 859(a); *see also id.* § 948b(c) ("[t]he procedures for military commissions . . . are based upon the procedures for trial by general courts-martial under . . . the [UCMJ]"). The U.S. Court of Appeals for the Armed Forces (CAAF) has long read the UCMJ's review provision to incorporate a plain-error standard that is identical, in all material respects, to Rule 52(b). *See United States v. Tunstall*, 72 M.J. 191, 197 n.7 (C.A.A.F. 2013); *see also id.* at 196 ("To establish plain error, an appellant has the burden to demonstrate: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused."). Given the CAAF's interpretive gloss on the UCMJ and the Congress's use of identical language in the 2009 MCA, the plain-error standard applies with the same statutory force here. *See* 10 U.S.C. § 948b(c) ("judicial construction and application" of UCMJ is "instructive" in interpreting 2009 MCA); *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."); *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."). The sources cited by my colleagues, Maj. Op. 9, are inapposite because they deal with review by the Service Courts of Criminal Appeals (CCAs) and CMCR, rather than the "much more limited" review of the CAAF and this Court. *United States v. Claxton*, 32 M.J. 159, 162 (CMA 1991); *see also United States v. Powell*, 49 M.J. 460, 463 (CAAF 1998) ("[CCAs] enjoy much broader appellate authority than civilian intermediate courts or our Court."); *United States v. Riley*, 47 M.J. 276, 281 (CAAF 1997) (Gierke, J., concurring) (whereas "a [CCA] may take notice of errors of law, whether or not they were preserved by timely objection[, the CAAF] is constrained by the rules of waiver and the doctrine of plain error"). Indeed, the CAAF applies plain error even when the CCA reviewed a forfeited issue *de novo*. *See, e.g.*, *Riley*, 47 M.J. at 279–80 (majority op.); *United States v. Goings*, 72 M.J. 202, 203–04 (CAAF 2013); *Tunstall*, 72 M.J. at 193–96; *United States v. Sweeney*, 70 M.J. 296, 300 n.8, 304 (CAAF 2011).

Second, even if we *could* bypass the plain-error standard and review Bahlul's Article III challenge *de novo*, I would follow the *en banc* court and decline to do so here. Preliminarily, my colleagues are wrong to suggest that the Supreme Court has "instructed that courts *should* excuse waivers of Article III structural claims." Maj. Op. 8 (emphasis added). Quite the contrary: it is a "rare" case in which we entertain a forfeited Article III argument. *Plaut*, 514 U.S. at 232 (quoting *Freytag*, 501 U.S. at 878–79). Enforcing the traditional rules of waiver and forfeiture in the context of a Judicial Power Clause challenge, as in other contexts, serves the important interests of "increasing judicial efficiency and checking gamesmanship." *Sharif*, No. 13-935, slip op. at 19. Moreover, several factors unique to Bahlul's case make it a particularly inappropriate occasion to forgive his forfeiture.

Most notably, my colleagues' application of *de novo* review leads them to invalidate a provision of the 2006 MCA—a duly enacted statute produced by a coequal branch. *See Rostker*, 453 U.S. at 64 ("[W]e must have due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government." (quotation marks omitted)). Examining the constitutionality of a statute is "legitimate only in the last resort, and as a necessity." *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892); *see also Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (courts should not "pass on questions of constitutionality unless such adjudication is unavoidable" (ellipsis omitted)); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the

necessity of deciding them."); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment) ("Particularly in an area of constitutional law such as that of 'Art. III Courts,' with its frequently arcane distinctions and confusing precedents, rigorous adherence to the principle that this Court should decide no more of a constitutional question than is absolutely necessary accords with both our decided cases and with sound judicial policy."). Restraint is particularly necessary here because our decision affects sensitive matters of national security, the consequences of which we have neither the information nor the perspicacity to predict. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("courts traditionally have been reluctant to intrude . . . in military and national security affairs"); *Latif v. Obama*, 677 F.3d 1175, 1182 (D.C. Cir. 2011) ("Both the Constitution and common sense support judicial modesty" in this area because "the judiciary has the least competence and the smallest constitutional footprint."); *Humanitarian Law Project*, 561 U.S. at 34 ("[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess.").

Further, excusing Bahlul's forfeiture would not serve the interests of justice because he is concededly—and unapologetically—guilty of the charged offenses. Before the military commission, Bahlul candidly admitted to being a member of al Qaeda and engaging in all of the conduct attributed to him. *See* App. 190–94. Although he took one exception to the charge that he wore an explosive belt in order to protect bin Laden, he also noted, "[T]his doesn't mean that if I was given an explosive belt and bin Laden . . . asked me to explode myself, that I wouldn't do that. Of course, I would." App. 194. He promised to continue "to fight America" if

released "until the last drop of blood." App. 161–62; *see also* App. 161 ("I will not leave the American government anywhere on the face of this earth."). As I explain later, *infra* pp. 38–42, Bahlul's *conduct* was indisputably illegal under international law, whether or not he was charged with an offense the international community expressly recognizes. *See Marcus*, 560 U.S. at 265 (declining to exempt from plain-error review "errors that create a risk that a defendant will be convicted based exclusively on noncriminal conduct"). The notion that we should pardon Bahlul's forfeiture is "so ludicrous as itself to compromise the public reputation of judicial proceedings." *Puckett*, 556 U.S. at 143; *see also Cotton*, 535 U.S. at 634 ("The real threat . . . to the 'fairness, integrity, and public reputation of judicial proceedings' would be if respondents, despite the overwhelming and uncontroverted evidence that they were [guilty], were to [benefit from] an error that was never objected to at trial.").

Finally, nothing prevented Bahlul from raising his constitutional challenges before the military commission. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 571 F.3d 69, 76 (D.C. Cir. 2009) (declining to forgive forfeiture because party "offer[ed] no justification for its delay"). Bahlul chose to "boycott" the proceedings in the hope it would "make the Muslims rise for [al Qaeda's] cause." App. 156, 162. By rejecting the assistance of counsel and voluntarily absenting himself from the proceedings, forfeiture was "one of the perils [Bahlul] assume[d]." *United States v. Vonn*, 535 U.S. 55, 73 n.10 (2002). Bahlul had every opportunity to raise his challenges and he must accept the consequences of his deliberate failure to do so. *See Puckett*, 556 U.S. at 136.

Nor is this a case where applying the ordinary rules of forfeiture would forever prevent *de novo* review of the

constitutionality of the challenged provision. This concern may have been the principal motivation behind *Schor*. The law at issue in *Schor* permitted the CFTC to hear state-law counterclaims in reparations proceedings. 478 U.S. at 837. But the CFTC's jurisdiction was non-exclusive: parties remained free to bring reparations claims in federal court. *Id.* at 836. Thus, parties who *chose* to litigate before the CFTC arguably waived their right to complain about the CFTC's adjudication of state-law counterclaims. The same was true for the parties who raised the counterclaims—which were permissive, not compulsory, under the relevant law. *Id.* at 837. As a result, the Supreme Court faced a dilemma. If the ordinary rules of waiver applied, no court could ever determine whether the CFTC's adjudication of state-law counterclaims violated the Judicial Power Clause of Article III. This Catch-22 likely animated the *Schor* Court's decision to excuse the waiver and explains why it thought that "the parties cannot be expected to protect" the "institutional interests" behind Article III. *Id.* at 851. Here, that concern is plainly absent because every enemy combatant has the ability—and incentive—to challenge the military commission's jurisdiction. *See Bond v. United States*, 131 S. Ct. 2355, 2365 (2011) ("[T]he claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances."); Daniel J. Meltzer, *Legislative Courts, Legislative Power, and the Constitution*, 65 IND. L.J. 291, 304 (1990) ("[T]he strategic interests of litigants substantially coincide with institutional interests protected by article III."). We can indeed check "the power of the political branches to sideline the federal courts," Maj. Op. 6, once an enemy combatant properly preserves the argument. *See Sharif*, No. 13-935, slip op. at 19 ("the Article III right is substantially honored" notwithstanding courts "permitting waiver" in some cases).

In sum, I believe my colleagues err by parting ways with the *en banc* court and reviewing Bahlul's Article III challenge *de novo*. Their decision to sidestep the plain-error standard reads too much into an obscure passage from *Schor*—a reading the Supreme Court disavowed in *Plaut* and overruled in *Sharif*—and ignores important distinctions between civil and criminal cases. *Cf. Sharif*, No. 13-935, dissenting op. at 18 (Thomas, J.) (Article III issues "cannot—and should not—be resolved through a cursory reading of *Schor*, which itself is hardly a model of careful constitutional interpretation").

Applying the plain-error standard of review, I would easily reject Bahlul's challenges to his conspiracy conviction. The plain-error standard is "difficult" to satisfy, "as it should be." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004). The forfeited error must be "so obvious" that "the trial judge and prosecutor were derelict in countenancing it." *Bolla*, 346 F.3d at 1153. Here, the Congress's decision to authorize the trial of conspiracy by military commission did not *plainly* transcend Article III, as the *en banc* court's decision and my colleague's concurrence impliedly recognize. *See Bahlul*, 767 F.3d at 18–27; Concur. Op. 1–2. At the very least, "the lack of prior precedent . . . and the novelty of the issue presented militate against calling th[is] mistake plain error." *United States v. Blackwell*, 694 F.2d 1325, 1342 (D.C. Cir. 1982); *see also United States v. Terrell*, 696 F.3d 1257, 1260 (D.C. Cir. 2012) (error not plain unless "a clear precedent in the Supreme Court or this circuit establishe[s] its erroneous character"). Thus, no matter one's view of the merits, Bahlul cannot satisfy the "plainness" requirement of the plain-error standard. *See Olano*, 507 U.S. at 732. Nor do I believe he can satisfy the "error" requirement, a topic I turn to now.

## II. THE CONSTITUTIONAL CHALLENGES

Bahlul argues that (i) the Congress—in codifying conspiracy to commit war crimes as an offense triable by military commission—exceeded its Article I powers and independently violated Article III; (ii) he was convicted based on his thoughts, beliefs and ideals in contravention of the First Amendment; and (iii) the 2006 MCA discriminates against him as an alien in violation of the equal protection component of the Fifth Amendment. The latter two arguments are frivolous on their face. *See infra* Part II.C. Bahlul's Article I and Article III arguments, however, warrant a more thorough examination.

As detailed below, the Congress acted within its Article I authority and did not contravene any personal or structural Article III principles in codifying conspiracy as an offense triable by military commission. Bahlul's conspiracy trial and conviction were sanctioned by the President,[9] "pursuant to an express . . . authorization of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Their constitutionality is therefore "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion . . . rest[s] heavily upon" Bahlul to rebut it. *Id*. at 637. Additionally:

> [T]he detention and trial of petitioner[]—ordered by
> the President in the declared exercise of his powers
> as Commander in Chief of the Army in time of war
> and of grave public danger—are not to be set aside

---

[9] *See Bahlul*, 767 F.3d at 6 ("In 2003, the President designated Bahlul eligible for trial by military commission and in 2004 military prosecutors charged him with conspiracy to commit war crimes.").

by the courts without the *clear conviction* that they are in conflict with the Constitution . . . .

*Ex parte Quirin*, 317 U.S. 1, 25 (1942) (emphasis added).[10]

## A. ARTICLE I

Bahlul begins with an uncontroversial premise: "law-of-war military commissions" can try only those "offenses against the law of war." Pet'r's Br. 12 (quoting *Bahlul*, 767 F.3d at 7). But he then embroiders that premise with needlework that produces naught but knots. First, he insists that the Congress's power to codify a law-of-war offense derives exclusively from the Define and Punish Clause, U.S. CONST. art I, § 8, cl. 10. Second, he argues that the Define and Punish Clause allows the Congress to codify a law-of-war offense only if the international community has expressly agreed, element-by-element, that the offense is cognizable. And based on the Government's concession that "conspiracy has not attained recognition at this time as an offense under customary international law," Gov't's *En Banc* Br. at 34, Bahlul insists that "[t]he answer . . . is both plain and

---

[10] In *Hamdan*, the plurality flipped *Quirin*'s "clear conviction" language, stating "[w]hen . . . neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty, the precedent must be plain and unambiguous" because "[t]o demand any less would be to risk concentrating in military hands a degree of adjudicative and punitive power in excess of that contemplated either by statute or by the Constitution." *Hamdan*, 548 U.S. at 602 (plurality). Justice Thomas, in dissent, correctly pointed out that "[t]his is a pure contrivance, and a bad one at that. It is contrary to the [clear conviction] presumption we acknowledged in *Quirin*." *Id.* at 690 (Thomas, J., dissenting). In any event, the *Quirin* presumption, even by the *Hamdan* plurality's lights, applies here because Bahlul's offense *is* "defined by statute"—namely, the 2006 MCA. *See id.* at 602 (plurality).

uncontested": conspiracy falls outside the Congress's Article I power. Pet'r's Br. 24.

Both of Bahlul's embroidered premises are wrong. Even under the Define and Punish Clause alone, the Congress has the constitutional authority to codify conspiracy to commit war crimes by military commission. The international community *does* recognize that Bahlul violated "the principles of the law of nations, as they result from the usages established among civilized peoples, from the laws of humanity and the dictates of the public conscience," *Quirin*, 317 U.S. at 35, and the Congress has done nothing more than provide for "the limits or precise meaning" of those principles in authorizing the trial and sentencing by military commission for the violation thereof. 11 U.S. Op. Atty. Gen. 297, 299 (1865) (then–Attorney General James Speed's review of Lincoln conspirators' trial).

Bahlul's other embroidered premise fares no better. The Congress does not derive its power to enumerate war crimes triable by military commission solely from the Define and Punish Clause. As the Supreme Court has recognized, the "capture, detention, and *trial* of unlawful combatants" are " 'important incidents of *war*,' " *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (plurality) (quoting *Quirin*, 317 U.S. at 28 (emphases added) (alteration omitted)), and the Congress's power to conduct war, in all of its "incidents," necessarily derives from its several Article I war powers *mutatis mutandis*. "[U]nlike the Define and Punish Clause, . . . the other Article I war powers clauses do not refer to international law and are not defined or constrained by international law." *Bahlul*, 767 F.3d at 73 (Kavanaugh, J., concurring/dissenting).

## 1. Define and Punish Clause

The Define and Punish Clause declares that "[t]he Congress shall have Power . . . [t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  U.S. CONST. art. I, § 8, cl. 10. The power to "define" means that the Congress can "determine," "decide" or "lay down definitely" offenses against the law of nations.  *Define*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).  The word "define"—especially joined by the conjunction "and"—has teeth.

At the Constitutional Convention, the debate over the Define and Punish Clause focused on whether the Congress should be given the power to do more than merely *punish* violations of the law of nations.  An early draft of the Clause recited that the Congress could "define & punish piracies and felonies on the high seas" but could only "*punish* offenses agst. the law of nations."  Charles D. Siegal, *Deference and Its Dangers: Congress' Power to "Define . . . Offenses Against the Law of Nations"*, 21 VAND. J. TRANSNAT'L L. 865, 876 (1988) (quoting 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 614 (Farrand ed. 1937) (Madison's notes) (emphasis added)).  Gouverneur Morris, a Pennsylvania delegate to the Constitutional Convention, "moved to strike out 'punish' before the words 'offenses agst. the law of nations' " so that they would be "*definable* as well as punishable, by virtue of the preceding member of the sentence."  *Id.* (emphasis in original).  James Wilson, another Pennsylvania delegate, objected, arguing that "[t]o pretend to *define* the law of nations" would give the drafters a "look of arrogance" and "make us ridiculous."  *Id.* (emphasis in original).  In rejoinder, Morris explained that passive reliance on the international community was unworkable because "the law of nations [is] often too vague and deficient to be a rule."

*Id.* (alterations omitted); *see also* THE FEDERALIST NO. 42, at 266 (Madison) (explaining that "define" power was necessary to secure "certainty and uniformity"). Morris's approach carried the day, establishing that the Congress was not reflexively to follow other nations' lead in formulating offenses but instead to contribute to their formulation. *See* Peter Margulies, *Defining, Punishing, and Membership in the Community of Nations: Material Support and Conspiracy Charges in Military Commissions*, 36 FORDHAM INT'L L.J. 1, 27 (2013) ("Morris's concern suggested that Congress would play a valuable role by not merely defining the law of nations in a mechanical fashion, but refining that occasionally turgid and murky stream of disparate sources."); *cf.* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 316 (Morris) ("define . . . was said by others to be applicable to the creating of offences").

The Clause's history and text suggest two principles helpful to our interpretive task. The first is that international law derives from "a myriad of sources" and is "vast and always changing." Margulies, *supra*, at 24; *see also Bahlul*, 767 F.3d at 54 (Brown, J., concurring/dissenting). Justice Joseph Story, in 1820, recognized the varying nature of international law, observing that "[o]ffences . . . against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations," and therefore the Congress was given the "power to define." *United States v. Smith*, 18 U.S. 153, 159 (1820). The observation has stood the test of time. As declared at the Nuremburg International Military Tribunal that tried the World War II war criminals:

> [I]nternational law is not the product of an international legislature, and . . . international agreements . . . have to deal with general principles

of law. . . .  The law of war is to be found not only in treaties, but in the customs and practices of states which gradually obtained universal recognition, and from the general principles of justice applied by jurists and practised by military courts.  This law is not static, but by continual adaptation follows the needs of a changing world."

1 INT'L MILITARY TRIBUNAL (IMT), TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL: NUREMBERG 221 (1947).

The second principle is that "[t]he judiciary must give Congress extraordinary deference when it acts under its Define and Punish Clause powers." *Bahlul*, 767 F.3d at 59 (Brown, J., concurring/dissenting).  The Framers recognized that "[d]efining and enforcing the United States' obligations under international law require the making of extremely sensitive *policy* decisions, decisions which will inevitably color our relationships with other nations." *Finzer*, 798 F.2d at 1458 (emphasis added).  "[S]uch decisions 'are delicate, complex, and involve large elements of prophecy. . . .  They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility.' "  *Id.* at 1458–59 (quoting *Chi. & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948)).  Indeed, "[j]udicial deference to such congressional definition is but a corollary to the grant to Congress of *any* Article I power." *Eldred v. Ashcroft*, 537 U.S. 186, 218 (2003) (emphasis added) (quotation marks omitted).

The Supreme Court has remained faithful to these principles in the few instances in which it has examined the prosecution of war crimes by military commission.  The first instance was *Quirin*.  There, the Court had no difficulty

concluding that the offenses charged against the Nazi saboteurs—espionage and sabotage—had "generally been accepted" as punishable by military commission under international law. *Quirin*, 317 U.S. at 31–36. The offenses with which the saboteurs were charged, according to the *Quirin* Court, resulted from conduct "plainly" recognized as violative of the law of war. *Id.* at 46.

But the precedent my colleagues *cannot* reconcile with their Define and Punish Clause holding is *Application of Yamashita*, 327 U.S. 1 (1946). At the time Japanese Commander Yamashita assumed command, General MacArthur's troops were waging their assault on, and ultimate liberation of, the Philippines. *Id.*. at 31–32 (Murphy, J., dissenting). Although Allied victory was imminent, Yamashita's army troops and naval forces "exterminate[d] a large part [more than 25,000] of the civilian population of Batangas Province." *Id.* at 14 (majority op.). While the crimes committed by Yamashita's *soldiers and sailors* were "recognized in international law as violations of the law of war," Yamashita *himself* was not charged with participating in, or directing, their commission but instead with "fail[ing] to discharge his duty as commander to control . . . the members of his command." *Id*. at 13–14. The difficulty, then, was that international law did not expressly provide that a war-time commander could be prosecuted for failing to stop those under his command from committing war crimes. *See* Siegal, *supra*, at 883 (noting international law "dealt only tangentially with the issue" and "no provision dealt specifically with a commander's obligation to control his troops"). Nevertheless, the Court affirmed Yamashita's conviction and capital sentence.

In so doing, the Court framed the question as follows:

> [W]hether the law of war imposes on an army commander a duty to take such appropriate measures as are within his power to control the troops under his command for the prevention of the specified acts which are violations of the law of war and which are likely to attend the occupation of hostile territory by an uncontrolled soldiery, and whether he may be charged with personal responsibility for his failure to take such measures when violations result.

*Yamashita*, 327 U.S. at 14–15. The Court looked to four international-law sources for an answer. Although none directly addressed whether a commanding officer's failure to affirmatively prevent his troops from committing war crimes was itself a war crime, the Fourth Hague Convention of 1907 established that armed forces could be considered lawful belligerents only if commanded by an individual "responsible for his subordinates." *Id.* at 15 (quoting 36 Stat. 2295). Article 43 of the Annex to the Fourth Hague convention required a commander occupying enemy territory to "take all the measures in his power to restore, and *ensure, as far as possible, public order and safety, while respecting*, unless absolutely prevented, *the laws in force in the country*." *Id.* at 16 (quoting 36 Stat. 2306) (emphases added).[11] Notwithstanding the absence of international authority outlawing a commander's failure to affirmatively prevent

---

[11] The other two sources included Article 19 of the Tenth Hague Convention, which mandated that commanding officers of bombarding naval vessels must adhere to the principles of the Tenth Hague Convention, *Yamashita*, 327 U.S. at 15 (quoting 36 Stat. 2389), and Article 26 of the Geneva Red Cross Convention of 1929, which included rules related to wounded and sick in armies and made it the commander's duty to provide "details of execution of" his duties under that Convention. *Id*. at 15–16 (quoting 47 Stat. 2074, 2092).

those under his command from committing war crimes, the Court was not deterred, finding it "evident that the conduct of military operations by troops whose excesses are unrestrained by the orders or efforts of their commander would almost certainly result in violations which it is the *purpose* of the law of war to prevent." 327 U.S. at 15 (emphasis added). That "purpose . . . would largely be defeated if the commander . . . could with impunity neglect to take reasonable measures for their protection." *Id.* "Hence the law of war *presupposes* that its violation is to be avoided through the control of the operations of war by commanders who are to some extent responsible for their subordinates." *Id.* (emphasis added).

The holding was attacked—*molto agitato*—by the two dissenting Justices, *see id.* at 35 (Murphy, J., dissenting) (noting that "[i]nternational law ma[de] no attempt to define the duties of a commander of an army under constant and overwhelming assault; nor [did] it impose liability under such circumstances"); *id.* at 43 (Rutledge, J., dissenting), on the same ground Bahlul today urges. Justice Murphy's criticism was sweeping: "Nothing in all history or in international law" established that "such a charge against a fallen commander of a defeated force" constituted a war crime. *Id.* at 35 (Murphy, J., dissenting); *see also* Eugene Kontorovich, *Discretion, Delegation, and Defining in the Constitution's Law of Nations Clause*, 106 Nw. U. L. Rev. 1675, 1736 (2012) (charge in *Yamashita* was upheld "with some general and not quite on-point citations to the Hague Conventions.").[12]

---

[12] Contrary to my colleagues' suggestion, I do not rely on *Yamashita* as precedent that speaks directly to "the type of deference owed to Congress." Maj. Op. 27. Rather, in *Yamashita*, as in *Quirin* and *Hamdan*, the Court noted that the Congress did not "itself undertake[] to . . . define" the law of war. *See infra* p. 44. It is wrong, however, to suggest that

Mindful of the two principles discussed above—the inherently fluid nature of international law and the deference owed to the Congress's power to define offenses against the law of nations—we should examine whether the international community *permits* Bahlul to be tried by military commission rather than requiring that the charge against him, as defined by the Congress, *matches* an offense expressly recognized by the law of nations as a war crime.

Bahlul was convicted of "conspiracy to commit war crimes." *Bahlul*, 767 F.3d at 5.[13]  The 2006 MCA defines conspiracy as including any enemy combatant "who conspires to commit one or more" law-of-war offenses and "who knowingly does any overt act" in furtherance thereof.  10 U.S.C. § 950v(28) (2006).  As is common in the United States, the conspiracy offense set out in the 2006 MCA has two elements: an agreement to commit a war crime and an overt act in furtherance of that agreement. *Cf., e.g.*, 18 U.S.C. § 371.

In civil-law countries, conspiracy is instead viewed as a type of vicarious liability requiring proof of a completed offense. *See* Margulies, *supra*, at 84.  Inchoate conspiracy has

---

*Yamashita* does not bear on the proper interpretation of the Define and Punish Clause. Far from it. *Yamashita* demonstrates that the Supreme Court, implicitly rejecting the rigid international-law veto my colleagues rely upon to vacate Bahlul's conviction, recognizes that military commissions may constitutionally try offenses that, like inchoate conspiracy, reflect broad international norms.  My colleagues make no attempt to meet *Yamashita* on its terms and, given *Yamashita*'s significance, the silence is deafening.

[13]  Bahlul was also convicted of material support and solicitation, which convictions were earlier vacated by the *en banc* court. *See Bahlul*, 767 F.3d at 5, 29, 31.

been internationally recognized, however, in connection with certain war crimes. *See* 1 IMT, *supra*, at 224–26 ("common plan" to wage aggressive war); Updated Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 4 (2009) (making punishable "conspiracy to commit genocide" as well as incitement or attempt to commit genocide and complicity in genocide); Statute of the International Criminal Tribunal for Rwanda, art. 2 (1994) (same); Convention on the Prevention and Punishment of the Crime of Genocide, art. 3 (1948) (same). Additionally, international law recognizes "joint criminal enterprise" (JCE). *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 220 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999). JCE has three essential elements: "a plurality of persons participating in the criminal plan," "the existence of a common purpose which amounts to or involves the commission of a crime," and "the accused's participation in the common design." Giulia Bigi, *Joint Criminal Enterprise in the Jurisprudence of the International Criminal Tribunal for the Former Yugoslavia and the Prosecution of Senior Political and Military Leaders: The Krajišnik Case*, *in* 14 MAX PLANCK YEARBOOK OF UNITED NATIONS LAW 56 (A. von Bogdandy & R. Wolfrum eds. 2010).

At one point, my colleagues suggest that the conspiracy offense set out in the 2006 MCA is *inconsistent* (as opposed to not recognized *in haec verba*) with international law. They note that "[t]he International Military Tribunal at Nuremberg considered and rejected conspiracy to commit war crimes as an international law of war offense." Maj. Op. 24. The Nuremburg Tribunal, however, did recognize one inchoate conspiracy offense: "common plan" to wage aggressive war. 1 IMT, *supra*, at 224–26. The Congress is aware of this history and could have legitimately concluded that the international community would agree that the September 11,

2001 attacks are sufficiently abhorrent to impose inchoate-conspiracy liability. Importantly, the "jurisdiction" of the military commission has traditionally been "adapted in each instance to the need that called it forth," *Madsen v. Kinsella*, 343 U.S. 341, 347–48 (1952),[14] and international terrorism is "the global security challenge of the 21st Century." *Bahlul*, 767 F.3d at 61 (Brown, J., concurring/dissenting). Furthermore, international law has developed since the Nuremberg trials of seventy years ago. International tribunals now prosecute JCE, which "functions in ways virtually identical to" inchoate conspiracy. Allison Marston Danner & Jenny S. Martinez, *Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law*, 93 CAL. L. REV. 75, 119 (2005). Thus, the hesitation of certain Allies at Nuremberg—that "overbroad application of the conspiracy principle may drag innocent people into the prosecution's net," TELFORD TAYLOR, THE ANATOMY OF THE NUREMBERG TRIALS: A PERSONAL MEMOIR 553 (1992)—appears to have been removed by the international community. Indeed, JCE allows the prosecution as war criminals of those who join together and participate in a criminal plan, which plan's purpose "amounts to" the commission of a crime. Bigi, *supra*, at 56; *see also Tadic, supra*, at ¶ 199. Bahlul joined with other al Qaeda members and participated[15] in the plan to attack our

---

[14] My colleagues fault my reliance on *Madsen* because "that case involved a military government commission, not a law of war military commission." Maj. Op. 31–32. But *Madsen*'s reliance on *Yamashita*, in which case the Supreme Court expressly decided a law-of-war military commission had jurisdiction over a law-of-war offense, makes plain that *Madsen*'s discussion of "the history of United States military commissions" encompasses Bahlul's military commission. *See Madsen*, 343 U.S. at 346.

[15] The charges against Bahlul, on which he was convicted, alleged that he:

a.  traveled to Afghanistan with the purpose and intent of joining al Qaeda;

b.  met with Saif al 'Adl, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization;

c.  underwent military-type training at an al Qaeda sponsored training camp then located in Afghanistan near Mes Aynak;

d.  pledged fealty, or "bayat," to the leader of al Qaeda, Usama bin Laden, joined al Qaeda, and provided personal services in support of al Qaeda;

e.  prepared and assisted in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer U.S.S. Cole," to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite and advise persons to commit Terrorism;

f.  acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;

g.  arranged for Muhammed Atta, also known as Abu Abdul Rahman al Masri, and Ziad al Jarrah, also known as Abu al Qa'qa al Lubnani, to pledge fealty, or "bayat," to Usama bin Laden;

h.  prepared the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by the said Muhammed Atta, Ziad al Jarrah and others at various locations in the United States on September 11,2001;

i.  at the direction of Usama bin Laden, researched the economic effect of the September 11, 2001 attacks on the United States, and provided the result of that research to Usama bin Laden;

j.  operated and maintained data processing equipment and media communications equipment for the benefit of Usama bin Laden and other members of the al Qaeda leadership.

Charge Sheet 2–3; Findings Worksheet 3–4.

country on September 11, 2001, which plan's purpose—to murder civilians—"amounts to" the commission of a war crime.

Discernible in this brief discussion is a common animating principle that, notwithstanding the differences in descriptive labels or elements, individuals who join together to further the commission of a war crime violate the law of war. Granted, the Congress did not include proof of a completed war crime as an element of the conspiracy offense included in the 2006 MCA. My colleagues characterize this omission as the *creation* of a new, purely "*domestic*" offense, as if it were made out of whole cloth. Maj. Op. 15. In my view, the Congress has taken a preexisting international law-of-war offense—conspiracy to commit war crimes—and eliminated one element. This it is constitutionally authorized to do within its "power to define" that Justice Story wrote about almost 200 years ago. *Smith*, 18 U.S. at 159; *see also Bahlul*, 767 F.3d at 57 (Brown, J., concurring/dissenting).

Nor does the Define and Punish Clause require the Congress to wait for the international community to catch up. The *Yamashita* Court did not play "Mother, may I" with established international law. *See* 327 U.S. at 15–16. Instead, it used what it viewed as the international law of war's "presuppos[ition]" and "purpose" in order to uphold Yamashita's conviction of "failure to prevent" war crimes, which failure "result[ed] in" war crimes it was "the purpose of the law of war to prevent." *Id.* at 15–16 & n.3. Moreover, it upheld Yamashita's war crimes convictions for *omissions to act*; even more cognizable as war crimes, then, are Bahlul's *commissions*. *See supra* pp. 40–41 n.15. And today, in our post-*Erie* world, we recognize that there is no "transcendental body of law outside of any particular State." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). Law is created, not

discovered, and it changes based on the actions of individual sovereigns. As one commentator puts it:

> [I]nternational law has grown more fluid and responsive to shifts in international consensus. The United States' influence on international law has changed as well: the twentieth century saw the nation develop into a superpower, one that, when it trims its sails, can cause the winds of international law to blow in a new direction.

Note, *The Offences Clause After* Sosa v. Alvarez-Machain, 118 HARV. L. REV. 2378, 2390 (2005); *see also* Stewart Jay, *The Status of the Law of Nations in Early American Law*, 42 VAND. L. REV. 819 (1989). In my view, the Congress can, consonant with the Define and Punish Clause, track somewhat ahead of the international community. The United States can be the standard bearer and take the reins in resolving difficult questions of international law related to the ongoing threat of international terrorism. *See Bahlul*, 767 F.3d at 61 (Brown, J., concurring/dissenting) ("Perhaps the United States should be a leader in this area—a leader in international law commensurate with its status as a military leader in the war on terror—recognizing the offense of conspiracy to commit acts of terrorism.").[16]

---

[16] Unlike my colleagues, *see* Maj. Op. 24, 26–27, I do not find the dicta from *United States v. Furlong*, 18 U.S. 184 (1820), or *United States v. Arjona*, 120 U.S. 479 (1887), on point. *Furlong* merely held that the Congress could not declare "murder to be *piracy*" because "there exist well-known distinctions between the crimes of piracy and murder" and "[t]hese are things so essentially different in their nature[] that not even the omnipotence of legislative power can confound or identify them." 18 U.S. at 196, 198. The same bright line cannot be drawn here because, unlike piracy—"a crime of a settled and determinate nature"—"[o]ffences

My colleagues' narrow view of the Congress's authority under the Define and Punish Clause, requiring that a law-of-war offense be *already* recognized by the international community on an element-by-element basis, follows, they believe, from *Quirin* and *Hamdan*. In my view, these two cases did not set the outer limits of the Congress's authority because neither involved an exercise of the Congress's power to "define" the law of nations. The military commissions in *Hamdan* and *Quirin* operated under section 821 (or its predecessor), giving military commissions jurisdiction of "offenses that by statute or *by the law of war* may be tried by military commissions." 10 U.S.C. § 821 (emphasis added). By enacting this statute, however, the Congress did not "itself undertake[] to . . . define" the law of war but instead left its definition to the courts. *Quirin*, 317 U.S. at 29–30. Accordingly, to determine whether an offense was covered by section 821, the Supreme Court had to survey the "common law" of war, *id*. at 30; *Hamdan*, 548 U.S. at 593, which is necessarily limited to the offenses *already* recognized as triable by military commission. *See Hamdan*, 548 U.S. at 595 (plurality) ("The common law governing military commissions may be gleaned from past practice and what sparse legal precedent exists."); *see also Quirin*, 317 U.S. at

---

. . . against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined." *Smith*, 18 U.S. at 159, 161. *Arjona*, moreover, stands only for the proposition that a statute need not include the phrase "offense against the law of nations" to be a valid exercise of the Congress's Define and Punish Clause power. 120 U.S. at 488. It says nothing about the deference we owe the Congress when it exercises that power. *Cf. Boos*, 485 U.S. at 329 (deferring to "congressional judgment in this delicate area"); *Ware v. Hylton*, 3 U.S. 199, 224 (1796) (opinion of Chase, J.) ("If the right is conceded to be in Congress, it necessarily follows, that she is the judge of the exercise of the right, as to the extent, mode, and manner.").

29 (looking to what "our courts" have recognized as "violations of the law of war").

In *Hamdan*, however, five Justices emphasized that their task would have been considerably easier had the Congress affirmatively *defined* conspiracy as an offense against the law of war. *See* 548 U.S. at 601–02 (plurality) (noting Congress had not "positively identified 'conspiracy' as a war crime"); *id.* at 612 (noting "the absence of specific congressional authorization"); *id.* at 595 (majority op.) (same); *id.* at 636 (Breyer, J., concurring) ("Nothing prevents the President from returning to Congress to seek the authority he believes necessary."). As Justice Kennedy put it:

> I . . . see no need to address the validity of the conspiracy charge . . . . Congress may choose to provide further guidance in this area. Congress, not the Court, is the branch in the better position to undertake the "sensitive task of establishing a principle not inconsistent with the national interest or with international justice."

*Id*. at 655 (Kennedy, J., concurring in part) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964)).

Heeding this call, the Congress provided such guidance by enacting the 2006 MCA, which expressly enumerates conspiracy as a law-of-war offense triable by military commission. *See* 10 U.S.C. § 950v(28) (2006). Inexplicably, my colleagues suggest that the Congress was *not* exercising its power to "define" the law of nations in enacting the challenged provision. Maj. Op. 26; Concur. Op. 4. The *en banc* court, however, necessarily recognized that the Congress *was* exercising its power to "define" in the 2006 enactment. *See Bahlul*, 767 F.3d at 13 ("[T]he 2006 MCA . . . provides the President the very power he sought to exercise in

*Hamdan*—the power to try the 9/11 perpetrators for conspiracy . . . by military commission . . . . We must heed this inter-branch dialogue." (citations omitted)); *id.* at 26 ("[T]he elements of the conspiracy charge were not defined by statute in *Hamdan* . . . . Here, the Congress has positively identified conspiracy as a war crime." (citation omitted)). Moreover, the legislative history accompanying the 2006 MCA makes plain that the Congress viewed itself as acting pursuant to its authority under the Define and Punish Clause.[17] My colleagues rely on the Government's failure to argue this point but we "retain[] the independent power to identify and apply the proper construction of governing law." *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993). And, to the extent we consider the parties' characterizations of what the Congress did, Bahlul himself concedes that the Congress "codified a conspiracy offense . . . in a self-conscious exercise of its power under the Define & Punish Clause." Pet'r's Br. 22; *see also id.* at 21–22 ("The Define & Punish Clause is the authority . . . to which Congress looked when enacting the 2006 Act." (citing H.R. REP. NO. 109-664, pt. 1, at 24)); *id.* at 25 ("Congress enacted

---

[17] *See, e.g.*, H.R. REP. NO. 109-664, pt. 1, at 24 (2006) ("The offenses defined here . . . reflect the codification of the law of war into the United States Code pursuant to Congress's constitutional authority to 'Define and Punish * * * Offences against the Law of Nations.' "); *id.*, pt. 2, at 15 ("[T]he Committee finds the authority for this legislation in article 1, section 8 of the Constitution, including clauses 10 [the Define and Punish Clause], 11, 14 and 18."); S. 3930, 109th Cong. § 102 (2006) ("Congress makes the following findings: (1) The Constitution of the United States grants to Congress the power 'To define and punish . . . Offenses against the Law of Nations', as well as the power 'To declare War . . . To raise and support Armies . . . <and> To provide and maintain a Navy'. . . . It is in the national interest for Congress to exercise its authority under the Constitution to enact legislation authorizing and regulating the use of military commissions to try and punish violations of the law of war.").

[the challenged provision] in explicit reliance on its power under the Define & Punish Clause."). Contrary to my colleagues' suggestion, Maj. Op. 26, the Congress does not need to incant any magic words to invoke its "define" power. *See Arjona*, 120 U.S. at 488 (if "[a] statute defines the offense, . . . there is no more need of declaring in the statute that it is . . . an offense [against the law of nations] than there would be in any other criminal statute to declare that it was enacted to carry into execution any other particular power").

Bahlul's conspiracy conviction thus stands on firmer constitutional footing than Hamdan's, Quirin's or even Yamashita's convictions. The Congress has in fact *exercised* its Article I power to "define" conspiracy as an offense against the law of nations. The difference between this case and *Hamdan* is the difference between Justice Jackson's first and third categories, respectively. *See Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring). The Congress has *used* its expertise in national security and military affairs, *see Finzer*, 798 F.2d at 1458–59, which warrants the Judiciary's utmost deference. Unlike my colleagues, I would not treat this case as another *Quirin* or *Hamdan*. Every Justice in *Hamdan* who ruled against the Government necessarily recognized that a case like Bahlul's would present a much easier question. Here, the Congress and the President have acted in concert, cloaking their actions "with all the attributes of sovereignty." *Youngstown*, 343 U.S. at 635 n.2 (Jackson, J., concurring). We should "hesitate long before limiting or embarrassing such powers," *id.* (emphasis omitted)—much longer and harder than my colleagues have hesitated here.

Accordingly, the Congress's decision to define conspiracy to commit war crimes as an offense against the law of war triable by military commission is consistent with international law—even if not a perfect match. Add to that

the elevated level of deference we give the Congress in exercising its Article I powers and, to me, the inclusion of conspiracy to commit war crimes in the 2006 MCA is plainly within its authority under the Define and Punish Clause.

## 2. Necessary and Proper Clause

Next, the Necessary and Proper Clause augments the Congress's already ample Define and Punish Clause authority to codify conspiracy as a law-of-war offense triable by military commission. The Supreme Court has made plain that, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute," courts "look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010); *see also Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (statute falls within Necessary and Proper Clause if "Congress had a rational basis" for concluding statute implements another enumerated Article I power). The constitutionally enumerated power here—the Define and Punish Clause—allows the Congress, at a minimum, to codify Bahlul's object offenses (*e.g.*, murder in violation of the law of war) as war crimes triable by military commission. *See Quirin*, 317 U.S. at 29. Trying by military commission those who *conspire* to commit war crimes is "convenient," "useful," and " 'conducive' to the . . . 'beneficial exercise' " of the Congress's power to authorize the trial of substantive war crimes and doing so is abundantly rational. *Comstock*, 560 U.S. at 133–34 (quoting *M'Culloch v. Maryland*, 17 U.S. 316, 413, 418 (1819)).

In *Comstock*, the Supreme Court held that the Necessary and Proper Clause granted the Congress the authority to enact a civil-commitment statute allowing the Department of Justice

to detain certain federal prisoners beyond their release date. *Id.* at 129–30. It based its holding on "five considerations": (1) the Necessary and Proper Clause "grants Congress broad authority to enact federal legislation," *id.* at 133; (2) the civil-commitment statute was a "modest addition" to preexisting law, *id.* at 137; (3) the Congress had sound reasons for the statute and the statute was "reasonably adapted" thereto, *id.* at 142–43; (4) the statute "properly accounts for state interests," *id.* at 143; and (5) the connection between the statute and an enumerated Article I power was "not too attenuated" and the statute was not "too sweeping in its scope," *id.* at 146. Here, each of these considerations indicates that the Congress acted within its constitutional authority.

*First*, as *Comstock* emphasized, the Congress's power under the Necessary and Proper Clause is broad. *See id.* at 133; *see also Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1383 (2015) (Necessary and Proper Clause "vests Congress with broad discretion over the manner of implementing its enumerated powers"). Indeed, in *M'Culloch*, "Chief Justice Marshall emphasized that the word 'necessary' does not mean 'absolutely necessary.'" *Comstock*, 560 U.S. at 134 (quoting *M'Culloch*, 17 U.S. at 413–15 (emphasis omitted)). Rather, he wrote:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

*M'Culloch*, 17 U.S. at 421. For this reason, courts deciding whether the Necessary and Proper Clause supports a piece of legislation ask only "whether the statute constitutes a means that is rationally related to the implementation of a

constitutionally enumerated power." *Comstock*, 560 U.S. at 134; *see also Sabri v. United States*, 541 U.S. 600, 605 (2004) (using "means-ends rationality" to describe necessary relationship). Moreover, the "choice of means" lies "primarily" with "the judgment of Congress" and "the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted, and the end to be attained, are matters for congressional determination alone." *Burroughs v. United States*, 290 U.S. 534, 547–48 (1934).

*Second*, the Congress, through the 2006 MCA, legislated in an area that is *exclusively* federal, not simply one with a "long history of federal involvement." *Comstock*, 560 U.S. at 149. The Supreme Court has long held that "the government of the United States has been vested exclusively with the power of representing the nation in all its intercourse with foreign countries," *Arjona*, 120 U.S. at 483, and that states are "expressly prohibited from entering into any 'treaty, alliance, or confederation.' " *Id.* (quoting U.S. CONST. art. I, § 10, cl. 1). In fact, the Define and Punish Clause itself recognizes that "[t]he national government is . . . responsible to foreign nations for all violations by the United States of their international obligations." *Id.*

*Third*, the Congress has indisputably sound reasons for codifying conspiracy as a war crime triable by military commission. As the Supreme Court has explained, "[c]oncerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961). Bahlul himself recognized this fact at his military-commission trial. He stated that he had "asked bin Laden for a martyrdom operation, a suicide operation; but

[bin Laden] refused." App. 194. He was instead put in charge of propaganda because, according to bin Laden, "recruiting people through media gets you more people than suicidal attacks." *Id.* Furthermore, there is no principled reason to prevent the United States—or any member of the international community, for that matter—from subjecting to military justice those enemy combatants who plot, but fail, to commit war crimes. Once conspirators enter into an agreement, their "[c]riminal intent has crystallized, and the likelihood of actual, fulfilled commission warrants *preventive* action." *United States v. Feola*, 420 U.S. 671, 694 (1975) (emphasis added).

*Fourth*, for the reasons discussed in the second point, *supra*, the challenged provision does not infringe on any state interest.

*Fifth*, the link between the Congress's decision to authorize trial of conspiracy to commit war crimes by military commission and its undisputed power to authorize trial of other war crimes by military commission is not attenuated. Indeed, under the challenged provision, an enemy combatant tried by military commission can be convicted of conspiracy only if the Government proves that he agreed to commit, and took acts in furtherance of committing, a war crime. There is no question that the object offenses underlying Bahlul's conspiracy conviction—which the Government proved or Bahlul conceded—violated the international law of war. *See, e.g.*, Findings Worksheet 2 (Bahlul convicted of conspiring to "murder . . . protected persons"); Rome Statute of the International Criminal Court, art. 8, July 17, 1998, 2187 U.N.T.S. 90 (murder of civilians constitutes international war crime). Nor is the conspiracy provision of the 2006 MCA sweeping in scope.

Bahlul makes no attempt to distinguish *Comstock*, arguing instead that *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955), forecloses application of the Necessary and Proper Clause. But *Toth*, a case involving the court-martial trial of an Army veteran who had been honorably discharged, *id*. at 13, is beyond inapposite. In *Toth*, the Supreme Court rejected an attempt to use the Necessary and Proper Clause to supplement the Congress's power "[t]o make Rules for the Government and Regulation of the land and naval Forces." *Id*. at 14 (quoting U.S. CONST. art. I, § 8, cl. 14). The Court declared that the Make Rules Clause "authorizes Congress to subject persons *actually in the armed service* to trial by court-martial for military and naval offenses." *Id.* (emphasis added). It gave two reasons that the Congress had exceeded its Article I authority by trying Toth, by then a civilian, via court-martial: (1) the Necessary and Proper Clause did not empower the Congress "to deprive people of trials under Bill of Rights safeguards"; and (2) it was "impossible to think that the discipline of the Army [was] going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving exservicemen the benefit of a civilian court trial when they [were] actually civilians." *Id.* at 22.

Neither of these concerns exists here. There is no risk that a countervailing constitutional right supersedes the Necessary and Proper Clause because Bahlul—an alien enemy combatant outside the sovereign United States—is not protected by the Bill of Rights. *See infra* Part II.B.2. In addition, the Supreme Court's holding that Toth could not be tried by court-martial was, by necessary implication, a determination that the trial of a citizen by court-martial was not "rationally related" to the Congress's authority under the

Make Rules Clause. *Comstock*, 560 U.S. at 134.[18] The Army would gain nothing in discipline or morale by court-martialing an individual who was no longer a service member. *See Toth*, 350 U.S. at 22. As just discussed, *supra* pp. 50–51, the Congress's inclusion of conspiracy to commit war crimes as an offense triable by military commission *is* rationally related to its unquestioned authority to make war crimes themselves triable by military commission. And trying conspiracy by military commission is not *inconsistent* with international law. *Cf. M'Culloch*, 17 U.S. at 421. Conspiracy to commit war crimes is not a purely "*domestic*" offense, Maj. Op. 15, but instead is in accord with the international community's agreement that those who conspire to commit war crimes can be punished as war criminals. *See supra* Part II.A.1.

To the extent there is any doubt that the Congress has the power to "define" conspiracy as a war crime and "punish" it by military commission, the Necessary and Proper Clause is more than sufficient to remove it.

### 3. Broader War Powers

"[O]ut of seventeen specific paragraphs of congressional power, eight of them are devoted in whole or in part to specification of powers connected with warfare." *Johnson v. Eisentrager*, 339 U.S. 763, 788 (1950). Specifically, the Congress has the power:

---

[18] My colleagues' reliance on *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960), and *Reid v. Covert*, 354 U.S. 1 (1957) (plurality), suffers from the same deficiency as Bahlul's reliance on *Toth*. The only difference is that in *Singleton* and *Reid*, the subjects of the attempted courts martial were the civilian spouses of service members, not ex-servicemen. *See Singleton*, 361 U.S. at 235; *Reid*, 354 U.S. at 3.

- "[T]o . . . provide for the common Defence and general Welfare of the United States," U.S. CONST. art. I, § 8, cl. 1;

- "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," *id.* cl. 10;

- "To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," *id.* cl. 11;

- "To raise and support Armies," *id.* cl. 12;

- "To provide and maintain a Navy," *id.* cl. 13;

- "To make Rules for the Government and Regulation of the land and naval Forces," *id.* cl. 14;

- "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," *id.* cl. 15; and

- "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress," *id.* cl. 16.

Supreme Court precedent, Colonel Winthrop's influential treatise and our constitutional history all support the proposition that the Congress's authority to specify law-of-war offenses triable by military commission is also supported by its broader war powers.

### a. Supreme Court Precedent

The Supreme Court has recognized the breadth of the Congress's war powers, both individually and in combination. *See, e.g.*, *Rostker*, 453 U.S. at 65 ("The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping."); *Wayte v. United States*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning. Recognizing this fact, the Framers listed 'provid[ing] for the common defence' [in the Preamble] as a motivating purpose for the Constitution . . . ."). The Congress's war powers include the creation and use of military commissions. "Since our nation's earliest days, such commissions," also called "our commonlaw war courts," "have been constitutionally recognized agencies for meeting many urgent governmental responsibilities related to war." *Madsen*, 343 U.S. at 346–47. Historically, "their procedure" and "their *jurisdiction*" have been "adapted in each instance to the need that called [them] forth." *Id.* at 347–48 (citing *Yamashita*, 327 U.S. at 18–23 (emphasis added)).

The Supreme Court has never expressly held that the Congress's power to provide for law-of-war military commissions stems from the Define and Punish Clause alone. Instead, its limited jurisprudence indicates that the *combined* effect of the Congress's war powers allows for military-commission trials as their need arises. A century before *Madsen*, four Justices opined that "the power of Congress . . . to authorize trials for crimes against the security and safety of the national forces, may be derived from its constitutional authority to raise and support armies and to declare war." *Ex parte Milligan*, 71 U.S. 2, 142 (1866) (Chase, C.J., concurring in judgment).

Moreover, nothing in *Quirin* suggests that the Supreme Court intended to limit the Congress's war powers to the Define and Punish Clause in setting the jurisdiction of military commissions. In fact, the *Quirin* Court took pains to emphasize that "[w]e have no occasion now to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war." 317 U.S. at 45–46. *Quirin* held only, on the facts of that case, that the Congress's power under the Define and Punish Clause provided *sufficient* authority to support the charges made against the Nazi saboteurs. *See id.* at 46 ("We hold *only* that those particular acts constitute an offense against the law of war which the Constitution authorizes to be tried by military commission." (emphasis added)). *Quirin* did not purport to read out the Congress's other war powers; in fact, it expressly recognized and listed them. *See id.* at 26. The *Quirin* Court also observed, consistent with Chief Justice Chase's words nearly a century earlier, *Milligan*, 71 U.S. at 142 (Chase, C.J., concurring in judgment), that "[a]n important incident to the *conduct of war* is the adoption of measures by the military command . . . to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war." *Quirin*, 317 U.S. at 28–29 (emphasis added).

To the extent *Quirin*'s scope may be debatable, the *Yamashita* Court made plain that *Quirin* does not limit the Congress's power to codify law-of-war offenses to the Define and Punish Clause. Although it recognized *Quirin*'s holding that the Define and Punish Clause provided the Congress with sufficient power to authorize the trial of the Nazi saboteurs by military commission, *Yamashita*, 327 U.S. at 7, the *Yamashita* Court reiterated that military-commission trials are "[a]n important incident to the *conduct of war*." *Id.* at 11 (citing *Quirin*, 317 U.S. at 28). The Court continued:

> The trial and punishment of enemy combatants who have committed violations of the law of war is thus not only a part of the conduct of war operating as a preventive measure against such violations, but is an exercise of the authority sanctioned by Congress to administer the system of military justice recognized by the law of war. That sanction is *without qualification* as to the exercise of this authority *so long as a state of war exists*—from its declaration until peace is proclaimed. *The war power*, from which the commission derives its existence, is not limited to victories in the field, but carries with it the inherent power to guard against the immediate renewal of the conflict, and to *remedy*, at least in ways Congress has recognized, the evils which the military operations have produced.

*Id.* at 11–12 (emphases added) (citations omitted); *see also Toth*, 350 U.S. at 13–14 & n.4 (describing *Yamashita* as holding about Congress's war powers); Howard S. Fredman, Comment, *The Offenses Clause: Congress' International Penal Power*, 8 COLUM. J. TRANSNAT'L L. 279, 303 (1969) (*Yamashita* "put the military prosecution of war criminals squarely within the war powers of Congress").

*Yamashita*'s words are not mere rhetoric. To determine whether Yamashita had committed a war crime triable by military commission, the Supreme Court looked not only to international sources but also to the practice of "our *own* military tribunals" to conclude that Yamashita's dereliction could be "*penalized*" as a violation of the law of war. *Yamashita*, 327 U.S. at 16 (emphases added). In other words, the *Yamashita* Court cited domestic law to *supplement*, not merely "limit[]," the law of war. *Cf.* Maj. Op. 12. Justice Murphy, in dissent, likewise examined whether "the laws of

war heretofore *recognized by this nation* . . . impute[d] responsibility to a fallen commander for excesses committed by his disorganized troops while under attack." *Yamashita*, 327 U.S. at 37 (Murphy, J., dissenting) (emphasis added). Thus, both the *Yamashita* majority and dissent agreed that, in the *absence* of international agreement that an offense constituted a violation of the law of war, "the principal offenses under the laws of war *recognized by the United States*" could also constitute cognizable war crimes triable by military tribunal. *Id.* (emphasis added).

The shift from *Quirin*'s reliance on the Define and Punish Clause to *Yamashita*'s recognition that military-commission jurisdiction of law-of-war offenses—including law-of-war offenses denominated as such by the Congress—derives from the broader war powers occurred in just four years, from 1942 to 1946. And it was that shift that led, six years later, to the Supreme Court's conclusion that the "jurisdiction" of military commissions had traditionally been, and should be, "adapted in each instance to the need that called it forth." *Madsen*, 343 U.S. at 347–48 (citing *Yamashita*, 327 U.S. at 18–23). There can be no doubt that the war on terror, begun in response to the September 11, 2001 attacks, constitutes the next "need" to which the jurisdiction of law-of-war military tribunals must adapt. *Id.* Recognizing the adaptive nature of the Congress's war powers, the Supreme Court has, in a variety of contexts, referred to the broad war powers of both political branches in conducting this ever-evolving war.[19]

---

[19] *See, e.g.*, *Hamdan*, 548 U.S. at 591 (listing broader war powers); *Hamdi*, 542 U.S. at 518 (plurality) ("The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important incident[s] of war.' " (quoting *Quirin*, 317 U.S. at 28, 30)); *accord id.* at 579 (Thomas, J.,

59

I believe my colleagues have incautiously interfered with the reasoned decisions of the political branches based solely on *Quirin*, a case in which the Supreme Court affirmatively failed to draw the line they today draw. *See* 317 U.S. at 45–46. Because they apparently see *Quirin* as the alpha and omega of the Congress's Article I war powers, they conclude that Bahlul's conspiracy conviction cannot stand. But *Yamashita* belies their conclusion that *Quirin* set the "contours" of law-of-war jurisdiction, Maj. Op. 11, that those contours are defined exclusively by express international agreement, Maj. Op. 15–16, and that "[t]he Supreme Court has adhered to *Quirin*'s understanding of the meaning of the 'law of war' for over seventy years." Maj. Op. 13.

### b. *Winthrop's Treatise*

As discussed, neither the plain text of the Congress's Article I war powers nor Supreme Court precedent examining the contours of law-of-war military-commission jurisdiction supports the "clear conviction" needed to invalidate Bahlul's conspiracy charge. *Quirin*, 317 U.S. at 25. Secondary authority also weighs against him. Almost one hundred years ago, Colonel William Winthrop, considered the "Blackstone

---

dissenting) ("The Executive Branch, acting pursuant to the powers vested in the President by the Constitution and with explicit congressional approval, has determined that Yaser Hamdi is an enemy combatant and should be detained. This detention falls squarely within the Federal Government's war powers, and we lack the expertise and capacity to second-guess that decision."); *Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring in judgment) ("The decision in *Eisentrager* indicates that there is a realm of political authority over military affairs where the judicial power may not enter. The existence of this realm acknowledges the power of the President as Commander in Chief, and the joint role of the President and the Congress, in the conduct of military affairs.").

of Military Law," *Reid*, 354 U.S. at 19 n.38 (plurality), authored the definitive treatise on these matters.    In his chapter "Authority and Occasion for the Military Commission," Winthrop made plain that, "in general, it is those provisions of the Constitution which empower Congress to 'declare war' and 'raise armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which th[e military] tribunal derives its original sanction." WILLIAM WINTHROP, MILITARY LAW & PRECEDENTS 831 (1920) (emphasis in original).    According to Winthrop, a military tribunal "is simply an instrumentality for the more efficient execution of the *war powers vested in Congress* and the power vested in the President as Commander-in-chief in war." *Id.* (emphasis added).

Notwithstanding his reference to the "Law of War" as "intended [to refer to] that branch of International Law which prescribes the rights and obligations of belligerents," he further observed that the "Law of War *in this country* is not a formal written code, but consists mainly of general rules derived from International Law, *supplemented* by acts and orders of the military power and a few *legislative provisions*." *Id.* at 773 (first emphasis in original). Winthrop, it appears, had no issue with Congressional "supplementation" of law-of-war offenses proscribed by international agreement.    In his treatise, Winthrop listed[20] the "offences in violation of the

---

[20]   WINTHROP, *supra*, at 839–40:

> [B]reaches of the law of non-intercourse with the enemy, such as running or attempting to run a blockade; unauthorized contracting, trading or dealing with, enemies, or furnishing them with money, arms, provisions, medicines, &c.; conveying to or from them dispatches, letters, or other communications, passing the lines for any purpose without a permit, or coming

laws and usages of war" and described them as "those principally, in the experience of *our wars*," that have been "cognizable by military tribunals." WINTHROP, *supra*, at 839 (emphasis added). The most natural reading of Winthrop's expertise—a reading also consistent with Article I's multiple war powers and the Supreme Court's analyses in both *Yamashita*, 327 U.S. at 11–12, and *Madsen*, 343 U.S. at 346–48—is that the Define and Punish Clause is *one* grant of power to the Congress to determine the law-of-war offenses triable by military commission but it is not the *exclusive* one.

---

back after being sent through the lines and ordered not to return; aiding the enemy by harboring his spies, emissaries, &c.; assisting his people or friends to cross the lines into his country, acting as guide to his troops; aiding the escape of his soldiers held as prisoners of war, secretly recruiting for his army, negotiating and circulating his currency or securities—as counterfeit notes or bonds in the late war, hostile or disloyal acts, or publications or declarations calculated to excite opposition to the federal government or sympathy with the enemy, &c.; engaging in illegal warfare as a guerilla, or by the deliberate burning, or other destruction of boats, trains, bridges, buildings, &c.; acting as a spy, taking life or obtaining any advantage by means of treachery; abuse or violation of a flag of truce; violation of a parole or of an oath of allegiance or amnesty; breach of bond given for loyal behavior, good conduct, &c.; resistance to the constituted military authority, bribing or attempting to bribe officers or soldiers or the constituted civil officials; kidnapping or returning persons to slavery in disregard of the President's proclamation of freedom to the slaves, of January 1, 1863.

Elsewhere, Winthrop included conspiracy among these offenses. *See id.* at 842 ("[c]onspiracy" is "both a crime against society and a violation of the laws of war"); WILLIAM WINTHROP, A DIGEST OF OPINIONS OF THE JUDGE ADVOCATE GENERAL OF THE ARMY 328–29 (1880) ("[c]onspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy" is an "offence[] against the laws and usages of war").

### c.  Historical Practice

My colleagues note that our nation lacks "a long-standing historical practice" of conspiracy trial and conviction by military commission, dismissing it as "thin . . . and equivocal at best."  Maj. Op. 18.  There is no dispute that the "military commission . . . was born of military necessity."  *Hamdan*, 548 U.S. at 590.  Fortuitously, military necessity has occurred only sporadically since the creation of the military commission.  But what history exists demonstrates that, each time military necessity has resulted in subjecting war criminals to military court jurisdiction, conspiracy has been among the charges tried.

The majority takes issue with the example of the Lincoln conspirators, *see* WILLIAM H. REHNQUIST, ALL THE LAWS BUT ONE: CIVIL LIBERTIES IN WARTIME 144 (1998) ("Edwin Stanton personally directed the investigation of Lincoln's assassination and the pursuit of the conspirators."); *id.* at 145 ("The administration . . . decided to try the alleged conspirators before a military commission rather than in the civil courts."), concluding that the charging document "referred to conspiracy" but did not in fact *charge* conspiracy.  Maj. Op. 18.  According to the charging document, however, the Lincoln conspirators were charged with "*combining, confederating, and conspiring together* . . . to kill and murder . . . Abraham Lincoln."  J. HOLT & T. EWING, CHARGE AND SPECIFICATION AGAINST DAVID E. HEROLD, *ET AL.* (1865) (emphasis added); *see also* REHNQUIST, *supra*, at 143 ("Obviously, Booth had not acted alone in this enterprise, and the stage was now set for the trial of those who were charged with *having conspired* with him." (emphasis added)).  The circumstances surrounding the Lincoln assassination also make indisputable that the defendants could *only* have been charged with conspiracy.  Because John Wilkes Booth was

the lone assassin and was himself killed while a fugitive, the remaining eight necessarily could have been tried and convicted based solely on their conspiracy. One of those eight individuals—Mary Surratt, who was hanged for her role—participated in the conspiracy by allowing the others to use her boarding house as a meeting place. *See* REHNQUIST, *supra*, at 165. And two other Lincoln conspirators—Michael O'Laughlin and Samuel Arnold—could have been convicted only of *inchoate* conspiracy because, "[b]efore the final plot to assassinate Lincoln was hatched, O'Laughlin and Arnold appear to have abandoned the enterprise." *Id.* at 162. Indeed, Arnold had apparently "told the others he wanted nothing more to do with the affair" one month before the assassination and, when Arnold withdrew, the remaining conspirators planned to kidnap—not assassinate—Lincoln. *Id.* at 160. Nevertheless, both O'Laughlin and Arnold were convicted and sentenced to life imprisonment at the conclusion of their military-commission trial. *See id.* at 162. Today, their withdrawal would have immunized them from the "postwithdrawal acts of [their] co-conspirators," *Smith v. United States*, 133 S. Ct. 714, 719 (2013), and they would not have been convicted of a completed offense. But abandonment without also preventing the object offense is not a defense to *inchoate* conspiracy. *See* MODEL PENAL CODE § 5.03(6).

My colleagues respond by describing the military commission that tried the Lincoln conspirators as "a mixed martial law and law of war military commission." Maj. Op. 19. Its description, however, does not withstand scrutiny. True, at the time of the Lincoln conspirators' trial, Washington, D.C., was under limited martial law. Nevertheless, the civilian courts remained open and operational. 11 U.S. Op. Atty. Gen. at 297 ("Martial law had been declared in the District of Columbia, but the civil courts

were open and held their regular sessions, and transacted business as in times of peace."). But because the military cannot exercise martial-law jurisdiction unless civilian courts are closed, *Milligan*, 71 U.S. at 127, the Lincoln conspirators' military court necessarily was purely a military commission with law-of-war (including conspiracy) jurisdiction. *See also Hamdan*, 548 U.S. at 597 (plurality) (noting that military courts have at times "*substituted* for civilian courts at times and in places where martial law has been declared" (emphasis added)).[21] My colleagues, then, would retroactively undermine the constitutionality of at least two of the Lincoln conspirators' convictions. *Contra Bahlul*, 767 F.3d at 25 ("the Lincoln conspirators' trial [i]s a particularly significant precedent" because it "was a matter of paramount national importance and attracted intense public scrutiny").

My colleagues' attempt to distinguish Bahlul from the Nazi saboteurs in *Quirin* fares no better. *Quirin* marked the first time in our nation's history that the Supreme Court addressed the jurisdiction of a law-of-war military

---

[21] My colleagues object to my reliance on *Milligan*, having been decided *after* the military-commission trial of the Lincoln conspirators. *See* Maj. Op. 19. Three Lincoln conspirators petitioned for a writ of habeas corpus in 1868, however, relying on *Milligan* to argue that "military tribunals have no authority to try civil offenses in districts where the regularly organized civil courts of the country are in undisturbed possession of all their powers." *Ex parte Mudd*, 17 F. Cas. 954, 954 (S.D. Fla. 1868). The district court dismissed the petition, *Milligan* notwithstanding. *See id.* ("I do not think that *ex parte Milligan* is a case in point here."). Regardless whether the courts were open, the conspirators' offense "transgressed the laws of war" and, thus, "the proper tribunal for the trial of those engaged in it was a military one." *Id.*; *see also id.* (describing "charge on which" Lincoln conspirators were convicted as "conspiracy to commit the military crime which one of their number did commit and some of them . . . more or less" participated in).

commission.  *See* Haridimos V. Thravalos, *History,* Hamdan*, and Happenstance: "Conspiracy by Two or More to Violate the Laws of War by Destroying Life or Property in Aid of the Enemy"*, 3 HARV. NAT'L SEC. J. 223, 277 (2012) (referring to *Quirin* as "the first time in civil litigation" that "the Court explicitly recognized the existence of law-of-war jurisdiction enforceable through criminal proceedings conducted by pure law-of-war military commissions, a source of jurisdiction that had long been recognized by the practice of our own military authorities" (quotation marks omitted)).  Before *Quirin*, the Executive Branch had provided most of the legal authority prescribing offenses cognizable as law-of-war offenses.  *See id.* at 240–41.  Although the Supreme Court did not reach the conspiracy charge in *Quirin*, the petitioners' conspiracy convictions secured the imprimatur of President Roosevelt.  Because the President heads "a coequal branch of government" and "take[s] the same oath we do to uphold the Constitution of the United States," his judgment is entitled to deference.  *Rostker*, 453 U.S. at 64; *see also United States v. Nixon*, 418 U.S. 683, 703 (1974) ("In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.").

My colleagues also distinguish the conspiracy charges in *Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956).  *See* Maj. Op. 20.  The *Colepaugh* petitioners, described as the "1944 Nazi Saboteurs," were charged with nearly identical offenses to those of the *Quirin* petitioners, including conspiracy.  *See Colepaugh*, 235 F.2d at 431; Thravalos, *supra*, at 241.  As with the *Quirin* saboteurs, the *Colepaugh* petitioners' convictions arrived at the court with the Executive Branch's full sanction.  In fact, their convictions were deemed lawful by (1) a special Board of Review in the Office of the

Judge Advocate General of the Army, (2) the Judge Advocate General himself and (3) President Harry Truman, who "personally approved" their convictions. Thravalos, *supra*, at 241–42. The Tenth Circuit in *Colepaugh* affirmed "the *charges* and specifications before us." 235 F.2d at 432 (emphasis added). My colleagues read *Colepaugh* as affirming *only* "the law of war acts of belligerency," and not "addressing the conspiracy charge." Maj. Op. 20. But the Tenth Circuit put no such limitation on its holding. And even if it had, "[t]he U.S. Army continued to follow" *Colepaugh* "to try conspiracy in overseas theaters of war during the concluding months of World War II"[22] and to authorize trial of conspiracy by military commission during the Korean War.[23] Thravalos, *supra*, at 242–43.

Rather than meet this—to me—robust history, my colleagues instead take issue with the Government's (admittedly) paltry submission. *See* Maj. Op. 16–21. But we are "called upon to judge the constitutionality of an Act of Congress—'the gravest and most delicate duty that this Court is called upon to perform,'" *Rostker*, 453 U.S. at 64 (quoting

---

[22] *See* United States Army Forces, Pacific, *Regulations Governing the Trial of War Criminals* (Sept. 24, 1945) (making "participation in a common plan or conspiracy" punishable by military commission in Pacific Theater of Operations during World War II); United States Army Forces, China, *Regulations Governing the Trial of War Criminals* (Jan. 21, 1946) (same for China theater of operations).

[23] *See* U.N. COMMAND, RULES OF CRIMINAL PROCEDURE FOR MILITARY COMMISSIONS OF THE UNITED NATIONS COMMAND at Rule 4 (Oct. 22, 1950) (making "all attempts to commit, or conspiracies and agreements to commit, as well as inciting, encouraging, aiding, abetting, or permitting violations of the laws and customs of war" committed during Korean War punishable by U.N. military commission); Gen. Douglas MacArthur, Letter Order, Gen. HQ, U.N. Command, Tokyo, Japan, *Trial of Accused War Criminals* (Oct. 28, 1950) (adopting Rule 4).

*Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.)), and I, accordingly, take issue with—and indeed reject—my colleagues' languid dismissal of the Government's submission without more.

In sum, I would hold that Bahlul has not carried his burden of establishing—"clear[ly]" or otherwise—that his military trial and conviction are unconstitutional. *Quirin*, 317 U.S. at 25. The Congress has ample authority under the Define and Punish Clause—especially when supplemented by the Necessary and Proper Clause and the broader war powers and supported by judicial precedent, Winthrop's treatise and history—to authorize a military-commission trial charging conspiracy to commit war crimes.

Before moving to Article III, one final point is in order. Both of my colleagues contend that, unless we stringently police the Congress's Article I powers, the Government will possess "virtually unlimited authority" to try enemy combatants by military commission. Concur. Op. 8; *see also* Maj. Op. 26–27. Yet, when it comes to issues of national security and foreign affairs, abstention—not aggressive policing—has always been our watchword. *See Egan*, 484 U.S. at 530; *Latif*, 677 F.3d at 1182. In addition, several limitations on military commissions remain, including the other jurisdictional requirements identified by Winthrop, *see Hamdan*, 548 U.S. at 597–98 (plurality) (citing WINTHROP, *supra*, at 836–39); the Bill of Rights (for U.S. citizens); and—at the very least—the existence of an ongoing *war*, *see Yamashita*, 327 U.S. at 11–13. This last requirement should not be minimized. We would be wise to remember that, in a democracy like ours, not every question calls for a *judicial* answer. *See Mo., K. & T. Ry. Co. of Tex. v. May*, 194 U.S. 267, 270 (1904) ("[I]t must be remembered that legislatures are ultimate guardians of the liberties and welfare of the

people in quite as great a degree as the courts."); *Al-Bihani v. Obama*, 619 F.3d 1, 11–12 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing *en banc*) (discussing potential "serious consequences, such as subjecting the United States to sanctions, undermining U.S. standing in the world community, or encouraging retaliation against U.S. personnel abroad" should political branches "ignore or disregard international-law norms" but nonetheless maintaining that "in our constitutional system of separated powers, it is for Congress and the President—not the courts—to determine in the first instance whether and how the United States will meet its international obligations").

## B. ARTICLE III

The heart of Bahlul's appeal is his claim that the Congress violated Article III when it made conspiracy triable by military commission. In my view, Bahlul invokes two separate provisions of Article III: the Judicial Power Clause, U.S. CONST. art. III, § 1, and the Criminal Jury Clause, *id.* § 2, cl. 3. I analyze both arguments below.

### 1. Judicial Power Clause

The Judicial Power Clause of Article III provides:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. . . .

U.S. CONST. art. III, § 1. The Clause mirrors similar grants of power to the Congress in Article I and to the President in Article II. *See id.* art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress . . . ."); *id.* art. II, § 1, cl. 1 ("The executive Power shall be vested in a President . . . .").

Together, the Vesting Clauses erect "walls" that separate the three branches, *Plaut*, 514 U.S. at 239, and prevent them from "shar[ing]" their respective powers, *Nixon*, 418 U.S. at 704. The walls, however, are not "hermetically sealed," *Stern*, 131 S. Ct. at 2609, and they must bend a little to ensure we remain "a Nation capable of governing itself effectively," *Buckley v. Valeo*, 424 U.S. 1, 121 (1976). *See also Mistretta v. United States*, 488 U.S. 361, 381 (1989) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)); *Mo., K. & T. Ry*, 194 U.S. at 270 ("Some play must be allowed for the joints of the machine . . . .").

Section 1 of Article III vests the "judicial Power" in the federal courts, whose judges enjoy life tenure and fixed salaries. *See* U.S. CONST. art. III, § 1. The "judicial Power," as relevant here, extends to "Cases . . . arising under . . . the Laws of the United States." *Id*. § 2, cl. 1. Axiomatically, these provisions require Article III cases to be adjudicated by Article III judges in Article III courts. *See Stern*, 131 S. Ct. at 2608–09. And they restrain the Congress's authority to assign the judicial power to federal tribunals lacking the insulating protections of Article III. *See id.*

Despite this analytic simplicity, however, "the literal command of Art. III . . . must be interpreted in light of the historical context in which the Constitution was written, and of the structural imperatives of the Constitution as a whole." *N. Pipeline*, 458 U.S. at 64 (plurality); *see also id.* at 94 (White, J., dissenting) ("[A]t this point in the history of constitutional law th[e Article III] question can no longer be answered by looking only to the constitutional text."). The Supreme Court has recognized several historical—albeit

atextual—"exception[s]" to the Judicial Power Clause. *See id.* at 63–76 (plurality). The deviations are justified by longstanding historical practice and "exceptional constitutional grants of power to Congress" over particular subject matters. *Id.* at 70 & n.25.

The military commission is one such exception. *See Eisentrager*, 339 U.S. at 785–90; *Quirin*, 317 U.S. at 39–41; *Ex parte Vallandigham*, 68 U.S. 243, 251–53 (1863). Like courts martial and occupational courts, the constitutionality of the law-of-war military commission is "well-established." *Eisentrager*, 339 U.S. at 786. Military tribunals predate the ratification of our Constitution and were used—without constitutional incident—during the Revolutionary, Mexican–American and Civil Wars. *See Madsen*, 343 U.S. at 346 & nn.8–9; *Quirin*, 317 U.S. at 31 & nn.9–10. Moreover, the Constitution vests broad war powers in the Congress, *Eisentrager*, 339 U.S. at 788, and military-commission trials are part of waging war. *See Yamashita*, 327 U.S. at 11–12. Accordingly, placing the military commission outside the confines of Article III is "consistent with, rather than threatening to, the constitutional mandate of separation of powers." *N. Pipeline*, 458 U.S. at 64 (plurality); *see also Maqaleh v. Hagel*, 738 F.3d 312, 334 (D.C. Cir. 2013) ("The prosecution of our wars is committed uniquely to the political branches . . . .").

As discussed earlier, *supra* Part II.A, the Congress acted well within its Article I powers when it made conspiracy triable by military commission. The challenged provision therefore falls within a historical exception to the Judicial Power Clause. The Supreme Court said it well more than 150 years ago:

> Congress has the power to provide for the trial and punishment of military and naval offences in the manner then and now practiced by civilized nations; and . . . the power to do so is given *without any connection* between it and the 3d article of the Constitution defining the judicial power of the United States; indeed, . . . the two powers are *entirely independent* of each other.

*Dynes v. Hoover*, 61 U.S. 65, 79 (1857) (emphases added). For this reason alone, Bahlul's Article III challenge should fail.

My colleagues suggest that, because inchoate conspiracy is not an expressly recognized international law-of-war offense, the challenged provision falls outside the historical safe harbor for military-commission jurisdiction and therefore violates Article III. *See* Maj. Op. 30–32; Concur. Op. 3. But this syllogism is faulty, even under their crabbed view of the Congress's Article I authority. A statute does not *automatically* violate the Judicial Power Clause simply because it falls outside a historical exception to Article III. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985) ("[P]ractical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III."); *Schor*, 478 U.S. at 851 ("Although [formalistic and unbending] rules might lend a greater degree of coherence to this area of the law, they might also unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers."). Instead, we apply the general standard for Judicial Power Clause challenges: the *Schor* balancing test. *See Schor*, 478 U.S. at 851 (announcing "practical" test for courts to apply "in reviewing Article III challenges"). Criminal cases are not exempt from this framework. *See United States v. Seals*, 130

F.3d 451, 459 n.8 (D.C. Cir. 1997) ("While *Schor* addressed . . . a state-law counterclaim in an administrative reparation proceeding, there is no reason that the structural constitutional analysis should be any different in the criminal context." (citing *Mistretta*, 488 U.S. at 382–83)).   And they do not enjoy any special significance under Article III.   As the Supreme Court has explained:

> It was neither the legislative nor judicial view . . . that trial and decision of all federal questions were reserved for Art. III judges.  Nor, more particularly has the enforcement of federal criminal law been deemed the exclusive province of federal Art. III courts.  Very early in our history, Congress left the enforcement of selected federal criminal laws to state courts and to state court judges who did not enjoy the protections prescribed for federal judges in Art. III.

*Palmore v. United States*, 411 U.S. 389, 402 (1973); *see also id.* at 407 ("neither this Court nor Congress has read the Constitution as requiring . . . every criminal prosecution for violating an Act of Congress[] to be tried in an Art. III court").

The Supreme Court's decision in *Stern v. Marshall* does not alter the analysis.  There, the Supreme Court held that the Congress could not constitutionally authorize the bankruptcy courts to hear a debtor's compulsory state-law counterclaim. *See* 131 S. Ct. at 2620.  The *Stern* Court emphasized that its holding was "narrow" and "isolated."  *Id.*; *see also Sharif*, No. 13-935, slip op. at 16 ("An expansive reading of *Stern* . . . would be inconsistent with the opinion's own description of its holding.").   Its decision followed quite naturally from *Northern Pipeline*—another bankruptcy case.  *See* 131 S. Ct. at 2615 ("*Northern Pipeline* . . . directly covers this case.").

Despite the dissent's concern that the majority had not faithfully applied the balancing approach from earlier cases, including *Schor*, *see Stern*, 131 S. Ct. at 2622 (Breyer, J., dissenting), the *Stern* Court did not overrule, or even call into question, those precedents. *See id.* at 2615. In fact, the Court faithfully applied *Schor*'s multi-factor balancing approach. *See id.* at 2614–19; *see also id.* at 2621 (Scalia, J., concurring) ("I count at least seven different reasons given in the Court's opinion for concluding that an Article III judge was required to adjudicate this lawsuit."). Indeed, *Sharif*—the Supreme Court's latest pronouncement on the Judicial Power Clause— confirmed that the *Schor* balancing test remains the correct one. *See Sharif*, No. 13-935, slip op. at 12–15.

My colleagues suggest, however, that the proper allocation of power between the Congress and the Judiciary turns on the latter's interpretation of *international law*. *See* Maj. Op. 11–15; Concur. Op. 3–7. This approach is troubling enough under Article I; but the notion that international law dictates the operation of the separation of powers under *our* Constitution is outlandish. Indeed, the notion "runs counter to the democratic accountability and federal structure envisioned by our Constitution." Hon. J. Harvie Wilkinson III, *The Use of International Law in Judicial Decisions*, 27 HARV. J.L. & PUB. POL'Y 423, 429 (2004). Instead, if the challenged provision falls outside a historical exception to Article III, we must still assess it under *Schor*. *Schor*'s balancing test is the only one that considers factors that are *relevant* to the separation-of-powers concerns underlying the Judicial Power Clause. We should look to separation-of-powers interests to decide separation-of-powers questions.

Applying the *Schor* balancing test here, I believe the challenged provision does not violate the Judicial Power Clause. Granted, on one side of the *Schor* balance, a military

trial for conspiracy implicates "private," as opposed to public, rights. *See* HART & WECHSLER'S THE FEDERAL COURTS & THE FEDERAL SYSTEM 336 (6th ed. 2009) (noting criminal cases are private rights cases under *Schor*). This observation "does not end our inquiry," *Schor*, 478 U.S. at 853, but it means our review must be "searching." *Id*. at 854. Further, military commissions exercise many, but not all, of the "ordinary powers of district courts." *N. Pipeline*, 458 U.S. at 85 (plurality). *But see Sharif*, No. 13-935, slip op. at 11 n.9 (non–Article III tribunal's power to enter final judgment is relevant but not decisive).

It is unclear whether Bahlul "consented" to trial by military commission. Although he resisted being tried at all, he never raised an Article III objection to the military commission. *Compare Sharif*, No. 13-935, slip op. at 19 ("[T]he key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still *voluntarily appeared* to try the case before the non-Article III adjudicator." (emphasis added) (quotation marks omitted)), *with id.* at 17 ("[T]he cases in which this Court has found a violation of a litigant's right to an Article III decisionmaker have involved an *objecting* defendant forced to litigate involuntarily before a non-Article III court." (emphasis added)), *and United States v. Underwood*, 597 F.3d 661, 669–73 (5th Cir. 2010) (in criminal case, failure to raise Article III objection can constitute implied consent). In my view, "consent" from an enemy combatant like Bahlul does not meaningfully tip the scales one way or the other.

On the other side of the balance, several factors indicate that conspiracy to commit war crimes can be constitutionally tried by military commission. First, and most importantly, the

Congress has subjected the military commission to judicial review. The 2009 MCA, like its 2006 predecessor,[24] allows the enemy combatants held at Guantanamo Bay, Cuba, to appeal their convictions to this Court, 10 U.S.C. § 950g, after intermediate review by the CMCR, *id.* § 950f. We then review *de novo* all "matters of law" that an enemy combatant preserves for appeal, *id.* § 950g(d), with the opportunity of certiorari review by the Supreme Court, *id.* § 950g(e). This safeguard "provides for the appropriate exercise of the judicial function in this class of cases" and keeps the military commission within the bounds of law. *Crowell v. Benson*, 285 U.S. 22, 54 (1932). As the Supreme Court has repeatedly recognized, the availability of *de novo* review of questions of law by an Article III court substantially allays any Judicial Power Clause concerns with a given statutory arrangement. *See Schor*, 478 U.S. at 853; *Union Carbide*, 473 U.S. at 592; *Crowell*, 285 U.S. at 54; *see also N. Pipeline*, 458 U.S. at 115 (White, J., dissenting) ("the presence of appellate review by an Art. III court will go a long way toward insuring a proper separation of powers"). Granted, we review the military commission's verdict—*i.e.*, its findings of *fact*—only for "sufficiency of the evidence." 10 U.S.C. § 950g(d). But, contrary to my colleagues' assertion, Maj. Op. 33–34, Article III requires very little—perhaps zero—judicial review of ordinary questions of fact. *See Crowell*, 285 U.S. at 51 ("[I]n [private rights] cases . . ., there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges."); *The Francis Wright*, 105 U.S. 381, 386 (1881)

---

[24] The 2009 MCA, Pub. L. No. 111-84, 123 Stat. 2190, was enacted in October 2009, after Bahlul's military-commission trial but before his appeal to the CMCR. *See United States v. Bahlul*, 820 F. Supp. 2d 1141, 1156–57 (USCMCR 2011).

(Congress has "power to limit the effect of an appeal to a review of the law as applicable to facts finally determined below"). The deferential review provided by the 2009 MCA thus goes beyond the constitutional minimum. *See, e.g.*, *Estep v. United States*, 327 U.S. 114, 122 (1946) (upholding "no basis in fact" standard for jurisdictional facts and zero review for ordinary facts in *criminal* case); *Union Carbide*, 473 U.S. at 592–93 (review for "fraud, misconduct, or misrepresentation" satisfies Article III); *Schor*, 478 U.S. at 853 (review for "weight of the evidence" satisfies Article III); *Crowell*, 285 U.S. at 48 ("not supported by evidence" standard satisfies Article III); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) ("sufficiency of the evidence" standard satisfies due-process requirements for criminal cases).

Second, the military commission has very limited jurisdiction under the 2006 MCA. It "deals only with a particularized area of law"—namely, the law of war. *Schor*, 478 U.S. at 852 (quotation marks omitted). The 2006 MCA enumerates, in total, 30 war crimes, 10 U.S.C. §§ 950r, 950u–950v (2006), and only an "alien unlawful enemy combatant" is subject to military-commission trial, *id.* § 948c. No one disputes that military commissions can—consistent with Article III—adjudicate expressly recognized international law-of-war offenses. An inchoate offense like conspiracy adds only a "narrow class of . . . claims . . . incident to the [military commission's] primary, and unchallenged, adjudicative function." *Sharif*, No. 13-935, slip op. at 13. This is not a case in which the Congress "created a phalanx of non–Article III tribunals equipped to handle the entire business of the Article III courts." *Schor*, 478 U.S. at 855. Nor does the commission possess unbounded jurisdiction "reaching any area of the *corpus juris*." *Stern*, 131 S. Ct. at 2615. Here, "the magnitude of any intrusion on the Judicial

Branch can only be termed *de minimis*." *Schor*, 478 U.S. at 856.

Third, "the concerns that drove Congress to depart from the requirements of Article III" tilt in favor of the challenged provision's constitutionality. *Id*. at 851. The Congress chose the military commission over Article III court for one overriding reason: national security. Among the discussed concerns were the potential disclosure of highly classified information[25]; the efficiency of military-commission proceedings[26]; the military's expertise in matters of national security[27]; the inability to prosecute enemy combatants due to speedy-trial violations[28]; the inadmissibility of certain forms of evidence[29]; and, later, the risk of terrorist attacks on

---

[25] *See, e.g.*, 152 Cong. Rec. S10243 (Sept. 27, 2006) (statement of Sen. Frist); *id*. (statement of Sen. Warner); 152 Cong. Rec. H7522 (Sept. 27, 2006) (statement of Rep. Hunter); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Hunter); 152 Cong. Rec. S10354 (Sept. 28, 2006) (statement of Sen. Bond); *id*. (statement of Sen. McConnell); *id*. (statement of Sen. Frist).

[26] *See, e.g.*, 152 Cong. Rec. H7522 (Sept. 27, 2006) (statement of Rep. Hunter); *id*. (statement of Rep. Sensenbrenner); *id*. (statement of Rep. Cardin); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Hunter); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Sensenbrenner).

[27] *See, e.g.*, 152 Cong. Rec. S10243 (Sept. 27, 2006) (statement of Sen. Graham); *id*. (statement of Sen. Kyl); 152 Cong. Rec. S10354 (Sept. 28, 2006) (statement of Sen. Graham); *id*. (statement of Sen. Cornyn); *id*. (statement of Sen. Sessions).

[28] *See* 10 U.S.C. § 948b(d)(1)(A) (2006) (making "speedy trial" rules inapplicable in military commissions). *See generally* Scott L. Silliman, *Prosecuting Alleged Terrorists by Military Commission: A Prudent Option*, 42 CASE W. RES. J. INT'L L. 289, 294 (2009).

[29] *See, e.g.*, 152 Cong. Rec. S10243 (Sept. 27, 2006) (statement of Sen. Graham); 152 Cong. Rec. H7522 (Sept. 27, 2006) (statement of Rep.

domestic courts.[30] Unlike my concurring colleague, who believes that Article III courts are well-suited to try conspirators like Bahlul, *see* Concur. Op. 8–9, I would defer to the choice made by the Congress—an institution with real-world expertise in this area that has rejected a one-size-fits-all choice of forum. In any event, the Congress's concerns are plainly legitimate; indeed, "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981). And these legitimate interests demonstrate without question that the Congress did not "transfer jurisdiction to [a] non-Article III tribunal[] for the *purpose* of emasculating constitutional courts." *Schor*, 478 U.S. at 850 (emphasis added) (alterations and quotation marks omitted).

Finally, the system that the Congress has established—military-commission proceedings in the Executive Branch, appellate review in the Judicial Branch—"raises no question of the aggrandizement of congressional power at the expense of a coordinate branch." *Schor*, 478 U.S. at 856. As the Supreme Court explained in *Mistretta*, "encroachment and aggrandizement" are the hallmarks of cases in which the Court has invalidated a congressional statute for violating the separation of powers. 488 U.S. at 382. "By the same token," the Supreme Court has "upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or

---

Hunter); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Hunter).

[30] *See, e.g.*, 155 Cong. Rec. S5589 (May 19, 2009) (statement of Sen. McConnell); *id.* (statement of Sen. Johanns); *id.* (statement of Sen. Martinez); 155 Cong. Rec. S5650 (May 20, 2009) (statement of Sen. Thune); 155 Cong. Rec. S7509 (Jul. 15, 2009) (statement of Sen. Inhofe).

encroachment." *Id.* (citing, as examples, *Morrison v. Olson*, 487 U.S. 654 (1988) and *Schor*, 478 U.S. 833). In the 2006 MCA, the Congress has assigned conspiracy to the military for trial and sentencing and to the Judiciary for review "without appreciable expansion of its own power," *Schor*, 478 U.S. at 856–57, and while "retain[ing] for itself no powers of control or supervision," *Morrison*, 487 U.S. at 694. This is not the sort of legislation that raises separation-of-powers hackles.

Notably, the Supreme Court has found a violation of the Judicial Power Clause in only two cases—both involving bankruptcy courts. *See Stern*, 131 S. Ct. at 2620; *Northern Pipeline*, 458 U.S. at 87 (plurality). Outside the bankruptcy context, however, the Court has repeatedly upheld congressional statutes against such attacks. *See, e.g.*, *Mistretta*, 488 U.S. at 393–97 (U.S. Sentencing Commission); *Schor*, 478 U.S. at 851–58 (CFTC); *Union Carbide*, 473 U.S. at 582–93 (mandatory arbitration); *Palmore*, 411 U.S. at 407–10 (District of Columbia courts); *Williams v. United States*, 289 U.S. 553, 568–81 (1933) (Court of Claims); *Crowell*, 285 U.S. at 48–65 (workmen's compensation board); *Ex parte Bakelite Corp.*, 279 U.S. 438, 452–61 (1929) (Court of Customs Appeals); *Dynes*, 61 U.S. at 79 (courts martial); *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 546 (1828) (territorial courts). The bankruptcy cases are an anomaly in this area of the law and I do not believe they provide a relevant analog. Military commissions are a recognized exception to Article III whereas bankruptcy courts are not. *See N. Pipeline*, 458 U.S. at 71 (plurality) (Congress's bankruptcy power is not "exceptional grant of power" subject to Article III exception); *Stern*, 131 S. Ct. at 2614 (bankruptcy courts do not fall under "public rights" exception to Article III). This case, then, is much easier than *Stern* and *Northern Pipeline*: the historical exceptions to Article III are exceptions

not because they are *close* to the constitutional line but because they are far from it. *See Dynes*, 61 U.S. at 79. Historically, courts martial and military commissions are thought to pose no Article III problem, notwithstanding they are subject to little judicial review. *See* 28 U.S.C. § 1259; *Burns v. Wilson*, 346 U.S. 137, 140–41 (1953) (plurality); *Vallandigham*, 68 U.S. at 252–53. The availability of *de novo* appellate review under the 2009 MCA keeps the challenged provision in the constitutional fold, even if, *arguendo*, inchoate conspiracy were to venture beyond the historical Article III exception for military-commission jurisdiction.

For these reasons, I believe the challenged provision satisfies the *Schor* balancing test. Moreover, irrespective of *Schor*, the statute falls comfortably within the Congress's Article I authority and, concomitantly, under the military-commission exception to Article III. Bahlul's Judicial Power Clause challenge therefore fails.

## 2. Criminal Jury Clause

In addition to ensuring the separation of powers, Article III also protects individual rights. The Criminal Jury Clause broadly requires that "[t]he Trial of all Crimes . . . shall be by Jury . . . in the State where the said Crimes shall have been committed" or where the "Congress may by Law have directed." U.S. CONST. art. III, § 2, cl. 3. Like the Sixth Amendment, the Criminal Jury Clause preserves the right to a jury only as it existed at common law. *Quirin*, 317 U.S. at 39 ("[I]t was not the purpose or effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial.").

Bahlul—an enemy combatant tried by military commission—has no right to a jury. At common law, "trial by a jury" was a "familiar part[] of the machinery for criminal

trials in the civil courts." *Id.* But it was "unknown to military tribunals, which are not courts in the sense of the Judiciary Article, and which in the natural course of events are usually called upon to function under conditions precluding resort to such procedures." *Id.* (citations omitted). For example, the Continental Congress passed a resolution ordering the trial of alien spies in military courts without a jury. *See id.* at 41 (citing Resolution of the Continental Congress of Aug. 21, 1776, 5 J. CONT'L CONG. 693). The resolution—a "contemporary construction" of the Constitution "entitled to the greatest respect"—manifests that the Founders did not see juries as a limitation on military-commission trials. *Id.* at 41–42; *see also Kahn v. Anderson*, 255 U.S. 1, 8 (1921) (rejecting idea that military courts must use jury because it would "directly den[y] the existence of a power [that] Congress exerted from the beginning"). Moreover, members of our *own* military are tried by court martial without a jury; thus, the Constitution plainly presents "no greater obstacle" to trying enemy combatants by military commission. *Quirin*, 317 U.S. at 44; *see also Whelchel v. McDonald*, 340 U.S. 122, 127 (1950) ("The right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts-martial or military commissions."); *Sanford v. United States*, 586 F.3d 28, 35 (D.C. Cir. 2009) ("[T]he Sixth Amendment right to a criminal jury trial does not, itself, apply to the military."). As discussed earlier, *supra* Part II.A, the Congress has the Article I authority to require Bahlul to be tried by military commission. He therefore has no right to a jury. *See Quirin*, 317 U.S. at 40 ("[section] 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission"); *id.* at 41 ("trials before military commissions . . . are . . . no[t] within the provisions of Article III, § 2"); *accord Colepaugh*, 235 F.2d at 433 ("*Quirin* . . . removes any doubt of the

inapplicability of the Fifth or Sixth Amendments to trials before military commissions.").

Bahlul contends, however, that the Criminal Jury Clause, like the Judicial Power Clause, is a structural limitation on military-commission jurisdiction. Specifically, he believes—and my colleagues at one point appear to agree, *see* Maj. Op. 14—that a military commission has no jurisdiction of offenses triable by jury at common law. Bahlul is mistaken. The right to a jury is not a "structural" constraint but an individual right that can be both forfeited and waived. *Johnson*, 520 U.S. 461, 465–66 (1997); *see also B&B Hardware*, 135 S. Ct. at 1304 (jury-trial right "does not strip competent tribunals of the power to issue judgments," no matter "the nature of the competent tribunal"); *Gosa v. Mayden*, 413 U.S. 665, 677 (1973) (plurality) (denial of jury-trial right does not deprive military tribunal of jurisdiction or render its judgments void). Even *Schor* recognized this difference:

> [A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried. See, *e.g.*, *Duncan v. Louisiana*, 391 U.S. 145, 158 (1968) (waiver of right to trial by jury in criminal case).

478 U.S. at 848–49 (some citations omitted). The right to a jury—regardless of its location in Article III—is no more a structural limitation on military-commission jurisdiction than are the myriad personal safeguards in the Bill of Rights. *Cf. Seals*, 130 F.3d at 456 n.3 ("constitutional safeguards associated with Article III supervision of federally-indicting grand juries . . . implicate[] personal, not structural, constitutional rights" (citations omitted)).

The Supreme Court's Seventh Amendment jurisprudence makes doubly clear that the right to a jury is not an independent constraint on the Congress's authority to use non–Article III tribunals. In *Granfinanciera*, the petitioners argued that their Seventh Amendment right to a civil jury prevented the Congress from assigning certain claims to the bankruptcy courts. *See* 492 U.S. at 36–37. According to the Court, whether the petitioners had a right to trial by jury "requires the *same answer* as the question whether Article III allows Congress to assign adjudication . . . to a non–Article III tribunal." *Id.* at 53 (emphasis added). In other words, the Judicial Power Clause—not the Seventh Amendment—is the only structural limit on the Congress's authority. "[I]f Congress may assign the adjudication . . . to a non-Article III tribunal, then the Seventh Amendment poses *no independent bar* to the adjudication of that action by a nonjury factfinder." *Id.* at 53–54 (emphasis added). The same is true here. As noted, *supra* Part II.B.1, the Judicial Power Clause allows the Congress to authorize the trial of conspiracy by military commission. Accordingly, Bahlul has no right to a jury and the Criminal Jury Clause poses "no independent bar" to his conviction. *Id.* at 54.[31]

Even if the Criminal Jury Clause did limit military-commission jurisdiction, it has no application here because Bahlul is neither a U.S. citizen nor present on U.S. soil. The Supreme Court has repeatedly held that the Constitution offers no protection to noncitizens outside the United States. *See, e.g.*, *Eisentrager*, 339 U.S. at 784–85; *United States v. Verdugo–Urquidez*, 494 U.S. 259, 273–75 (1990); *Zadvydas*

---

[31] Notably, the *Hamdan* Court cited only the Judicial Power Clause, not the Criminal Jury Clause, as a limitation on the Congress's authority to employ military commissions. *See* 548 U.S. at 591.

*v. Davis*, 533 U.S. 678, 693 (2001); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 597 n.5 (1953); *United States v. Belmont*, 301 U.S. 324, 332 (1937); *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 318 (1936). This limitation on the Constitution's extraterritorial reach encompasses the right to a jury trial in a criminal case. *See, e.g.*, *Eisentrager*, 339 U.S. at 784–85; *Balzac v. Porto Rico*, 258 U.S. 298, 304–05 (1922); *Dorr v. United States*, 195 U.S. 138, 149 (1904); *Territory of Hawaii v. Mankichi*, 190 U.S. 197, 218 (1903). Granted, in *Reid v. Covert*, a plurality of the Supreme Court agreed that the right to a jury extends to U.S. citizens abroad. *See* 354 U.S. at 7. But "[s]ince [Bahlul] is not a United States citizen, he can derive no comfort from the *Reid* holding." *Verdugo-Urquidez*, 494 U.S. at 270. The cases Bahlul relies on to support his jury-right argument suffer from the same fatal flaw: all involved U.S. citizens. *See Reid*, 354 U.S. at 3 (citizen wives of U.S. soldiers); *Toth*, 350 U.S. at 13 (U.S. soldier); *Quirin*, 317 U.S. at 20 (Nazi saboteur with U.S. citizenship through his parents); *Milligan*, 71 U.S. at 107 (U.S. citizen living in Indiana).

In *Boumediene v. Bush*, the Supreme Court held "only" that the Suspension Clause protects enemy combatants held at Guantanamo Bay. 553 U.S. 723, 795 (2008). This Court has declined to extend *Boumediene* beyond its narrow holding. *See Maqaleh*, 738 F.3d at 336 n.16 ("As a novel constitutional development, we are loath to expand *Boumediene*'s reach without specific guidance from the Supreme Court, particularly where expansion would carry us further into the realm of war and foreign policy."); *Kiyemba v. Obama*, 555 F.3d 1022, 1032 (D.C. Cir. 2009) ("*Boumediene* . . . specifically limited its holding to the Suspension Clause"). And we lack the authority to read *Boumediene* as overruling *sub silentio* Supreme Court precedent on the nonavailability of jury rights to noncitizens abroad. *See Rodriguez de Quijas*

*v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Bahlul has no constitutional right to a jury and neither the Criminal Jury Clause nor the Judicial Power Clause of Article III can invalidate his conspiracy conviction.

### C. EQUAL PROTECTION & FIRST AMENDMENT

Bahlul's two remaining challenges are frivolous. He contends that the 2006 MCA violates the equal protection component of the Fifth Amendment Due Process Clause because it applies only to aliens, not U.S. citizens, and that he was convicted because of his speech in violation of the First Amendment. Two of my colleagues have already considered these arguments and rejected them. *See Bahlul*, 767 F.3d at 62 (Brown, J., concurring/dissenting); *id.* at 75–76 (Kavanaugh, J., concurring/dissenting). I fully endorse their reasoning.

For the foregoing reasons, I respectfully dissent.